**NATIONAL WILDLIFE FEDERATION, et al., Appellants,**

**v.**

**Donald P. HODEL, Secretary of the Interior, et al., Appellees.**

Nos. 84–5743, 84–5744, 84–5757, 84–5772 to 84–5774, 84–5788, 84–5912 to 84–5926, 85–5001, 85–5002, 85–5132 to 85–5137, 85–5748, 85–5905, 85–5951 to 85–5953 and 85–5961.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1986 and Jan. 5, 1987.

Decided Jan. 29, 1988.

Warner W. Gardner, Washington, D.C., for Peabody Coal Co., John A. Macleod and Thomas C. Means, Washington, D.C., for National Coal Ass'n/American Mining Congress, et al., with whom James R. Bird, Steven P. Quarles, Peter K. Levine and Thomas Lundquist, Washington, D.C., were on the joint brief for appellants in Nos. 84–5772 to 84–5774, 84–5912 to 84–5925, 85–5951 and 85–5952, and for appellees in No. 84–5744. I. Michael Greenberger also entered an appearance for Peabody Coal Co.

L. Thomas Galloway with whom Norman L. Dean, Jr., Thomas J. Fitzgerald and Glenn P. Sugameli, Washington, D.C., were on the brief for National Wildlife Federa-

tion, et al., appellants in Nos. 84–5743, 84–5744, 85–5001, 85–5002, 85–5748 and 85–5905, and for appellees in Nos. 84–5757, 84–5772 to 84–5774, 84–5788, 85–5132 to 85–5137. Joseph Onek and Peter Huber, Washington, D.C., also entered an appearance for National Wildlife Federation, et al.

Arthur E. Gowran and Alfred T. Ghiorzi, Attys., Dept. of Justice and Stuart A. Sanderson, Atty., Dept. of the Interior, with whom Peter R. Steenland, Jr., and Robert L. Klarquist, Attys., Dept. of Justice, Washington, D.C., were on the joint brief for Donald P. Hodel, Secretary of the Interior, et al., appellants in Nos. 84–5757, 85–5953, 85–5736, 85–5737, and for appellees in Nos. 84–5743, 84–5744, 84–5772 to 84–5774, 84–5783, 84–5912 to 84–5926, 85–5001, 85–5002, 85–5132 to 85–5135, 85–5748, 85–5905, 85–5951 and 85–5952. Harold P. Quinn, Atty., Dept. of the Interior, Washington, D.C., also entered an appearance for Donald P. Hodel, Secretary of the Interior, et al.

Thomas H. Altmeyer, Washington, D.C., was on the brief for Mining and Reclamation Council of America, appellants in Nos. 84–5788, 84–5926, 85–5132 to 85–5135, and 85–5961. James T. Hemphill, Washington, D.C., also entered an appearance for Mining and Reclamation Council of America.

Guy L. Nevill, Houston, Tex., entered an appearance for Dow Chemical, USA.

Before WALD, Chief Judge, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD, Circuit Judge RUTH BADER GINSBURG, and Circuit Judge SILBERMAN.

### TABLE OF CONTENTS

| | Page |
|---|---|
| I. INTRODUCTION | 701 |
| II. STANDING | 703 |
| A. The History of the Standing Issue in this Case | 703 |
| B. A Brief Overview of Standing Doctrine | 703 |
| C. NWF's Standing on Particular Issues | 706 |
| 1. Issues where the Secretary has Eliminated Minimum National Environmental Standards (Four Issues) | 706 |
| 2. Issues where the Challenge to Standing Focuses on the Adequacy of Affidavits (Fourteen Issues) | 709 |
| a. Federal Lands | 711 |
| b. Off-Site Facilities | 712 |
| c. Host Soils | 713 |
| d. Prime Farmland Lakes | 713 |
| e. Support Facilities on Prime Farmland | 714 |
| f. Variances from Original Contours | 714 |
| g. Submerged Highwalls | 715 |
| h. Actual Grazing on Land | 715 |
| D. Conclusion | 716 |
| III. MERITS | 716 |
| A. Prime Farmland and Pastureland Issues | 716 |
| 1. Revegetation Success Standards for Prime Farmland | 716 |
| 2. Revegetation Success Standards for Grazing and Pastureland | 718 |
| 3. Exemptions from Performance Standards for Prime Farmlands | 719 |
| a. Construction of Water Impoundments on Prime Farmland | 719 |
| b. Exemption for Prime Farmland Affected by Coal Preparation Plants, Support Facilities, and Roads | 722 |
| B. Bonding to Assure Reclamation of Land Affected by Mine Operations | 723 |
| 1. Incremental and Phased Bonding | 724 |
| 2. Bonding for Damage Caused by Subsidence of Land Overlying Underground Mines | 726 |
| C. Regulatory Guidance | 729 |
| 1. Alluvial Valley Floors | 729 |
| 2. Mine Waste | 731 |
| 3. Backfilling and Grading | 734 |
| a. Contemporaneous Reclamation | 735 |
| b. Thin and Thick Overburden | 736 |
| c. Terraces | 737 |

| | | Page |
|---|---|---|
| D. | Residual Issues | 739 |
| | 1. Damage Caused by Subsidence of Land Overlying Underground Mines | 739 |
| | 2. Reshaping Cut and Fill Slopes (Roads and Underground Mines) | 741 |
| | 3. Jurisdiction Over Processing and Support Facilities | 742 |
| | 4. Alluvial Valley Floors Performance Standards | 746 |
| | 5. Substantial Legal and Financial Commitment | 747 |
| E. | Residual Issues II | 748 |
| | 1. Continually-Created Valid Existing Rights | 748 |
| | 2. Values Incompatible with Surface Mining | 751 |
| | 3. Replacement of Damaged Water Supplies by Operators of Underground Mines | 753 |
| | a. The Unplain Meaning of Section 717(b) | 753 |
| | b. The "Puzzling Contradiction" of Section 508(a)(13)'s Permitting Requirements | 754 |
| | 4. Exemption from Water Replacement Requirements for Holders of Senior Water Rights | 756 |
| | 5. Cumulative Hydrologic Assessment—What is "Anticipated Mining"? | 757 |
| | 6. Elimination of Underwater Highwalls | 759 |
| | 7. Temporary (but Long-Term) Storage of Top Soil | 760 |
| | 8. Authority to Grant Variance from AOC Requirements | 761 |
| | 9. Jurisdiction Over Non-Erosional Aspects of Air Quality | 764 |
| | 10. Use of Proximity as a Factor in Determining Jurisdiction Over Support Facilities | 765 |
| | 11. Delegability of Secretary's Authority Over Federal Land Mining Permits | 766 |
| IV. | CONCLUSION | 768 |

---

WALD, Chief Judge, GINSBURG, RUTH BADER, Circuit Judge, and SILBERMAN, Circuit Judge:

## I. INTRODUCTION

The Surface Mining Control and Reclamation Act of 1977, Pub.L. No. 95–87, 91 Stat. 445 (codified as amended at 30 U.S.C. §§ 1201 et seq.) ("the Surface Mining Act," "the Act," or "SMCRA"), emerged from prolonged deliberations that reach back to hearings and the introduction of legislation in the 90th Congress.[1] The Act, as finally passed by the 95th Congress, established "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." SMCRA § 102(a). Environmental impacts from surface coal mining (and the surface impacts of underground coal mining operations) are regulated through two basic mechanisms: a permit system (§§ 506–514) and a series of performance standards (§§ 515–516). The Act's permit provisions require that before engaging in a surface coal mining operation, a mine operator must submit detailed information concerning the environmental consequences of the proposed mining operations and include a plan for reclaiming affected lands as required by the Act. Once the mining operation has begun, the mine operator must adhere to the statutory environmental performance standards, many of which relate to the obligation to restore and reclaim affected lands. See SMCRA §§ 515–516.

The Act can be enforced at either the state or federal level. After an interim period of direct federal regulation, states are authorized by the Act to assume a major regulatory role. A state wishing to take on that responsibility must submit a proposed regulatory program to the Secretary of the Interior ("Secretary"), who determines whether the state has the capability to implement SMCRA consistent with federal standards. With the Secretary's approval, the state then assumes primary responsibility for SMCRA enforcement and rulemaking.

The Act has been a fertile source of litigation since its inception. In 1977, nu-

---

1. Prior opinions of this court have discussed the background and general provisions of SMCRA in considerable detail. See In re Permanent Surface Mining Regulation Litigation, 653 F.2d 514 (D.C.Cir.) (en banc), cert. denied, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981) ("PSMRL"); In re Surface Mining Regulation Litigation, 627 F.2d 1346 (D.C.Cir.1980).

merous coal industry and environmental organizations filed suit in the District Court for the District of Columbia, challenging the interim program regulations that went into effect shortly after the Act's passage and continued until the permanent regulatory regime went into effect in 1979 and 1980. The district court consolidated those challenges and ruled on them in two separate opinions. *In re Surface Mining Regulation Litigation,* 452 F.Supp. 327 (D.D.C.1978); *In re Surface Mining Regulation Litigation,* 456 F.Supp. 1301 (D.D.C.1978). This court subsequently affirmed the district court's judgment in part, and reversed in part. *In re Surface Mining Regulation Litigation,* 627 F.2d 1346 (D.C.Cir.1980) ("*SMRL* ").

Buffeted by politics and the courts, the interpretation of SMCRA has been an epic in itself. In 1979 Secretary Andrus promulgated permanent program surface mining regulations which prompted a myriad of legal challenges. In a series of three opinions, the district court decided over 100 issues raised by the various parties. *In re Permanent Surface Mining Regulation Litigation I,* 13 E.R.C. 1586 (D.D.C.1979) (preliminary injunction); *In re Permanent Surface Mining Regulation Litigation I,* 14 E.R.C. 1083 (D.D.C.1979) ("*PSMRL I (Round I)*"); *In re Permanent Surface Mining Regulation Litigation I,* 19 E.R.C. 1477 (D.D.C.1980) ("*PSMRL I (Round II)*"). One aspect of those decisions, a challenge by the coal industry to the Secretary's rulemaking authority to require applicants for a permit to submit additional information not specifically enumerated in the Act, was eventually rejected on appeal by this court. *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d 514 (D.C.Cir.) (en banc), *cert. denied,* 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981) ("*PSMRL I* "). Many other issues on appeal from the district court were over-

taken by events. The presidential election of 1980 resulted in a change in administration mining policy. In 1981, while appeals relating to the 1979 regulations were pending, the new Secretary of the Interior, James Watt, announced his intention to repromulgate the permanent SMCRA program regulations. The entire case was accordingly remanded to the Secretary.

In his reconsideration of the 1979 regulations, Secretary Watt specifically asked commentators to focus on ways to increase the flexibility of federal supervision of state regulatory programs; and more generally, he requested suggestions on how to revise "excessive, burdensome, or counterproductive" regulations. States, citizen groups, and representatives of the coal industry responded with a range of proposals: increase the flexibility of regulations to permit case-by-case implementation, take into account the differences between coal producing regions, eliminate unreasonable difficulties and expense in complying with the regulations, and improve the enforcement program. In 1983, the Secretary announced revised regulations that, *inter alia,* granted both state regulators and coal mine operators greater discretion in complying with the general requirements of the statute. The Secretary also retained many of the 1979 regulations.

Many of the new "flexible" regulations were challenged by the National Wildlife Federation and other environmental groups (collectively referred to as "NWF").[2] Several groups representing the coal industry ("Industry")[3] mainly objected to regulations that had remained unchanged from the 1979 program. In four separate opinions, or "Rounds," the district court addressed the 113 issues presented by these various challenges.[4] Over 30 of those issues are now before us on appeal.

---

**2.** Other environmental groups included Western Organization of Resource Councils, Sierra Club, National Audubon Society, Save Our Cumberland Mountains, Virginia Citizens for Better Reclamation, and Illinois South Project.

**3.** Industry groups included the American Mining Congress, National Coal Association, Peabody Coal Co., Pennsylvania Coal Mining Association, and Mining and Reclamation Council of America.

**4.** *In re Permanent Surface Mining Regulation Litigation II, Round I,* 21 E.R.C. 1193 (D.D.C. 1984) ("*PSMRL II (Round I)* "); *In re Permanent Surface Mining Regulation Litigation II, Round II,* 21 E.R.C. 1724 (D.D.C.1984) ("*PSMRL II (Round II)* "); *In re Permanent Surface Mining*

## II. Standing

At the outset, we confront the challenges posed by Industry to the standing of the National Wildlife Federation, appellants here. For reasons to follow, we conclude that district court Judge Flannery correctly found that NWF has standing to challenge each of the regulations in question. We proceed to discuss the merits of each challenge.

### A. The History of the Standing Issue in This Case

Standing has emerged as a prime issue in this appeal. Industry raised standing objections in the district court, but Judge Flannery initially made no fact findings on the subject. On appeal, however, Industry interposed a broad challenge to NWF's standing, reaching each of the 21 regulations contested by the environmental organizations. Specifically, Industry argued that NWF had failed to allege a constitutionally adequate injury with respect to each regulation. In the case of several regulations, Industry maintained that NWF had failed to demonstrate a sufficiently strong chain of causation between the challenged regulation and the alleged harm.[5]

After oral argument, this court remanded the record to Judge Flannery to make additional fact findings on standing. We instructed the district court to receive affidavits "demonstrating specific injury" to members of the plaintiff environmental organizations. NWF thereupon filed with the district court 70 affidavits, amounting to over 1,600 pages.

On August 10, 1987, Judge Flannery issued a memorandum opinion concluding that NWF's affidavits had alleged sufficiently specific injuries with regard to each regulation challenged by NWF to satisfy Article III of the Constitution. *See In re Permanent Surface Mining Regulation Litigation*, No. 79–1144, mem. op. (D.D.C. Aug. 10, 1987) (hereinafter "Findings on Standing").

In light of the vast expanse of issues before us in this appeal, we pause first to sort out which issues are, and are not, subject to standing challenges. NWF has not contested, nor could it seriously contest, the standing of Industry to challenge those regulations that Industry has assailed. Thus, as to issues on which Industry is pitted against the Secretary, no standing challenge is before this court.

■ Additionally, in the aftermath of Judge Flannery's memorandum opinion on standing, Industry concedes that NWF has standing to challenge three of the 21 regulations NWF has contested. These regulations involve: (1) the replacement of the water supply of property owners whose supply has been damaged by underground coal mining; (2) the measures coal operators must take to control "fugitive dust"; and (3) the requirement that regulatory authorities determine the probable cumulative impact of all anticipated mining prior to its inception. *See* Brief for Industry at 25, 27, 43 (conceding standing on these issues).[6] After studying NWF's affidavits and reviewing Judge Flannery's treatment, *see* Findings on Standing, at 16–17, 19–20, 33–34, with regard to these three issues, we conclude along with Judge Flannery that NWF has satisfied the standing requirements of Article III of the Constitution. We are thus left with challenges to NWF's standing to contest the 18 remaining surface-mining regulations.

### B. A Brief Overview of Standing Doctrine

Standing jurisprudence is a highly case-specific endeavor, turning on the precise

---

Regulation Litigation II, Round III–VER, 22 E.R.C. 1557 (D.D.C.1985) ("*PSMRL II (Round III–VER)*"); *In re Permanent Surface Mining Regulation Litigation II, Round III,* 620 F.Supp. 1519 (D.D.C.1985) ("*PSMRL II (Round III)*").

**5.** The Secretary of the Interior has not contested NWF's standing with respect to any of the regulations at issue in this case.

**6.** These issues correspond to headings 6, 8, and 19, respectively, in the district court's memorandum opinion. *See* Findings on Standing, at 16–17, 19–20, 33–34. Our decisions on the merits on these issues are located at the following places in this opinion: § III–E–3 (water replacement); § III–E–5 (probable impact of anticipated mining); and § III–E–9 (fugitive dust).

allegations of the parties seeking relief. *Compare Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (denying standing to an environmental organization challenging development of a ski resort in a national forest because it failed to identify "specific injury" to members) *with United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (finding pleadings alleged facts which, if true, would establish standing by environmental group to challenge Interstate Commerce Commission's allowance of rail freight increase which identified members whose recreational and aesthetic interests would be allegedly injured because rate increase would lead to heightened use of raw, instead of recycled, scrap metal). Thus, in this case, rather than passing a composite judgment on the standing of NWF with regard to the mass of regulations before us, we evaluate the nature of NWF's objection to each challenged regulation in order to determine whether NWF can contest these measures in court.

We begin our standing inquiry by recalling some principles of special relevance to this case. Standing involves both limitations imposed by the "case or controversy" requirement of Article III of the Constitution and "prudential limits on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974).[7] The Supreme Court has construed the constitutional elements of the standing requirement as embracing three separate, yet necessarily intertwined components: The party invoking the court's authority must demonstrate (1) "some actual or threatened injury" that (2) "fairly can be traced to the challenged action" and (3) "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone,*

*Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), and *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450 (1976), respectively). *See also Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

The first of these elements, that a party "has been or will in fact be perceptibly harmed by the challenged agency action," *see United States v. SCRAP*, 412 U.S. at 688, 93 S.Ct. at 2416, is the core of standing. *See Daughtrey v. Carter*, 584 F.2d 1050, 1056 (D.C.Cir.1978) (characterizing injury requirement as "first and foremost element of standing"). The requisite injury cannot be to merely "abstract" interests, *see Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986); *Simon*, 426 U.S. at 40, 96 S.Ct. at 1925; *Sierra Club*, 405 U.S. at 739–40, 92 S.Ct. at 1368–69. Nevertheless, the "distinct and palpable injury," *see Warth v. Seldin*, 442 U.S. at 501, 95 S.Ct. at 2206, suffered by a party need not be tangible or great: an "identifiable trifle" will do. *See United States v. SCRAP*, 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14.

■ Injury to aesthetic or recreational interests, as well as to more traditional economic interests, will support a claim of standing. *See, e.g., Sierra Club*, 405 U.S. at 734, 92 S.Ct. at 1366 ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."); *Montgomery Envtl. Coalition v. Costle*, 646 F.2d 568, 576–78 (D.C.Cir.1980) ("concerned citizens" professing interest in the preservation of the environment held, un-

---

**7.** Because Congress has clearly signaled its desire for broad standing in this case, *see* H.R.REP. No. 218, 95th Cong., 1st Sess. 90 (1977), *reprinted in* 1977 U.S. CODE CONG. & ADMIN.NEWS 593, 626 ("It is the intent of the committee that the phrase 'any person, having an interest which is or may be adversely affected' shall be construed to be coterminous with the broadest standing requirements enunciated by the U.S. Supreme Court."), and because NWF's aggrieved environmentalist members are clearly among the parties sought to be protected by the SMCRA and hence are squarely within the Act's "zone of interests," we readily conclude that the prudential component of the standing requirement is satisfied in this case.

der statutory provision incorporating the *Sierra Club* test, to have standing to challenge permits issued to sewage treatment plants); *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 997–99 (D.C. Cir.1979), *cert. denied sub. nom. Committee for Auto Responsibility v. Freeman*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980) (environmental organization has standing to challenge "[h]arm to health and conservational interests" stemming from failure of General Services Administration to prepare an environmental impact statement prior to leasing city land for use as a parking lot). Also significant here is the time-honored principle that harm can be actual or threatened, *see Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758, thus allowing those who plausibly anticipate future injury to bring suit. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 10–12 (D.C.Cir.1987) (discussing standards for determining when an allegation of threatened injury suffices for standing); *see also National Wildlife Fed'n v. Burford*, 835 F.2d 305, 313–14 (D.C.Cir.1987) (same).

The second prong of the standing inquiry is causation: the injury alleged must be "fairly traceable" to the action under attack. The Supreme Court's decisions on this point show that mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice. *See, e.g., Meese v. Keene*, —— U.S. ——, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (would-be distributor has standing to challenge Justice Department's characterization of film as "political propaganda" under foreign agents' registration act because label could hurt his chances of reelection to state senate); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405. As we stated in *Autolog Corp. v. Regan*, 731 F.2d 25 (D.C.Cir.1984):

> It is well settled that a plaintiff has standing to challenge conduct that indirectly results in injury.... 'We are concerned here not with the length of the chain of causation, but on [sic] the plausibility of each of the links that comprise the chain.'

731 F.2d at 31 (citations omitted) (quoting *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 717 (D.C.Cir.1977)). Other prominent cases in which the "fairly traceable" requirement was found satisfied despite a relatively attenuated chain of causation are *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), in which the Supreme Court held that an environmental group had standing to challenge Price–Anderson Act's limitation on utility liability in event of nuclear accident, and *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), in which the Court held that a whale-watching group had standing to challenge the failure of the Secretary of Commerce to cite Japan for violations of international limitations on harvesting of whales.

The final prong of current constitutional standing analysis is redressability. Redressability and causation analyses often replicate one another, particularly in cases where, as here, the relief requested is merely the cessation of illegal conduct. *See Allen v. Wright*, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325–26 n. 19; *see also Haitian Refugee Center v. Gracey*, 809 F.2d 794, 801 (D.C.Cir.1987) (describing "traceability" and "redressability" requirements as "closely related"); *cf. California Ass'n of the Physically Handicapped v. Federal Communications Comm'n*, 778 F.2d 823, 825 n. 7 (D.C.Cir.1985) (explaining the distinction between the two requirements). We note, however, that a party seeking judicial relief need not show to a certainty that a favorable decision will redress his injury. A mere likelihood will do. *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280–81, 98 S.Ct. 2733, 2743, 57 L.Ed.2d 750 (1978) (Powell, J.); *International Ladies Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 n. 27 (D.C.Cir.1983), *cert. denied, sub. nom. Breen v. International Ladies Garment Workers' Union*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). As we stated in *Community Nutrition*

*Inst. v. Block,* 698 F.2d 1239, 1249 (D.C.Cir. 1983), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), a plaintiff need not "negate every 'speculative and hypothetical possibilit(y) . . . in order to demonstrate the likely effectiveness of judicial relief.'"

With these guiding principles in mind, we turn to Industry's 18 remaining standing challenges to NWF's various claims. For the sake of coherence we have classified those challenges into two broad groups, each of which raises analytically similar issues.

### C. *NWF's Standing on Particular Issues*

1. *Issues Where the Secretary Has Eliminated Minimum National Environmental Standards (Four Issues)*

■ The first cluster of standing challenges includes four instances in which NWF has challenged Secretary Watt's elimination of minimum national standards governing various aspects of surface mining. These regulations involve (1) the contemporaneous reclamation of mined land; (2) the design of earth "terraces" on restored land; (3) the exemption from the "approximate original contour" requirement of lands featuring unusually thick or thin overburden; and (4) the information required from those seeking permits for activities that could unsettle alluvial valley floors.[8] In each of these areas, the Secretary has eliminated regulations previously prescribed as minimum standards for implementing the broadly worded provisions of the Act. These regulatory floors were to guide federal enforcement or, in the event that states accepted the Act's invitation to assume regulatory authority, state enforcement.

The first NWF issue in this cluster stems from the requirement imposed by § 515(b)(16) that mine operators reclaim land "as contemporaneously as practicable [to the] mining operations." In 1979, then-Secretary Andrus promulgated specific "time and distance" standards for such backfilling and grading, *see* 30 C.F.R. § 816.101, but four years later, Secretary Watt repealed those standards, concluding that "'contemporaneous reclamation' is a relative term which must be interpreted by each State on the basis of the mining conditions in its territory." 48 FED.REG. 23357–58 (1983).

The second issue relates to the requirement of § 515(b)(3) that land be restored to its "approximate original contour." The regulations adopted in 1979 attached numerical benchmarks to this broad requirement, requiring terraces to be built with bench widths less than 20 feet and slopes between benches at less than a 50 degree angle. Secretary Watt's revisions, however, abandoned maximum bench widths and outslope angles, leaving to regulatory authorities the decision on a case-by-case basis whether to approve given terrace characteristics.

The third issue involves the exemption in § 515(b)(3) from the requirement that lands be returned to their approximate original contour. The 1979 regulations provided numerical specifications for grants of a variance from the approximate original contour requirement; but in 1983, Secretary Watt eliminated the numerical standards, allowing variances whenever the mine operator asserts that spoil is either "insufficient" or "more than sufficient" to restore land to its approximate original contour. 30 C.F.R. § 816.104–105 (1986).

The fourth issue involves the information required of those seeking permits for operations that might affect alluvial valley floors. Section 515(b)(10)(F) requires surface coal mining operations to "preserve throughout the mining and reclamation process the essentially hydrologic functions of alluvial valley floors in the arid and semi-arid areas of the country." The origi-

---

8. These issues correspond to headings 1, 2, 3, and 13, respectively, in the district court's memorandum opinion. *See* Findings on Standing, at 6–12, 25–26. Our discussion of the merits of NWF's challenges on these issues is located at: § III–C–1 (permit information for alluvial valley floors); § III–C–3–a (contemporaneous reclamation); § III–C–3–b (thick and thin overburden); and § III–C–3–c (terrace design).

nal regulations contained precise specifications on the information needed in a permit application when a mine operator's proposed operations might affect an alluvial valley floor, but in 1983, Secretary Watt withdrew the enumeration of this "technical data, information and analysis." Instead, he required simply that "generally ... sufficient information be submitted to enable the regulatory authority to make the necessary determinations." 48 FED. REG. 29814 (1983).

With regard to each of these issues, NWF alleges that it suffers at the very least a threat of injury from the Secretary's deletion of the regulatory minimums. In response, Industry suggests that NWF has merely alleged a statutory violation without proffering a viable claim of specific injury. *See* Motion to Remand Certain Issues With Direction to Dismiss for Want of Jurisdiction and Ripeness (hereinafter "Brief for Industry"), at 12–15. Insofar as the first prong of the standing requirement, injury in fact, is concerned, we, however, are satisfied that NWF's affidavits now provide sufficient allegations of personalized injury to satisfy the *Sierra Club* and *SCRAP* standards for "injury in fact" in environmental cases. These affidavits provide sufficient details describing threatened injuries. Typically, NWF's affiants live in communities where surface mining operations have occurred. In addition to alleging past environmental degradation, these affiants describe in substantial detail the injuries they fear from ongoing and future mining operations. Those affiants addressing the contemporaneous reclamation, terracing and thick and thin overburden requirements allege that the new regulations permit greater deviance from the goal of approximating the original contour of the mined land, a major environmental goal of the Act. Those affiants addressing the deletion of specific information requirements regarding alluvial valley floors in permit applications allege that this policy will create an increased danger of degrading water supplies in the West.

Industry suggests that these affidavits are inadequate for failure to track the sometimes hypertechnical language of the statute, *see, e.g.,* Brief for Industry at 23 ("Neither [affiant] so much as mentions ... the thick overburden exemption"), or for failure to describe with precision the harms they fear. *See, e.g., id.* at 21 ("[n]either points to any specific mine or terrace, and each offers only a general and irrelevant observation that their aesthetic enjoyment would be diminished....."). We disagree. Unyielding insistence on parroting the arcane technicalities of the law or regulations, however, would turn the standing requirement into a barrier impeding all but mining engineers from challenging this legislation. NWF's allegations of injury in these affidavits, far from being "an ingenious academic exercise in the conceivable," *see SCRAP,* 412 U.S. at 688, 93 S.Ct. at 2416, are the allegations of real people personally concerned about constitutionally-sufficient environmental, recreational, or aesthetic injuries. In view of the specificity of the numerous allegations affiants make concerning threatened deviations from reclaiming land to its original contour, those allegations are reasonably read to address the technical regulations which implement that important requirement. We therefore wholly concur in Judge Flannery's evaluation of the adequacy of these allegations to establish injury in fact with respect to each of these regulations. *See* Findings on Standing at 6–12, 25–26.

The more difficult issue regarding these four regulations is whether NWF has satisfactorily established that the injuries of which it complains are "fairly traceable" to the challenged action. Industry contends in each instance that the injuries cited in NWF's affidavits are merely speculative. Specifically, it makes three distinct arguments. First, Industry argues that because individual states may choose to adhere to the initial regulatory minimums set forth in 1979, any fear of laxer standards is premature. Second, it argues that the new, more nebulous regulations could still be interpreted so as to conform to, or even exceed, the previous minimum standards. Third, it maintains that threatened injury "can arise only after a government agency makes a future discretionary decision that

may be either favorable or unfavorable to the plaintiff." *See* Brief for Industry at 10–11.

We disagree with each of these arguments. At the outset, we note that Industry's contentions as to the speculative nature of NWF's challenge relate as much to ripeness as they do to causation; we therefore address each of Industry's contentions in turn with an eye to ripeness as well as to standing doctrine.

Industry's first argument—that it is conceivable that individual states will continue to apply the older, 1979 regulations with their precise minimum standards—does not stand up. With regard to each regulation, NWF has identified at least one plaintiff living in a state directly governed by Secretary Watt's deletion of the 1979 standards. Specifically, NWF has identified at least one of its members who lives in a state in which the federal government enforces surface-mining standards because the lands in question are federal ones, or because the state has not accepted the federal invitation to assume responsibility for enforcement. Although NWF's 70 affidavits offer a number of examples upon which standing might be found on these four issues, we need only note that several plaintiffs identified by NWF live in Tennessee, a state in which the federal government enforces surface-mining standards. Theses affiants allege threatened injuries stemming from the relaxation of the federal government's approximate original contour standards. *See, e.g.,* Hollis Aff.; Little Aff.; Miller Aff.; Smiddy Aff.; S. Williams Aff. Similarly, Neil McBride, also a Tennessee resident, alleges injuries from the diminution of permit information required by the federal government for activities that could harm alluvial valley floors. *See* McBride Aff.

Thus, the first argument put forth by Industry—that some cooperating states may choose to retain or even exceed the 1979 standards—is irrelevant, for NWF has identified plaintiffs directly governed by the Secretary's new regulations.[9]

As its second causation/ripeness argument, Industry repeatedly asserts that the newer regulations remain susceptible to interpretive constructions in which they would be every bit as stringent as the more specific 1979 standards, *see, e.g.,* Brief for Industry at 18–20, 21, 22, 33. It strains credulity, however, to suggest that the Secretary, in abandoning minimum standards, sought to encourage mining concerns to exceed the previous regulatory floors. Mining concerns were, after all, free to undertake extra precautions under the 1979 regulations; the paramount impact of the 1983 deletions is to position Industry to do less rather than more to restore mined land.

Although we do not read the Act to require that every statutory prescription be fleshed out by numerical standards, *see, e.g., infra* section III–C–3, we do regard Congress' admonitions—notably those expressed in the House Report—regarding the need for specific regulations as supporting the inference that a causal connection exists between deletion of regulatory specifics and adverse environmental effects. And while Congress cannot create standing on its own, it can provide legislative assessments which courts can credit in making standing determinations. *See Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C. Cir.1984) ("we must give great weight to

---

9. Because we conclude that NWF has standing to challenge these regulations based on its Tennessee affiants, we need not pass judgment on NWF's additional claim for standing. That claim is that NWF has standing as a result of those of its affiants living in the three states (Kentucky, Illinois, and Oklahoma) which, in response to the federal enactment, have passed legislation promising to enforce regulations "no more stringent than" those required by the federal government.

By the same token, we need not decide NWF's claim, contested by Industry, that Congress es-

tablished standing-analysis causation as a matter of law in suggesting that abandoning clear federal minimum environmental standards in many instances would lead to slippage below those levels by state authorities. *See, e.g.,* H.R. REP. No. 218, 95th Cong., 1st Sess. 85 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 622 (stating that "the committee is mindful of the past failures on the State expectation that Federal Regulations ... will fully implement the environmental performance standards").

this congressional finding [of causation] in our standing inquiry"); *see also Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1010 (D.C.Cir.1977), *cert. denied sub nom. Fouke Co. v. Animal Welfare Inst.*, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) (deferring to congressional determination that causation existed "as a matter of law"). Congress' suggestion here that the deletion of minimum standards might lead to lessened protection is just such a legislative assessment.

Industry's third contention is that NWF cannot challenge the Secretary's relaxed regulations until a decision unfavorable to plaintiffs is actually made under them. In support of this contention, Industry cites a string of cases from the Supreme Court and this circuit purportedly saying that the existence of an intervening discretionary authority blocks standing and/or ripeness. *See* Brief for Industry at 11 n. 11. Industry's cases, however, arise in a very different context. They all involve parties seeking to overturn rules or enactments before such enactments have been enforced against them personally. *See, e.g., Brown v. Hotel Employees*, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984); *Pacific Gas & Elec. v. Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *International Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); *Cabais v. Egger*, 690 F.2d 234 (D.C.Cir.1982). By contrast, NWF here challenges currently operative rules that require no act of administrative discretion to affect environmentalist plaintiffs. *Cf. Japan Whaling Ass'n*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (standing found where harm to whalewatchers from failure to sanction Japan for whale-harvesting could ensue without any further governmental action).

In any event, Industry's argument overlooks fundamental principles of ripeness analysis. Insofar as the constitutional dimensions of the ripeness requirement are concerned, a clear case or controversy exists here, given the significant likelihood of injury to NWF's members in states, such as Tennessee, where the federal government is the direct regulatory authority. *See, e.g., Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) ("[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"). Nor do the prudential components of the ripeness requirement impede NWF's claim, in light of Congress' express intent that those suits challenging the surface mining regulations be judged under "the broadest standing requirements enunciated by the U.S. Supreme Court." *See* H.R.Rep. No. 218, 95th Cong., 1st Sess. 90 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 593, 622.[10]

For the foregoing reasons, we regard the threat to NWF's members as "sufficiently real and immediate to show an existing controversy," *see Blum v. Yaretsky*, 457 U.S. 991, 1000, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982), and we therefore find that NWF has standing to challenge these four regulations.[11]

2. *Issues Where the Challenge to Standing Focuses on the Adequacy of Affidavits (Fourteen Issues)*

The primary focus of Industry's remaining 14 challenges to standing is on the

---

**10.** Although Industry's argument that an intervening discretionary agency action blocks NWF's standing is most clearly developed with respect to the four aforementioned issues, Industry asserts that the same principle defeats NWF's standing with respect to nine other issues. *See* Brief for Industry at 10 n. 10. The argument, however, fails with regard to those issues for the same reasons offered here, and we therefore do not refute it in our particularized discussion of each issue later in this opinion.

**11.** We do not dwell on the third prong of *Valley Forge's* tripartite test for standing, the prong of redressability, because as noted earlier, this is a case in which causation and redressability analysis merge: a decision here eliminating the source of the harm to plaintiffs (the "fairly traceable" requirement) will necessarily redress their injuries (the "redressability" requirement).

adequacy of NWF's affidavits in alleging an injury in fact.

■ We quickly dispose of six of these challenges; these involve (1) the Secretary's determination of the proper amount of the bond that underground mining operations must post; (2) the Secretary's endorsement of "incremental" and "phased" bonding, both of which NWF alleges allow initial bonds posted by mining operations to fall below the figure established by the statute; (3) the Secretary's interpretation of the scope of the "valid existing rights" exception to the general SMCRA prohibition of surface mining on certain federal lands; (4) the Secretary's determination that the exception allowing surface mining on federal lands which have "no significant recreational, timber, economic or other values which may be incompatible with surface mining operations," see SMCRA § 522(e)(2), allows surface mining in all circumstances except where incompatibility is permanent and reclamation is impossible; (5) the Secretary's decision to eliminate two specific design criteria for dry waste piles, which had been set forth pursuant to the statutory requirement in SMCRA § 515(f) that he establish standards and criteria for waste piles; and (6) the Secretary's creation of what amounts to a first-in-time, first-in-right exception to the general requirement that surface mine operators replace the water supply of property owners whose supply was contaminated or interrupted as a result of the mining operation.[12]

Industry's objections to standing on these issues, as we have noted, generally challenge NWF's allegations of injury in fact. These assertions are without merit. As with the three issues discussed earlier on which Industry conceded standing, see supra, NWF's affidavits here allege injury and make out highly plausible lines of causation leading from the Secretary's acts to the injury.

Industry attempts to impugn NWF's affidavits, mostly by disaggregating each allegation so as to make it appear to hinge on the chance occurrence of multiple unlikely contingencies. See, e.g., Brief for Industry at 24 (contending that absence of a subsidence bond could produce damage only if five events coincided, and therefore describing the alleged injury as "remote and speculative"); see also id. at 41–44 (deploying same form of argumentation with regard to validly existing rights, significant values in national forests, and junior water rights). Industry's attack falters on Autolog Corp., like this a case involving a motion for summary judgment for want of standing; in Autolog, we emphasized that it is not the length of the chain of causation, but rather its plausibility, that is dispositive in standing analysis. Industry's attempt to blend its substantive defense of the merits of the Secretary's actions into its standing argument, see, e.g., Brief for Industry at 24 (suggesting that the incremental bonding regulations are unobjectionable because they mirror a "similarly flexible provision" in the 1979 regulations), likewise cannot overcome NWF's allegations of injuries sufficient to satisfy the standing requirement.[13]

---

**12.** These issues correspond, respectively, to headings 4, 5, 17, 18, 20 and 21 in the district court's memorandum opinion. See Findings on Standing, at 12–16, 30–33, 35–37. Our decisions on the merits on these issues are located at the following places in this opinion): § III–B–1 (flexible bonding); § III–B–2 (subsidence bonding); § III–C–2 (dry waste); § III–E–1 (valid existing rights); § III–E–2 (significant values in national forests); and § III–E–4 (junior water rights).

**13.** We briefly address Industry's contentions with respect to each of these six regulations in turn.

With respect to subsidence bonding, NWF's plaintiffs allege insufficient bond coverage for damage to water supplies caused by subsidence. Industry's argument in response is that injury to NWF's affiants is "remote and speculative" because it could occur only upon the concurrence of five separate events. By way of illustrating what we regard as the empty formalism of such a dissection, we note that the final three of Industry's five "separate events" really amount to the same thing: unremediated damage. See Brief for Industry at 24 ("The absence of a subsidence bond could produce damage only ... (iii) if that subsidence causes damage, (iv) if the operator does not repair the damage, and (v) if the insurance required by § 507(f) is insufficient to repair the damage."). Industry's legal pointillism only underscores to us the importance of reading the causation requirement

Industry's arguments with reference to NWF's challenges to the remaining eight issues make more colorable contentions, and we therefore treat them individually.

### a. *Federal Lands*

■ NWF's challenge here is to the Secretary's delegation to a state agency of his duty to approve "mine plans" on federal lands. Under the Act, as the district court noted, a state may agree to regulate mining operations on federal land, but the Act also provides that "[n]othing in this subsection shall be construed as authorizing the Secretary to delegate to the States his duty to approve mining plans on Federal lands." SMCRA § 523(c).[14]

with an eye toward reasonableness; for if it is not so read, as Professor Tribe has noted, it becomes "highly manipulable," and focusing on it alone "poses a serious risk that in the guise of causality analysis, federal courts will engage in an unprincipled attempt to screen from their dockets claims which they substantively disfavor." *See* L. Tribe, American Constitutional Law 93 (1st ed. 1978).

With respect to flexible (or incremental) bonding, NWF's affiants allege that bond amounts are inadequate to cover the cost of reclamation. Industry's response is twofold. First, as noted in the text, it argues that the change effectuated by the Secretary is not terribly dramatic, *see* Brief for Industry at 24—a point we deem irrelevant for standing analysis. Additionally, Industry challenges the two NWF affiants mentioned by name by the district court, saying that they have merely "an apprehension of maladministration" of the regulation. *See* Brief for Industry at 25. This argument also amounts to an attempt to homogenize merits and standing. Industry is saying that a new regulation that facially appears quite different from its predecessor is in fact so similar to its precursor that only a bungling administrator could apply the old and new regulations differently. We read the new regulation the way it sounds—that is, like a change in policy—and therefore find affiants' concern that the regulation will be implemented in accord with this reasonable reading of it to be quite realistic.

With respect to the issue of validly existing rights, NWF claims that under the Secretary's new interpretation, more mining generally will be permitted. Industry's argument in response is that both affiants cited by the district court hike in Clifty Wilderness, an area where no coal mining presently exists. *See* Brief for Industry at 40. We note, however, that both affiants—Oscar Geralds, Jr. and Henry Graddy, *see* Geralds Aff., Graddy Aff.—allege that they hike in a broader area, the Daniel Boone National Forest, that includes but is not limited to the area classified as the Clifty Wilderness. Within the Daniel Boone Forest, about 75% of the subsurface coal rights belong to third parties, according to the Forest Service, and we thus find wholly plausible affiant Geralds' concern that some of these rightholders could qualify as having valid existing rights under the 1983 regulations. *See* Geralds Aff.; *see also* Brief for NWF at 22 n. 26. Industry's argument is again that NWF's allegations are unduly speculative. This argument, like Industry's argument with respect

to subsidence bonding, *supra*, is flawed in its attempt to disaggregate NWF's allegations into artificially separate parts. Affiants' concern about threatened injury is, quite simply, far more reasonable than is suggested by Industry's strategy of disaggregating every affiant's claim.

With respect to the issue of significant values in national forests, where NWF also contends the Secretary's new interpretation will lead to increased mining, Industry's argument is predictably that the causal connection is too lengthy. *See* Brief for Industry at 42. We disagree, finding in the affidavits of several NWF members simple and logical explanations that as recreational users of various national forests containing coal reserves, they fear that a broader interpretation of the "no significant values" exception will harm their interests. *See, e.g.,* Geralds Aff.; Graddy Aff.; *see also* Brief for Appellant NWF at 45 & n. 52 (listing other affidavits).

With respect to dry waste, NWF's affiants fear that water supplies will suffer if waste piles are unregulated. Industry makes no counter-argument, stating only that the issue is "very complex" and that "[w]e leave that debate to the Government and NWF." Brief for Industry at 43. In light of the Secretary of the Interior's determination not to contest NWF's standing with respect to all the challenged regulations, that debate seems rather one-sided, and we join NWF and Judge Flannery in concluding that the environmental plaintiffs have standing to challenge the Secretary's new regulations.

Finally, with respect to junior water rights, NWF's affiants fear water supplies will be destroyed if the Secretary's construction of this exemption stands. In response, Industry argues, first, that the district court misconstrued the scope of the change the regulations mark from the Act itself, *see* Brief for Industry at 44, an argument, that, we observe again, goes to the merits of Industry's dispute with NWF. Second, Industry argues that NWF's claim is "remote and speculative" because three events must occur to trigger NWF's claimed injury, a contention that, we note still again, is foreclosed by *Autolog*'s endorsement of standing in cases involving lengthy but plausible chains of events.

**14.** This issue corresponds to heading 7 in the district court's memorandum opinion. *See* Findings on Standing, at 18–19. We discuss the merits of NWF's challenge to this regulation at § III–E–11 of this opinion.

The district court concluded that NWF had standing to challenge this delegation. *See* Findings on Standing, at 18–19. On appeal, Industry focuses its challenge to standing entirely upon the affidavit of Colorado residents Timothy and Susan Brater, upon which the district court had heavily relied. The Braters had alleged injury on the ground that they had sued to challenge the Secretary's decision to issue a permit to a nearby mine, but that the Secretary had moved to dismiss on the ground that he no longer has authority with respect to the mine, having delegated it to the state of Colorado under a cooperative agreement. Industry now alleges that because the Braters' petition has already been heard twice by the Secretary in previous chapters of the dispute, the Braters lose no substantive or procedural rights as a result of the delegation, and thus NWF, to which the Braters belong, has no standing. *See* Brief for Industry at 26.

We disagree. Setting aside the issue of whether the Braters have lost a procedural right, Industry wholly fails to counter NWF's separate contention that its affiants lose a distinctive federal substantive right by dint of the delegation to the states: the right to have an environmental impact statement (EIS) prepared. Affiant Arthur Hayes fears that his ability to evaluate and oppose future mining will be impaired in the absence of an EIS, *see* Hayes Aff., and affiants Edward Dobson, Patty Kluver, and Wallace McRae voice similar concerns. *See* Dobson Aff., Kluver Aff., McRae Aff. We conclude that, for affiants voicing environmental concerns like those in the aforementioned affidavits, the elimination of the opportunity to see and use an EIS prepared under federal law does constitute a constitutionally sufficient injury on which to ground standing. *See Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937–39 (D.C.Cir.1986) (denial of access to government-provided information regarding services available to the elderly held a sufficient injury on which to ground standing); *Cady v. Morton*, 527 F.2d 786, 790

(9th Cir.1975) (absence of an EIS constitutes injury on the basis of which plaintiffs could sue for violation of National Environmental Policy Act of 1969 (NEPA)); *Scientists' Inst. for Pub. Information, Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1087 n. 29 (D.C.Cir.1973) (agency's decision not to draft a NEPA statement caused injury in fact satisfying *Sierra Club* test); *National Org. for the Reform of Marijuana Laws (NORML) v. United States Dep't of State*, 452 F.Supp. 1226, 1230 (D.D.C. 1978) (citing *Scientists' Inst.* and concluding that NORML had alleged a sufficient "informational interest" under NEPA in challenging agencies' failure to prepare and consider an EIS with respect to United States participation in herbicide spraying of marijuana plants); *Natural Resources Defense Council v. Securities and Exch. Comm'n*, 389 F.Supp. 689, 698 (D.D.C. 1974) (failure of SEC to make public disclosure of certain information held sufficient injury to support plaintiffs' standing to sue).

### b. *Off–Site Facilities*

Under this heading, NWF challenges the Secretary's interpretation of the jurisdictional scope of the Act. The Act, in § 701(28), states that it covers "surface coal mining operations." In 1983, however, the Secretary excluded from his definition of that term facilities that process coal but do not separate coal from its impurities. Additionally, the Secretary defined that statutory term to exclude off-site facilities beyond a certain distance from a mining operation.[15]

The district court concluded that the affidavits produced by NWF adequately alleged standing. *See* Findings on Standing, at 20–21 (citing McBride Aff.; Fretwell Aff.). Industry challenges this determination, arguing that the affiants in question did not spell out the types of off-site operations they fear with sufficient specificity to cover all the contingencies NWF now raises. *See* Brief for Industry at 27. We

---

**15.** This issue corresponds to heading 9 in the district court's memorandum opinion. *See* Findings on Standing, at 20–21. We discuss the merits of NWF's challenge to this regulation at § III–D–3 of this opinion.

disagree. Contrary to Industry's assertions, the McBride affidavit, for example, does voice concern about off-site injuries, citing "coal crushing tipples and rail load-out facilities" alongside two Tennessee highways. *See* McBride Aff. at 5.

More generally, as in its arguments about NWF's standing to challenge the regulations imposing minimum environmental standards, Industry adopts too parsimonious a reading of the standing requirement, one too hypertechnical to be supportable. Both the above-named affiants, as well as others, *see, e.g.,* Combs Aff., allege ongoing harms stemming from the failure to restrict certain off-site operations. Standing on this issue does not require meticulous specificity, or the affiants' intimate familiarity with operations on neighboring land. The core issue here is the scope of jurisdiction over offsite facilities, an issue the affiants identified by the district court surely have standing to raise. In attempting to disaggregate this issue so as to require NWF to name plaintiffs suffering from every conceivable side-effect of the Secretary's narrower conception of the Act's jurisdiction, Industry would turn the standing requirement from a means of identifying genuine controversies into a barrier blocking challenges by all but the most greviously afflicted plaintiffs.

### c. *Host Soils*

■ NWF here challenges the Secretary's interpretation of § 515(b)(5) of the Act, which provides that coal operators must carefully remove and replace topsoil displaced by their activities. The Secretary in 1983 issued a regulation allowing the storage on host soil of topsoil salvaged from adjacent mining activities, an interpretation NWF contends will damage the topsoil.[16]

The district court concluded that NWF had standing to bring this challenge, *see* Findings on Standing, at 22–23 (citing Smith Aff.). Industry now argues before us that the district court overlooked the

existence of other regulations that impose "protective conditions," thereby limiting possible harm stemming from the newer regulations. This argument, however, goes not to standing, but to the substantive validity of the new regulations.

Industry also challenges as speculative the Smith affidavit upon which the district court relied. *See, e.g.,* Brief for Industry at 29 (concluding that Ms. Smith would be injured only upon the chance occurrence of eight events, one of which it deems to have only a 0.8% chance of occurring). We disagree; Ms. Smith alleged injury with sufficient plausibility and specificity when she asserted:

> I am concerned that since our farmland contains prime farmland soils located over [a lessee coal company's] mineral holdings that our farming productivity will suffer as a result of [the company's] future mine. I am especially concerned with the surface impacts and disturbances that the future mine may produce, *particularly related to the redistribution and spreading of additional soils from the disturbed area over nondisturbed topsoil.*

*See* Smith Aff. at ¶ 4 (emphasis added). We again recall this court's caution in *Autolog Corp.,* 731 F.2d at 31, that "we are concerned ... not with the length of the chain of causation, but with the plausibility of each of the links that comprise the chain." The Smith affidavit evinces an altogether reasonable fear of threatened harm. Accordingly, we conclude that NWF has standing to challenge this regulation.

### d. *Prime Farmland Lakes*

■ Under the SMCRA, prime farmland, after a mining operation, generally must be restored to crop-producing land at 100% of the land's pre-mining productivity. NWF here challenges a regulation promulgated by Secretary Watt that creates an exception to this rule; the regulation permits as an acceptable post-mining use of prime

---

**16.** This issue corresponds to heading 10 in the district court's memorandum opinion. *See* Findings on Standing, at 22–23. We discuss the merits of NWF's challenge to this regulation at § III–E–7 of this opinion.

farmland "last-cut lakes," which are permanent impoundments of water.[17]

The district court, observing that NWF had named individuals alleging both aesthetic injury and economic harm, concluded that NWF had standing to challenge this regulation. *See* Findings on Standing, at 23–24. Industry's response is two-fold: it argues, first, that impoundments were permitted under the original regulations under some circumstances, and second, that presuming specific injury to an individual is unduly speculative.

We disagree with each of these contentions. First, while the original regulations may not have categorically proscribed any impoundments of water, Secretary Watt's regulation indisputably made such impoundments more likely than previously, and the permissibility of that policy change is an issue we address on the merits, not in the context of standing. We also disagree with Industry's dismissive treatment of NWF's specific allegations. Affiant Janis King, for example, lives on, rents and farms land classified as prime farmland; her property is adjacent to a strip of land mined by a nearby company. The company has left last-cut impoundments on the neighboring land and failed to return it to prime farmland. Ms. King describes at some length the interference posed by such impoundments to the operation of her seed corn business and to her aesthetic interests, which she has standing to raise under *Sierra Club*. *See* King Aff. Accordingly, we conclude on this issue that NWF has standing.

### e. *Support Facilities on Prime Farmland*

■ NWF here challenges an exception authorized by Secretary Watt to the rule that prime farmland be completely restored, one that would exempt support fa-

cilities associated with surface mining operations and underground mining operations. The district court concluded that NWF had standing. *See* Findings on Standing, at 24–25.[18]

Industry's argument on appeal is that the affidavit on which the district court relied, that of Eleanor Smith, is inapposite to the challenge lodged by NWF. Industry contends that although Ms. Smith refers only to support facilities associated with underground mining, NWF's challenge is specifically addressed to support facilities associated with surface mines. *See* Brief of NWF as Appellees and Appellee-Intervenors at 43–44 & n.*. NWF replies that although Ms. Smith refers to underground mining, her affidavit leaves open the possibility that surface as well as underground mining may be covered by the lease on her property. *See* Opposition of NWF to Industry's Motion to Remand at 32 & n. 34. We agree. The Smith affidavit states a broad concern with the effects of surface mining in her area, *see* Smith Aff. at ¶¶ 3, 8. In light of this fact, we cannot conclude that her lease permits only underground mining. We therefore conclude that her affidavit is sufficient to establish NWF's standing with respect to this issue.

### f. *Variances From Original Contours*

■ Under the SMCRA, mining operators are expected generally to restore their land to its approximate original contour. The Act, however, grants a limited variance for lands whose slope exceeds 20 degrees. In his 1983 regulations, however, Secretary Watt broadened this variance to include lands whose slope was below 20 degrees, a step NWF has challenged as inconsistent with Congress' intent that mined lands be returned to a state that "closely resemble[s]" its pre-mining condition. *See* SMCRA § 701(2).[19]

---

**17.** This issue corresponds to heading 11 in the district court's memorandum opinion. *See* Findings on Standing, *supra*, at 23–24. We discuss the merits of NWF's challenge to this regulation at § III–A–3–a of this opinion.

**18.** This issue corresponds to heading 12 in the district court's memorandum opinion. *See* Findings on Standing, at 24–25. We discuss the

merits of NWF's challenge to this regulation at § III–A–3–b of this opinion.

**19.** This issue corresponds to heading 14 in the district court's memorandum opinion. *See* Findings on Standing, at 26–28. We discuss the merits of NWF's challenge to this regulation at § III–E–8 of this opinion.

The district court concluded that NWF had standing to challenge this variance, *see* Findings on Standing, at 26–28, a finding Industry protests. It focuses upon the affidavit of Granville Burchard, heavily relied on by the district court. According to Industry, this affidavit misinterprets what the regulations allow and complains more about past than threatened harm. Whatever the inadequacies in Mr. Burchard's affidavit, however, other NWF affidavits satisfactorily plead injury. *See, e.g.,* Ford Aff. (expressing concern over "granting [of] any variances to allow leaving highwalls on non-steep slopes" on land near her home because "[s]uch a variance would adversely impact my enjoyment of the natural vistas of these hills"). Accordingly, we find NWF has standing to challenge the Secretary's regulation.

### g. *Submerged Highwalls*

■ NWF here challenges a regulation that it alleges falls short of requiring mining operations to backfill highwalls created by mining when those highwalls are part of a pit that will be filled with water and thus become a last-cut lake. *See* Findings on Standing, *at 28. The regulations, as the district court observed, "merely contain[ ] a general proviso that vertical highwalls be placed sufficiently below the waterline 'to provide adequate safety and access for the proposed water users.'"* Id. *(quoting 30 C.F.R. § 816.49(a)(9)).*[20]

The district court concluded that NWF had standing, observing that NWF had alleged injuries including dangers to recreational users of lakes and fishermen. *Id.* at 28–29 (citing Smith Aff.; Nelson Aff.). Industry's argument on appeal is that (1) the new regulations provide adequate safety for prospective swimmers, (2) the district court exaggerated the concerns of affiant Nelson, and (3) finding injury sufficient to support standing would require a chain of events altogether too speculative. *See*

Brief for Industry at 37–39. We disagree. Again we emphasize that the protections built into the new regulations bear on the merits of the Secretary's interpretation, not on standing. Moreover, although affiant Nelson did not precisely mention the elimination of fishing species, as the district court implied he did, he does state: "I also favor backfilling and regrading of those highwalls because it provides certain species of fish with a shallow habitat necessary for spawning or as habitat." *Id.* Industry's attempt to denigrate Mr. Nelson's claim of injury to his interest in observing fishing species is unpersuasive. Finally, we reject Industry's by-now familiar refrain that NWF's injury is unduly speculative with our by-now familiar observation that no amount of linguistic disaggregation dissipates the plausibility of the affiants' claim, here, that inadequate reparation of mining damage in the form of highwalls can harm local fish. Accordingly, we find NWF to have standing.

### h. *Actual Grazing on Land*

■ NWF here challenges a regulation for failing to require that when grazing is the designated post-mining use of land, the mine operator must use the land for grazing for two years before his bond on that land is released.[21]

The district court concluded that NWF had standing to challenge this regulation, citing affidavits of two sportsmen who alleged that their ability to hunt wildlife had been impaired by the failure to restore wildlife habitats to pre-mining conditions. In response, Industry argues that hunting is not grazing, and thus that the two hunters have no standing to challenge a regulation for want of better encouragement of grazing.

We disagree. Industry's argument is premised on the assumption that enhanced grazing itself is NWF's goal. That assumption is incorrect. NWF's argument is

---

20. This issue corresponds to heading 15 in the district court's memorandum opinion. *See* Findings on Standing, at 28–29. We discuss the merits of NWF's challenge to this regulation at § III–E–6 of this opinion.

21. This issue corresponds to heading 16 in the district court's memorandum opinion. *See* Findings on Standing, at 29–30. We discuss the merits of NWF's challenge to this regulation at § III–A–2 of this opinion.

rather that grazing is the best measure of successful revegetation, and thus that NWF members harmed by incomplete reclamation of grazing and pasturelands have standing to challenge the Secretary's regulation as inadequate. Sportsmen who claim that the resulting failure to restore wildlife habitats has impaired their ability to hunt are surely among those harmed by incomplete regulation. Accordingly, we conclude that the district court correctly held that NWF has standing.

## D. *Conclusion*

For the reasons stated above, we conclude that the district court correctly found that NWF has standing to challenge each of the regulations at issue, and accordingly we proceed to discuss their merits.

## III. MERITS

### A. *Prime Farmland and Pastureland Issues*

We consider under this heading two Industry challenges to the district court's dispositions, and one advanced by NWF. In each instance, we affirm the district court's

22. Under the Act's definition, SMCRA § 701(20), the term "prime farmland" shall have the same meaning as that previously prescribed by the Secretary of Agriculture on the basis of such factors as moisture availability, temperature regime, chemical balance, permeability, surface layer composition, susceptibility to flooding, and erosion characteristics, and which historically have been used for intensive agricultural purposes, and as published in the Federal Register.

23. 30 C.F.R. § 823.15(b) reads:

(b) Prime farmland soil productivity shall be restored in accordance with the following provisions:

(1) Measurement of soil productivity shall be initiated within 10 years after completion of soil replacement.

(2) Soil productivity shall be measured on a representative sample or on all of the mined and reclaimed prime farmland area using the reference crop determined under paragraph (b)(6) of this section. A statistically valid sampling technique at a 90–percent or greater statistical confidence level shall be used as approved by the regulatory authority in consultation with the U.S. Soil Conservation Service.

rulings, essentially for the reasons stated by the district judge.

### 1. *Revegetation Success Standards for Prime Farmland*

In order to show effective reclamation of prime farmland,[22] the Secretary requires, as the measure of soil productivity, and prior to the release of the mine operator's performance bond, the actual growth of crops for at least a three-year period. 30 C.F.R. § 823.15(b).[23] Industry complains that the Secretary and, on review, the district court failed to consider adequately whether a careful use of soil survey techniques would measure soil productivity in the manner (a) required by the statute, or (b) if not required by the Act, then at least preferable under the relevant section.

The Secretary's regulation calls for a comparison of the reclaimed land's actual crop productivity with the productivity of neighboring, nonmined prime farmland of the same soil type. To promote a valid comparison, similar management techniques must be employed and similar crops must be grown; measurement adjustments may be made, with the concurrence of the

(3) The measurement period for determining average annual crop production (yield) shall be a minimum of 3 crop years prior to release of the operator's performance bond.

(4) The level of management applied during the measurement period shall be the same as the level of management used on nonmined prime farmland in the surrounding area.

(5) Restoration of soil productivity shall be considered achieved when the average yield during the measurement period equals or exceeds the average yield of the reference crop established for nonmined soils of the same or similar texture or slope phase of the soil series in the surrounding area under equivalent management practices.

. . . .

(8) Under either procedure in paragraph (b)(7) of this section, the average reference crop yield may be adjusted, with the concurrence of the U.S. Soil Conservation Service, for—

(i) Disease, pest, and weather-induced seasonal variations; or

(ii) Differences in specific management practices where the overall management practices of the crops being compared are equivalent.

U.S. Soil Conservation Service, to account for disease, pest, and weather conditions, or specific management practice variations. Before revegetation will be accepted as successful, resulting in release of all or part of a performance bond or deposit, *see* SMCRA § 519(c)(2),[24] average yield of the restored soil over a period of three or more crop years must equal or exceed the average yield of the comparison area.

Industry urges initially that the § 519(c)(2) words "until soil productivity for prime farm lands has returned to equivalent levels of yield" are qualified by the further words of the section, "as determined from the soil survey performed pursuant to section 507(b)(16)." Under Industry's reading, a post-mining soil survey, not actual cropping, is the statutory requirement. The district court, however, concluded that the Secretary was entitled to require actual farming and we agree.

As the district court observed, "[t]he survey required by [§ 507(b)(16)] must be performed *before* mining takes place, to determine the exact location of the prime farmland. Thus, Congress could not have envisioned that [such a] survey could ... reveal the success of the reclamation operation." *PSMRL II (Round II)*, 21 E.R.C. at 1732–

33 (emphasis added). Section 519(c)(2), as we read it, relies on the pre-mining soil survey only to ensure that the comparison area is of the "same soil type" as the mined land in its pre-mined state. Furthermore, the words "equivalent levels of yield," as they appear in the section, are most naturally and plausibly read to anticipate comparison of production yields between the reclaimed land and the nonmined reference area.[25] *See FTC v. Manager Retail Credit Co., Miami Br. Office*, 515 F.2d 988, 995 (D.C.Cir.1975) (courts should avoid reading statutes in a manner that renders passages functionless). We therefore reject the contention that the statute commands the use of soil survey techniques to measure soil productivity.

As to the preferable measurement method, the Secretary stated in the preamble to § 823.15 of the regulation: "OSM [the Office of Surface Mining] has determined that cropping is the only method currently available to test the restoration of the productivity of prime farmland soils because insufficient research has been published that demonstrates the reliability of any other method." 48 Fed.Reg. 21458 (1983). Industry concedes "an even division of opinion as to whether the necessary techniques in a soil survey dealing with reclaimed

---

**24.** Section 519(c)(2) provides:

(c) The regulatory authority may release in whole or in part said bond or deposit if the authority is satisfied the reclamation covered by the bond or deposit or portion thereof has been accomplished as required by this Act according to the following schedule:

. . . .

(2) After revegetation has been established on the regraded mined lands in accordance with the approved reclamation plan. When determining the amount of bond to be released after successful revegetation has been established, the regulatory authority shall retain that amount of bond for the revegetated area which would be sufficient for a third party to cover the cost of reestablishing revegetation and for the period specified for operator responsibility in section 515 of reestablishing revegetation. No part of the bond or deposit shall be released under this paragraph so long as the lands to which the release would be applicable are contributing suspended solids to streamflow or runoff outside the permit area in excess of the requirements set by section 515(b)(10) or until soil productivity for prime farm lands has re-

turned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices as determined from the soil survey performed pursuant to section 507(b)(16).

**25.** A passage from the Conference Committee Report, Industry states, suggests that "Congress did not look to actual crop growth as the sole measure of success." Brief for Appellants NCA at 49. The cited passage reads:

This does not mean that mining and restoration must have taken place in the surrounding area, but simply that the operator can show by agricultural school studies, or other data for comparable areas that equivalent yields can be obtained after mining.

H.R.Conf.Rep. No. 493, 95th Cong., 1st Sess. 105 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin. News 593, 737. The passage is inapposite, having been drawn from a discussion of § 510(d) of the Act, not of § 519(c)(2). In context, the sentence explains that a mining operator can prove, as required by § 510(d), his ability to reclaim the prime farmland *to be mined* without actually pointing to surrounding land on which reclamation has already been achieved.

cropland have yet been developed," but urges that a soil survey nonetheless "provides a more accurate and much easier measure of soil productivity than does actual crop growth." Brief for Appellants NCA at 52. The Secretary, however, was alert to factors detracting from the reliability of actual crop growth (*i.e.*, the impossibility of ensuring identical management practices between sample and reference areas, yield variations due to weather, disease or pest circumstances, *see* Brief for Appellants NCA at 51 & nn. 52–56). He endeavored to provide for reliability-enhancing adjustments, *see* 30 C.F.R. § 823.15(b)(8), and considered this course sounder than adopting a standard as to which, even its proponents concede, "there seems to be respectable opinion that further refinement is necessary." Brief for Appellants NCA at 53.[26]

In sum, we do not hold that actual crop growth is *required* by the Act, although the statute at least arguably suggests such a requirement. Having rejected as unfounded Industry's contention that a *soil survey* is required, we have no cause to disturb the Secretary's reasoned and expert judgment that actual crop growth is the appropriate means to measure achievement of the statutory objective of restoration of prime farmland. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

### 2. *Revegetation Success Standards for Grazing and Pastureland*

■ Rejecting NWF's challenge, repeated here, the district court upheld the Secretary's revegetation regulation for land with a post-mining grazing or pasture-

land use, 30 C.F.R. § 816.116(b)(1).[27] That regulation aims to ensure reclamation success by requiring, at a minimum, that "the ground cover and production of living plants on the revegetated area shall be at least equal to that of a reference area or such other success standards approved by the regulatory authority." *Id.*

NWF argues first that soil surveys alone are inadequate to demonstrate the success of grazing land reclamation, and second that actual grazing must be required because it is the only reliable measure of range land revegetation success. The district court agreed that "the use of a soil survey alone is insufficient," but found that the Secretary so recognized. *PSMRL II (Round III)*, 620 F.Supp. at 1563. In this court too, the Secretary of the Interior has represented that the regulation does not contemplate reliance on a soil survey "or any other method not based on actual production to establish vegetative success." Brief for the Secretary of the Interior as Appellee at 23–24; *see also* 49 FED.REG. 40148 (1983) (preamble to final rule). Thus, there appears to be no contest over the insufficiency of a soil survey. The genuine issue concerns the actual production method necessary or proper to determine vegetation success.

For its second point, NWF relies most heavily on a National Academy of Science Report on mined land reclamation, National Research Council, *Surface Mining: Soil, Coal, and Society* 124–26 (1981). We comprehend that study, as did the Secretary and the district court, to conclude that evaluation of the productivity of soil reclaimed for grazing must be based on measurements of actual production. But we do not find in the study, any more than the Secre-

---

**26.** Industry suggests that the Secretary exercised no independent judgment, but simply bowed to what he perceived to be the district court's current view on this issue. *See* Brief for Appellants NCA at 47–48. We find that suggestion unwarranted. While the Secretary undoubtedly assigned weight to the district court's words, we have no reason to believe that he failed to act in accordance with his best judgment, based on the collective technical expertise of Department personnel, and guided by the comments of interested parties. *See* 48 FED.REG. 21458 (1983).

**27.** 30 C.F.R. § 816.116(b)(1) reads:

(b) Standards for success shall be applied in accordance with the approved postmining land use and, at a minimum, the following conditions:

(1) For areas developed for use as grazing land or pasture land, the ground cover and production of living plants on the revegetated area shall be at least equal to that of a reference area or such other success standards approved by the regulatory authority.

tary or the district court did, insistence that grazing is the only acceptable method of establishing range land revegetation success.[28] In sum, we cannot say that the Secretary acted unreasonably in declining to require grazing to test reclamation success on sites designated as post-mining range or pastureland; it was sufficient, we hold, for the Secretary to require the use of a reference area comparison or other approved success standard that measures actual vegetation production.

### 3. Exemptions from Performance Standards for Prime Farmlands

The Secretary's regulations specify performance standards—measures mine operators must take—to secure eventual restoration of prime farmland to its original state and use following mining. *See* 30 C.F.R. §§ 823.12 *et seq.* These prime farmland protective regulations govern soil removal, storage, replacement, and restoration. An anterior regulation, 30 C.F.R. § 823.11,[29] describes instances in which a mine operator can obtain exemption from the prime farmlands performance standards. NWF successfully challenged in the district court two of the § 823.11 exemptions; one relates to water bodies or impoundments, 30 C.F.R. § 823.11(b), the other, to coal preparation plants, support facilities, and roads, 30 C.F.R. § 823.11(a). Industry has appealed these twin rulings. We affirm both.

### a. Construction of Water Impoundments on Prime Farmland

■ Section 823.11(b) of the regulations condones reclaiming land that had been prime farmland prior to mining by constructing a permanent water impoundment, if the mine operator satisfies the general conditions for altering the use of affected land and if the water body is designed to minimize the loss of prime farmland. The Secretary had proffered a construction of the water impoundment exception that would limit the allowance to those found beneficial or necessary to agricultural activity, *i.e.*, water bodies necessary for irrigation of prime farmland would be allowed. But the district court, in agreement with Industry, found no such limitation in the provision; purposes for impoundments allowed by the regulation, the court enumerated, "include[d] recreational, municipal water supply, replacement of wetlands, livestock consumption, and esthetic improvement." *PSMRL II (Round II)*, 21 E.R.C. at 1734. The court concluded that, desirable as such uses may be, the Act—

---

**28.** The NAS study did warn that a purely quantitative comparison of vegetative yield between the reclaimed land and the comparison plot that ignored differences in the nutritional quality of the vegetation would not provide an accurate assessment of reclamation success. The Secretary addressed this warning in the preamble to the regulation:

> The determination of range land productivity should consider the pounds of beef (or equivalent) that may be produced per unit of area. This is dependent upon the quality as well as the quantity of forage available. Hence, equal quantities of forage are not always a true reflection of range or grazing land productivity, and measures of revegetation success should take into account the nutritional value of the forage when determining whether productivity has been restored. However, OSM is not requiring that actual grazing must occur in each instance.

48 Fed.Reg. 40148 (1983).

**29.** 30 C.F.R. § 823.11 prescribes:

> The requirements of this part shall not apply to—

(a) Coal preparation plants, support facilities, and roads of surface and underground mines that are actively used over extended periods of time and where such uses affect a minimal amount of land. Such uses shall meet the requirements of Part 816 of this chapter for surface mining activities and of Part 817 of the chapter for underground mining activities;

(b) Water bodies that have been approved by the regulatory authority as an alternative postmining land use in accordance with §§ 773.15, 780.23, 784.15, 816.133, and 817.133 of this chapter, as applicable, and where the regulatory authority has determined that the water bodies will be designed and constructed to minimize the loss of prime farmland. Such water bodies shall meet the requirements of §§ 816.49 and 817.49 of this chapter; or

(c) Prime farmland that has been excluded in accordance with § 785.17(a) of this chapter.

*See* 50 Fed.Reg. 7278 (1985) (suspending portions of the regulation that we now review).

specifically, § 510(d)(1)—does not countenance them. Accordingly, the court struck down the provision because it sanctioned "a broad and impermissible variance from the post-mining use of prime farmland." *Id.*[30]

Industry locates in § 515(b)(8) of the Act "unequivocal[ ]" authorization for "the creation ... of permanent impoundments when reclaiming mined land," and maintains that "the statute at no point commands that all prime farmland be reclaimed to crop farming." Brief for Appellants NCA at 54–55.[31] We find Industry's argument unpersuasive and hold that the Act and its legislative history impel the district court's ruling.

Taking one step back from the subsection Industry advances, we come upon the instruction, in § 515(b)(7), that "for all prime farm lands ... to be mined and reclaimed ... operator[s] shall" follow specified soil removal, storage, and replacement procedures deemed necessary by Congress to restore the productivity of mined prime farmland. *See also* H.R.Rep. No. 218, 95th Cong., 1st Sess. 67 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin. News 593, 605 (standards designed to assure full reclamation).[32] We emphasize the words "all" and "shall" in the § 515(b)(7) prescription. Beyond question, Congress did not intend to allow any mined prime farmland to be left altogether unreclaimed, and the subsection appears to instruct, in-

30. The district court explicitly refrained from deciding whether a regulation confining impoundments on prime farmlands to those "necessary or beneficial for the farmland" would be compatible with the Act. *PSMRL II (Round II),* 21 E.R.C. at 1734 n. 12. We, too, leave that question open because the Secretary has not challenged on appeal the district court's statement of the scope of § 823.11(b), and because Industry agrees with the district court as to the breadth of the exception.

31. SMCRA § 515(b)(8) provides:
(b) General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as a minimum to—
. . . .
(8) create, if authorized in the approved mining and reclamation plan and permit, permanent impoundments of water on mining sites as part of reclamation activities only when it is adequately demonstrated that—
(A) the size of the impoundment is adequate for its intended purposes;
(B) the impoundment dam construction will be so designed as to achieve necessary stability with an adequate margin of safety compatible with that of structures constructed under Public Law 83–566 (16 U.S.C. 1006);
(C) the quality of impounded water will be suitable on a permanent basis for its intended use and that discharges from the impoundment will not degrade the water quality below water quality standards established pursuant to applicable Federal and State law in the receiving stream;
(D) the level of water will be reasonably stable;
(E) final grading will provide adequate safety and access for proposed water users; and
(F) such water impoundments will not result in the diminution of the quality or quanti-

ty of water utilized by adjacent or surrounding landowners for agricultural, industrial[,] recreational, or domestic uses[.]

32. SMCRA § 515(b)(7) states:
(7) [F]or all prime farm lands *as identified* in section 507(b)(16) to be mined and reclaimed, specifications for soil removal, storage, replacement, and reconstruction shall be established by the Secretary of Agriculture, and the operator shall, as a minimum, be required to—
(A) segregate the A horizon of the natural soil, except where it can be shown that other available soil materials will create a final soil having a greater productive capacity; and if not utilized immediately, stockpile this material separately from other spoil, and provide needed protection from wind and water erosion or contamination by other acid or toxic material;
(B) segregate the B horizon of the natural soil, or underlying C horizons or other strata, or a combination of such horizons or other strata that are shown to be both texturally and chemically suitable for plant growth and that can be shown to be equally or more favorable for plant growth than the B horizon, in sufficient quantities to create in the regraded final soil a root zone of comparable depth and quality to that which existed in the natural soil; and if not utilized immediately, stockpile this material separately from other spoil, and provide needed protection from wind and water erosion or contamination by other acid or toxic material;
(C) replace and regrade *the root zone material* described in (B) above with proper compaction and uniform depth over the regraded spoil material; and
(D) redistribute and grade in a uniform manner the surface soil horizon described in subparagraph (A)[.]

clusively, that *all* prime farmland reclamation *shall*, "as a minimum," be conducted pursuant to the statutorily enumerated requirements. The listed requirements entail precise and arduous specifications that are altogether unnecessary, indeed counterproductive, to the construction of a water impoundment. We leave open the question whether, without defying congressional intent, the Secretary might plausibly urge a narrow exception allowing water impoundments necessary or beneficial to prime farmland activity. *See supra* note 30. Section 515(b)(7), it suffices to point out here, plainly supports the district court's conclusion that a general exception for water impoundments authorizes impermissible post-mining uses of prime farmland.

Section 519(c)(2) of the Act also accords with the district court's ruling and is dissonant with Industry's position. *See supra* note 24. This section permits release of the bond or deposit placed by a mine operator to guarantee satisfactory reclamation only when the soil productivity of the affected prime farmland has been returned to levels of yield equivalent to those of neighboring, nonmined prime farmland. While the provision does not say in so many words that "mine operators shall restore prime farmland to its pre-mined use," bond release is impermissible until such restoration is achieved.

We reproduce in the margin a significant excerpt from the legislative history. The item is a statement by Senator Culver, sponsor of an amendment to the Act; as proposed by Senator Culver, the amend-

ment expressly denied a mining permit to any operator unable to demonstrate the ability fully to restore prime farmland, if the mine area at stake included more than ten percent prime farmland.[33] The Culver statement strongly maintained that alternate uses of prime farmland, even uses perceived by a regulator as "higher" or "better," are inappropriate, and therefore must be disallowed by those who administer the Act. We find in the legislative history no reference to any objection to the amendment on the ground that alternate post-mining uses for prime farmland should be permitted; dissenters merely urged that the Act *already* protected prime farmland so that the amendment was superfluous. 123 CONG.REC. 15712 (1977) (statement of Senator Hansen); 123 CONG. REC. 15718 (1977) (statement of Senator Melcher). Senator Culver's amendment was incorporated into the Senate bill, and it emerged from the Conference Committee and full Congress without even the ten percent threshold limitation proposed by its sponsor. *See* SMCRA § 510(d)(1). The subsection containing Senator Culver's amendment is the very one featured by the district court in holding that the regulation's water impoundment exception is at odds with the Act.

Industry's reliance on § 515(b)(8)'s recognition that permanent water impoundments may be created on mined land does not aid the more focused inquiry we must make. That provision instructs that any water impoundment constructed on mined land must meet certain performance standards, but it neither requires mine operators to build

33. Senator Culver remarked:
Under the current bill the language states that an applicant for a new permit to strip mine must demonstrate that he can restore the land affected to a condition at least fully capable of supporting the uses which it was capable of supporting prior to any mining, or higher or better uses.
It is true, as the floor manager of the bill suggests, that implicit in this is that a reasonable person may interpret it, and so construe it, that a restoration to prime agricultural land use wou[l]d be a minimal essentiality under that language. But that caveat of a higher or better use is the hooker. That is the loophole you can drive a truck through. I shall tell why.

The effect of this amendment is to set a standard for reclamation of prime farm lands. Without this amendment, someone in the short term can determine that a better use is a recreational use; a better use is a residential use; a higher use is an industrial use. We are giving all that discretionary authority to some bureaucrat.
I do not want to do that, if we are worried about bureaucrats. I want to tell them what to do. We tell them loud and clear here, and we address a very, very vulnerable aspect of this legislation.
123 CONG.REC. 15719 (1977).

impoundments, nor says they may do so regardless of the prior use of the land. The Act anticipates that mine operators will be able "to comply with *each* of the requirements set out in section 515." SMCRA § 508(a)(5) (emphasis added); *see also* SMCRA § 515(b) (listed performance standards shall be required "as a minimum"). The district court thus most plausibly comprehended Congress to have ordered that permanent water impoundments unconnected to prime farmland use not be constructed on prime farmland. *Compare* SMCRA § 515(b)(7) (*obligation* to follow specified restoration procedures) *with* SMCRA § 515(b)(8) (*permission* to construct permanent water impoundments). We have no warrant to disturb the district court's solidly-supported disposition.

b. *Exemption for Prime Farmland Affected by Coal Preparation Plants, Support Facilities, and Roads*

■ The exemption contained in § 823.11(a) of the Secretary's regulation, *see supra* note 29, applies to surface and underground mines alike, and concerns "[c]oal preparation plants, support facilities, and roads" that "affect a minimal amount of land." 30 C.F.R. § 823.11(a). To fall within the exemption, these facilities must be "actively used over extended periods of time." *Id.* On NWF's challenge, the district court remanded this exemption for two distinct reasons. First, the court held that despite adequate reasons for exempting land underlying surface facilities of underground mines, the Secretary had too swiftly equated surface mining with underground mining for the purpose at hand. The district judge instructed the Secretary to reconsider, taking account of "basic differences" between the two operations. Second, the district court found the exemption imprecise because the Secretary had not further defined the terms "extended periods of time" and "minimal amount of land." *PSMRL II (Round II),*

21 E.R.C. at 1734–35. This second ruling is not contested on appeal. The challenge here is limited to Industry's objection to the district court's first basis for the remand.

We note, initially, that Industry misdescribes what the district court held. The ruling we review does not command application of § 515(b)(7) of the Act to the soil under support facilities for surface mines. *But see* Brief for Appellants NCA at 59, 63. Rather, the remand called for a more cogent explanation of the Secretary's action, so that the court could intelligently rule on the consistency of that action with the statute.

The regulatory preamble to § 823.11, 48 FED.REG. 21452–55 (1983), offers two reasons for ranking surface mining operations with underground operations in the context at issue. First, the Secretary referred to the district court's 1980 ruling that it would be unreasonable not to exempt underground mine operators' surface support facilities that are actively used over extended periods of time but affect a minimal amount of land. *See PSMRL I (Round II),* 19 E.R.C. at 1480–81. The Secretary thought that the same rationale, *i.e.,* the arbitrariness of "command[ing] operators to segregate [and store] the topsoil and the underlying horizons for 20–40 years in situations where reclamation will affect a small area," *id.,* "appl[ies] equally well to such facilities associated with surface mines. Surface mines often use the same types of facilities as underground mines and for comparable periods of time." 48 FED.REG. 21453 (1983).

Second, the Secretary relied upon his own finding that, for restoring prime farmland affected by surface support facilities, the prime farmlands standards provide procedures less suitable than those contained in the general performance standards.[34] A "reasonable construction of the prime farmland sections of the Act," the Secretary commented, "does not require that

---

**34.** The preamble to § 823.11 expressly finds that the general rules, requiring all topsoil to be temporarily removed from areas underlying support facilities, but permitting subsoils to be left in place and rejuvenated following removal

of the facilities, are better suited to reclaiming land underlying facilities than are the rules of § 515(b)(7), requiring removal, segregation, storage, and replacement of both the topsoil and the subsoil layers. 48 FED.REG. 21452 (1983).

they be applied to 'areas' where their special protections would be to no avail." 48 FED.REG. 21453 (1983).

The Secretary's first justification, as the district court observed, did not adequately explain why the court's 1980 opinion, written with underground mine facilities in mind, should apply to surface facilities for surface mining operations. During the comment period on § 823.11, two commenters noted that surface mine operations, unlike underground mine operations, constantly disturb and reclaim the surface in the process of removing coal. 48 FED.REG. 21453 (1983); *see* SMCRA § 515(b)(16) (reclamation is to proceed as contemporaneously as possible to the land disturbance). Soil affected by surface mine facilities, these comments suggested, need not be stored for 20–40 years until the facilities are dismantled, but could be used in the reclamation of the earliest mine cuts. Similarly, the prime farmland area affected by facilities for the life of the mine might be reclaimed using soil removed from the final mine cut.

Industry stresses that neither the district court nor this court is qualified to settle questions of mining techniques, *i.e.*, to say "how surface mines deal with the soil under support facilities." Brief for Appellants NCA at 62. We do not pretend to mining technique expertise, nor did the district court. We do insist, however, that the Secretary tell us comprehensibly, based on *his* expertise, why—despite "basic differences between surface and underground mining operations," *PSMRL II (Round II)*, 21 E.R.C. at 1735—a decision focused on facilities serving underground mines applies "equally well" to facilities supporting surface mines.

The Secretary's second prop for § 823.11(a) is unstable at two critical joints. First, the proffered explanation addresses only, and thus could justify only, exemption from the special soil removal, storage, and replacement standards; the explanation does not tell us why the special soil restoration requirements of 30 C.F.R. § 823.15 need not be observed. And second, the explanation loses some of the force it might otherwise have when, three sentences after the Secretary concludes that the special performance standards "would be to no avail" for land affected by support facilities, he stresses that "only [facilities] which affect a minimal amount of land are exempted [from prime farmland performance standards]." 48 FED.REG. 21453 (1983). We do not comprehend why the effectiveness of the reclamation scheme the Secretary appraises as superior when support facilities are involved, *see supra* note 34 and accompanying text, should vary according to the amount of land to be reclaimed.[35] The Secretary's position on this matter, in short, is in need of clearer statement.

The district court, we reiterate, remanded § 823.11(a) because "the Secretary's reasoning [was] flawed." *PSMRL II (Round II)*, 21 E.R.C. at 1735. We agree. The district court did not rule that the requirements of § 515(b)(7) of the Act are nonwaivable even as to soil under support facilities for surface mines, nor do we.[36]

### B. Bonding to Assure Reclamation of Land Affected by Mine Operations

In this part we address three challenges to district court rulings relating to the Secretary's bonding regulations. We reverse the district court's rulings, challenged by Industry, regarding incremental and

---

**35.** We note that the district court's 1980 decision, heavily relied upon in the preamble to the regulation, does not supply the missing explanation. The 1980 decision did not hold that the Act tolerates exemption of, at most, and whatever the context, only minimal amounts of prime farmland from prime farmland reclamation standards; what the court did hold was that the Secretary *must exempt*, with respect to underground mine support facilities, minimal amounts of prime farmland. *PSMRL I (Round II)*, 19 E.R.C. at 1480–81.

**36.** Section 515(b)(7) of the Act, we note, governs prime farmland "to be mined"; reclamation adequate to obtain bond release under § 519(c)(2) of the Act, it appears from the regulatory preamble, *see supra* note 34, might be best achieved for non-mined prime farmland without the removal and segregation of subsoils described in § 515(b)(7).

phased bonding; the Secretary's regulations on these bonding arrangements, we hold, are compatible with the Act. We uphold the district court's ruling, challenged by NWF, that the initial bond for an underground operation need not be set at an amount sufficient to cover the cost of restoring land damaged by subsidence.

### 1. Incremental and Phased Bonding

To facilitate bonding arrangements by mine operators, the Secretary has authorized the states (as regulatory authority) to implement plans allowing both incremental and phased bonding. Under the incremental bonding prescription, 30 C.F.R. § 800.11(b),[37] an operator is not required to bond all at once the entire area to be mined in a given permit term.[38] Instead, the state plan may permit the operator to bond, and then commence operations on, smaller units, specifically, "[i]ndependent increments ... of sufficient size and configuration to provide for efficient reclamation operations." 30 C.F.R. § 800.11(b)(4).

Under the Secretary's authorization for phased bonding, 30 C.F.R. § 800.13(a)(2),[39] an operator need not post one bond covering all phases of reclamation. Instead, the regulatory authority may allow the operator to obtain separate bonds for each of the three phases of reclamation (backfilling, regrading and drainage control; revegetation; all remaining reclamation), provided that all phase bonds are posted at the outset, that each bond is sufficient to cover reclamation work in the phase for which it is written, and that the sum of the bonds posted equals or exceeds the total amount needed to complete the reclamation plan for the entire area covered. 30 C.F.R. § 800.13(a)(2); see 48 FED.REG. 32936, 32938, 32941 (1983).[40] As each reclamation phase is completed, the bond for that phase, subject to limitations,[41] will be released. If the mine operator defaults, "[f]orfeiture of phase bonds ... will involve forfeiture of the total of the phase bonds remaining for the area or increment." 48 FED.REG. 32956 (1983). The Sec-

---

37. 30 C.F.R. § 800.11(b) reads:

 (1) The bond or bonds shall cover the entire permit area, or an identified increment of land within the permit area upon which the operator will initiate and conduct surface coal mining and reclamation operations during the initial term of the permit.

 (2) As surface coal mining and reclamation operations on succeeding increments are initiated and conducted within the permit area, the permittee shall file with the regulatory authority an additional bond or bonds to cover such increments in accordance with this section.

 (3) The operator shall identify the initial and successive areas or increments for bonding on the permit application map submitted for approval as provided in the application (under Parts 780 and 784 of this chapter), and shall specify the bond amount to be provided for each area or increment.

 (4) Independent increments shall be of sufficient size and configuration to provide for efficient reclamation operations should reclamation by the regulatory authority become necessary pursuant to § 800.50.

38. A permit term runs for a specified number of years, usually five. As the district court explained, the permit term need not, and generally does not, run contemporaneously with a permit area. *PSMRL II (Round II)*, 21 E.R.C. at 1743. Ordinarily, it will take a number of permit term renewals to complete operations throughout an

entire permit area. *Id.; see also* SMCRA § 506(d) (anticipating successive renewal).

39. 30 C.F.R. § 800.13(a)(2) provides:

 With the approval of regulatory authority, a bond may be posted and approved to guarantee specific phases of reclamation within the permit area provided the sum of phase bonds posted equals or exceeds the total amount required under §§ 800.14 and 800.15. The scope of work to be guaranteed and the liability assumed under each phase bond shall be specified in detail.

40. As the Mining and Reclamation Council of America explained, phased bonding permits mine operators to obtain bonds "from several different sources.... For example, the operator might obtain surety bonds for Phase I and II activities, and post a collateral bond for the long-term Phase III liabilities that sureties are often reluctant to cover." Brief of the Appellant Mining and Reclamation Council of America at 12 (footnote omitted); *see* 30 C.F.R. § 800.5 (defining surety bond and collateral bond).

41. If the bond for the first phase exceeds sixty percent of the total of all phase bonds, the excess over sixty percent is not immediately released. The bond for the second phase will be fully released following completion of that phase only if the third bond is adequate to assure completion of the third phase. 48 FED. REG. 32938 (1983).

retary has repeated his assurance that later phase bonds could be forfeited in the event that an earlier bond was released before the need for additional work was discovered. Supplemental Brief for the Secretary of the Interior at 2, 4–5; Correction to Supplemental Brief for the Secretary of the Interior at 2.

The district court found the incremental bonding allowance impermissible under § 509(a) of the Act; [42] the court read that provision to require each bond to cover no less than "the entire area to be mined in a given permit term." *PSMRL II (Round II)*, 21 E.R.C. at 1743. Phased bonding, the district court held, was inconsistent with § 509(b) of the Act; [43] the court read that provision to prohibit "break[ing] the bond into specific phases of reclamation." *Id.* at 1744. Rejecting the Secretary's argument that § 509(c) of the Act allows both bonding forms as "alternative system[s]," [44] the district court ruled that § 509(c) countenances only "alternatives to bonding," *id.* at 1743, not alternative bonding schemes.

We pretermit the question whether incremental and/or phased bonding can be accommodated within the terms of §§ 509(a) and (b) of the Act. Section 509(c), we hold, reasonably could be read by the Secretary to permit his approval of *alternative bonding methods* that will fulfill the purposes of the Act. While § 509(c) is not a model of the drafter's art, and the district court's reading of the provision is a plausible one, we defer to the reasonable interpretation ultimately proffered by the Secretary. *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Chemical Mfrs. Ass'n v. NRDC,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985).

Section 509(c) reads, in relevant part:

[I]n lieu of the establishment of a bonding program, *as set forth in this section,* the Secretary may approve as part of a State or Federal program an *alternative system* that will achieve the objectives and purposes of the bonding program pursuant to this section.

(Emphasis added.) Under the district court's construction, Congress established *the* sole permissible bonding program, but allowed the Secretary to approve a system alternative to bonding, *e.g.,* insurance. The Secretary, in contrast, reads the Act to permit any system that fulfills the Act's objectives and purposes; both bonding and nonbonding programs, the Secretary maintains, could fit that description.

The Conference Report on the bill that became the Act, we think it significant, accords with the Secretary's ultimate interpretation. The Report observed that the House bill

included discretionary authority for *alternative bonding approaches* providing

---

**42.** SMCRA § 509(a) provides:

After a surface coal mining and reclamation permit application has been approved ... the applicant shall file with the regulatory authority ... a bond for performance payable, as appropriate, to the United States or to the State, and conditional upon faithful performance of all the requirements of this Act and the permit. The bond shall cover that area of land within the permit area upon which the operator will initiate and conduct surface coal mining and reclamation operations within the initial term of the permit. As succeeding increments of surface coal mining and reclamation operations are to be initiated and conducted within the permit area, the permittee shall file with the regulatory authority an additional bond or bonds to cover such increments in accordance with this section. The amount of the bond required for each bonded area shall depend upon the reclamation requirements of the approved permit....

**43.** SMCRA § 509(b) reads:

Liability under the bond shall be for the duration of the surface coal mining and reclamation operation and for a period coincident with operator's responsibility for revegetation requirements in section 515.

**44.** SMCRA § 509(c) (emphasis added) provides:

The regulatory authority may accept the bond of the applicant itself without separate surety when the applicant demonstrates to the satisfaction of the regulatory authority the existence of a suitable agent to receive service of process and a history of financial solvency and continuous operation sufficient for authorization to self-insure or bond such amount *or in lieu of the establishment of a bonding program, as set forth in this section, the Secretary may approve as part of a State or Federal program an alternative system that will achieve the objectives and purposes of the bonding program pursuant to this section.*

the objectives and purposes of this bonding program are met. The Senate receded.

H.R. CONF.REP. No. 493, 95th Cong., 1st Sess. 103 (1977), *reprinted in* 1977 U.S. CODE CONG. & ADMIN.NEWS 593, 735 (emphasis added). The dispositive question, it thus appears to us, is whether the Secretary rationally concluded that the incremental and phased bonding plans he permitted "will achieve the [same] objectives and purposes" as those achievable under a plan indisputably consistent with §§ 509(a) and (b) of the Act. SMCRA § 509(c).

The district court rejected incremental bonding because the area covered by such a bond could be (and likely would be) smaller than the area to be mined in the course of one permit term. But under the Secretary's prescription, no surface area could be disturbed until the regulatory authority determined that the amount of bond posted for that area was sufficient to assure completion of the reclamation plan in the event of forfeiture. 30 C.F.R. § 800.11(c); § 800.14(b); *see* 48 FED.REG. 32937 (1983). True, the regulation allows an operator to confine bonding ahead to that portion of the permitted area that the operator plans to affect in the near future. But so long as the bond is calculated (as 30 C.F.R. § 800.14(b) requires) at the full cost of reclaiming that particular increment of land, and the size and configuration of the increment (as 30 C.F.R. § 800.11(b)(4) requires) are appropriate for efficient reclamation, we do not see how the arrangement appreciably heightens the risk that any land will be left unreclaimed.

Phased bonding, too, measures up to the standard we deem critical. We reiterate that "[t]he total of the phase bonds must be sufficient to cover costs to the regulatory authority to complete the reclamation plan, and bond[s] covering all three phases must be posted before disturbance of the area or increment bonded." 48 FED.REG. 32936 (1983).

Phase bonds are all posted before any land is disturbed, and are individually released as each reclamation phase is accomplished, with limits on release comparable to those applicable to a single bond. *See supra* note 42. If the operator defaults and additional work on a completed phase becomes necessary, remaining bonds can be used to complete that reclamation work, but coverage may be inadequate to carry out in full the later reclamation stage(s). A single bond covering all three reclamation phases, we note, may be released in stages as each phase is accomplished. SMCRA § 519(c) (60% may be released upon backfilling, regrading and drainage control; an unspecified percent may be released upon completion of revegetation and other requirements; the remainder may be released upon expiration of the period of operator liability following revegetation). If, subsequent to partial release of the single bond, additional work on an earlier phase is required, the operator's default will have similar consequences: the unreleased portion of the bond can be used to complete that work, but an inadequate amount may remain to fulfill the subsequent phase(s). Thus phased bonding appears to create no appreciably greater risk *of incomplete reclamation than does a single bond.*

In sum, the Secretary reasonably construed § 509(c) of the Act, and responsibly determined that the incremental and phased bonding programs he authorized fulfilled the statutory objective: to ensure, to the extent feasible, completion of the reclamation plan in the event that an operator defaults. We therefore reverse the district court's judgment with respect to incremental and phased bonding and uphold the Secretary's prescriptions.

2. *Bonding for Damage Caused by Subsidence of Land Overlying Underground Mines*

 The Secretary requires underground mine operators to repair any material damage to land caused by subsidence. 30 C.F.R. § 817.121(c)(1). Over Industry's objection, the district court upheld the Secretary's requirement, and we have affirmed that disposition. *See infra* pp. 739–41. NWF charges that the Secretary's bonding regulations are at odds with his

requirement that operators repair subsidence-caused surface damage. The regulations at issue do not require bonding for subsidence damage at the outset of mining operations. *See* 30 C.F.R. § 800.14.[45] They do call for bonding if and when damage occurs.[46] The Secretary's scheme in this regard, the district court held, "is reasonable and implements the requirements of the Act." *PSMRL II (Round II)*, 21 E.R.C. at 1743. We agree.

The Secretary explained that whether, when, and where subsidence will cause damage to the surface cannot be calculated with any degree of reliability when operations commence: "[T]echniques for estimating the extent of necessary land restoration that may result from subsidence have not yet been developed[, so that] the amount of a performance bond based on estimated costs would be pure conjecture." 48 FED.REG. 32948 (1983). With this impediment to initial bonding in view, the Secretary settled on the following arrangement.

If and when material damage to land results from subsidence, the operator's rec-

lamation and bonding obligations ripen simultaneously. The regulatory authority may, at that point, adjust the bond to take full account of the necessary reclamation work. 30 C.F.R. § 800.15(a), implementing SMCRA § 509(e). Liability insurance proceeds may also be used to accomplish reclamation,[47] and the initially-posted bond stands available for any reclamation obligations whenever they arise. 30 C.F.R. § 800.16(c); *see* Brief for the Secretary of the Interior as Appellee at 13. Under this scheme, it is only when the operator defaults before upward adjustment of the bond that land damaged by subsidence may be left incompletely reclaimed.

In thus dealing with the problem of bonding for damage to land from subsidence, the Secretary invoked § 516(d) of the Act, which permits "such modifications to ... bond requirements as are necessary to accommodate the distinct difference between surface and underground coal mining." [48] We hold, as did the district court, that the Secretary relied on that provision legitimately.

45. 30 C.F.R. § 800.14 reads:
 Determination of bond amount.
 (a) The amount of the bond required for each bonded area shall:
 (1) Be determined by the regulatory authority;
 (2) Depend upon the requirements of the approved permit and reclamation plan;
 (3) Reflect the probable difficulty of reclamation, giving consideration to such factors as topography, geology, hydrology, and revegetation potential; and
 (4) Be based on, but not limited to, the estimated cost submitted by the permit applicant.
 (b) The amount of the bond shall be sufficient to assure the completion of the reclamation plan if the work has to be performed by the regulatory authority in the event of forfeiture, and in no case shall the total bond initially posted for the entire area under one permit be less than $10,000.
 (c) An operator's financial responsibility under § 817.121(c) of this chapter for repairing material damage resulting from subsidence may be satisfied by the liability insurance policy required under § 800.60.

46. 30 C.F.R. § 800.15 instructs the regulatory authority to adjust the bond size to reflect any increase in reclamation costs. *See* Brief for the Secretary of the Interior as Appellee at 12.
 NWF maintains that once subsidence occurs, a mine operator will be unable to find a surety

willing to post a bond to guarantee repair. We do not follow the argument. A surety anticipates at the outset that the bonded land will require reclamation. The uncertainty is not over the obligation to reclaim; it relates instead to the question whether the mine operator will default on that obligation.

47. The Secretary anticipates that, in addition to the bond, the public liability insurance policy required of each mine operator, 30 C.F.R. § 800.60, will provide resources for reclamation. We note, however, that insurance proceeds may be pocketed by the recipient, and thus will not inevitably assure reclamation.

48. Section 516(d) of the Act states in full:
 The provisions of title V of this Act relating to State and Federal programs, permits, bonds, inspections and enforcement, public review, and administrative and judicial review shall be applicable to surface operations and surface impacts incident to an underground coal mine with such modifications to the permit application requirements, permit approval or denial procedures, and bond requirements as are necessary to accommodate the distinct difference between surface and underground coal mining. The Secretary shall promulgate such modifications in accordance with the rulemaking procedure established in section 501 of this Act.

The record and regulatory history bear out the essential points made by the Secretary: (1) the subsidence problem qualifies as a "distinct difference between surface and underground coal mining"; and (2) unless and until subsidence damage occurs, bonding for it would be a highly speculative endeavor. We summarize the salient points.

Rules proposed in 1978 would have required mine operators to post a bond adequate to defray the potential costs of repairing subsidence *damage*. The final 1979 rules, however, dropped this requirement in the face of comments emphasizing the absence of information and techniques adequate to project what restoration subsidence might require, and therefore the costs entailed. *See* 44 FED.REG. 15112 (1979); *cf.* 44 FED.REG. 15274 (1979) (citing technical literature, the Secretary observed that "[a]n itemization of the probable effects of subsidence on structures would most likely be so speculative or general as not to be useful to the property owner").

In 1980, the Secretary added to the bonding regulations a provision applicable only to underground operators engaged in planned subsidence mining. *See* FED.REG. 6031, 6037, 52309, 52318 (1980). This provision, 30 C.F.R. § 801.16(a),[49] required operators to post an initial bond large enough to cover measures to *prevent* potential damage to surface facilities. These preventive measures, set out in § 784.20(b) of the regulations, include reinforcing sensitive structures, and relocating pipelines, utility lines, and movable improvements to land. *See* 30 C.F.R. § 784.20(b) (1981) (referenced by 30 C.F.R. § 801.16(a) (1981)). Upon performance of the prescribed preventive measures, presumably before min-

ing commenced, the portion of the bond posted to guarantee their fulfillment became releasable. 30 C.F.R. § 801.16(a) (1981); *see also* FED.REG. 52309 (1980).

Not only was the provision put forward in 1980 limited to operators engaged in planned subsidence; more significantly, it did not require coverage for *repairing* subsidence-caused surface damage. Instead, bonding was to cover only pre-operation *preventive* measures. *See* 45 FED.REG. 6031 (1980) ("protection of surface owners from damaging effects of subsidence [is] the subject of further study"). In 1981, the Secretary deleted § 801.16(a) from the regulatory scheme. He reasoned that a bond affording funds to take preventive measures was unnecessary because, upon a mine operator's failure to undertake those measures, the operator would lose permission to mine, thus eliminating the need for the preventive measures. 46 FED.REG. 59934 (1981).

NWF cites nothing in the current administrative record relevant to the difficulty of estimating subsidence damage that was not also before the Secretary in 1979. *Compare* Brief for Appellants NWF at 30 (evidence in current record allegedly demonstrating predictability of subsidence consists of (1) environmental impact statement, (2) statement by Industry and (3) statement in 1979 record), *with* Brief for Appellants NWF at 25 n.* (environmental impact statement in current record also accompanied the 1979 regulations), and 44 FED.REG. 15273 (1979) (similar Industry statement made in 1979). Because the Secretary has not adopted a new view or approach on bonding for the effects of subsidence, but has merely restated a position he previously advanced and justified, we would require a further demonstration on

---

**49.** 30 C.F.R. § 801.16(a) (1981) read:
Subsidence and mine drainage.
 (a) 30 C.F.R. § 784.20 and 817.121 through 817.126 shall apply to the protection of surface-owner property rights against potential damage caused by unplanned subsidence. All measures undertaken *to conform with* § 784.20(b) in the prevention of damage to surface facilities through planned subsidence shall be subject to performance bond coverage, and the estimated cost of such measures

shall be included under § 805.11. In addition, the bond liability shall extend to performance of the construction, site preparation, and relocations approved by the regulatory authority under § 784.20(a). Release of bond coverage for construction of control measures to prevent subsidence shall be authorized only after final inspection, acceptance, and approval by the regulatory authority....

his part only if significant new evidence were present. Here, no such evidence has been called to our attention. In sum, we conclude that, confronted with the extraordinary complexity and uncertainty of estimating coverage for subsidence damage, the Secretary was entitled to find the requisite "necess[ity]" to modify, as he did, bond requirements that otherwise might have governed. *See* SMCRA § 516(d).

### C. *Regulatory Guidance*

In 1983, to afford greater leeway to local regulators, the Secretary cut back on nationwide guidelines in three areas: alluvial valley floors; coal mine waste disposal; backfilling and grading. The district court, on NWF's challenge, held that the Secretary had not adequately justified the regulatory reductions. We affirm the district court's judgment with respect to alluvial valley floors, but reverse that judgment as to mine waste disposal. On backfilling and grading, we hold, in accord with the district court, that the Secretary was intolerably terse in explaining his revised positions on "contemporaneous reclamation" and "thick and thin overburden." Contrary to the district court, however, we uphold the Secretary's action on "terracing."

We stress that to the extent we reject the Secretary's actions under this heading, we do so provisionally. We do not hold that the Secretary's revisions are proscribed by the Act; we do hold that he has not adequately accounted for the regulatory changes he ordered.

### 1. *Alluvial Valley Floors*

■ Section 515(b)(10)(F) of the Act requires surface coal mining operations to "preserv[e] throughout the mining and reclamation process the essential hydrologic functions of alluvial valley floors in the arid and semi-arid areas of the country."[50] Alluvial valley floors "are the productive lands that form the backbone of the agricultural and cattle ranching economy" in those areas. H.R.REP. No. 218, 95th Cong., 1st Sess. 116 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 649.

Prior to 1983, § 785.19(d) of the regulations contained detailed specifications of the information needed in a permit application when the proposed operation might affect an alluvial valley floor or waters supplied to an alluvial valley floor. In 1983, the Secretary withdrew the enumeration of "technical data, information, and analysis" that formerly had to be presented and evaluated in a permit application, and instead "require[d] generally that sufficient information be submitted to enable the regulatory authority to make the necessary determinations." 48 FED.REG. 29814 (1983).[51]

**50.** Under the Act's definition, SMCRA § 701(1), "alluvial valley floors" means the unconsolidated stream laid .deposits holding streams where water availability is sufficient for subirrigation or flood irrigation agricultural activities but does not include upland areas which are generally overlain by a thin veneer of colluvial deposits composed chiefly of debris from sheet erosion, deposits by unconcentrated runoff or slope wash, together with talus, other mass movement accumulation and wind-blown deposits[.]

According to the regulations' definition, 30 C.F.R. § 701.5,

*Essential hydrologic functions* means the role of an alluvial valley floor in collecting, storing, regulating, and making the natural flow of surface or ground water, or both, usefully available for agricultural activities by reason of the valley floor's topographic position, the landscape, and the physical properties of its underlying materials. A combination of these functions provides a water sup-

ply during extended periods of low precipitation.

**51.** The prior regulations contained two comprehensive sets of instructions, 30 C.F.R. § 785.19(d)(2) (1982), and 30 C.F.R. § 785.19(d)(3) (1982). We set out the former to convey the character of the change. 30 C.F.R. § 785.19(d)(2) (1982) provided:

(2) Information required under this paragraph shall include, but not be limited to—

(i) Geologic data, including geologic structure, and surficial geologic maps, and geologic cross-sections;

(ii) Soils and vegetation data, including a detailed soil survey and chemical and physical analyses of soils, a vegetation map and narrative descriptions of quantitative and qualitative surveys, and land use data, including an evaluation of crop yields;

(iii) Surveys and data required under this paragraph for areas designated as alluvial valley floors because of their flood irrigation

NWF challenged the Secretary's deletion of specific criteria for determining what constitutes the "preservation" of essential hydrologic functions of alluvial valley floors. The district court ruled that the Secretary had abandoned the detailed specification of standards approach "without adequate explanation," and therefore "remand[ed] this issue to the Secretary for further consideration." *PSMRL II (Round II),* 21 E.R.C. at 1740. In so ruling, the district judge recalled the Secretary's own recognition that "Congress was extremely concerned about protecting the [alluvial valley floors]." *Id.* at 1741. We affirm.

The Secretary cites the following passage as setting out a fully adequate explanation for the deletion of the detailed requirements contained in the original regulation:

> OSM carefully evaluated the detailed informational requirements contained in the previous alluvial valley floor regulation. The changes to the alluvial valley floor rules will eliminate much of the confusion about protection requirements of the Act and will provide regulatory authorities with flexibility to reflect site-specific conditions. Much of the technical information being eliminated, while not wrong, adds unnecessary length and confusion to the regulatory structure. *Most of the eliminated material will continue to be available in guidelines and is the type of information likely to be valuable in assisting the regulatory authority in making its determinations.* Elimination of the detailed informational requirements from every permit application will not result in the regulatory authorities making unsupported or technically inadequate determinations with respect to alluvial valley floors. Every decision must be based on and supported by adequate technical data and analyses regardless of whether each detail or study is enumerated in the rules.

48 FED.REG. 29802–03 (1983) (emphasis added), *quoted in* Brief for the Secretary of

characteristics shall also include, at a minimum, surface hydrologic data, including streamflow, runoff, sediment yield, and water quality analyses describing seasonal variations over at least 1 full year, field geomorphic surveys and other geomorphic studies;

(iv) Surveys and data required under this paragraph for areas designated as alluvial valley floors because of their subirrigation characteristics, shall also include, at a minimum, geohydrologic data including observation well establishment for purposes of water level measurements, ground water contour maps, testing to determine aquifer characteristics that affect waters supplying the alluvial valley floors, well and spring inventories, and water quality analyses describing seasonal variations over at least 1 full year, and physical and chemical analysis of overburden to determine the effect of the proposed mining and reclamation operations on water quality and quantity;

(v) Plans showing how the operation will avoid, during mining and reclamation, interruption, discontinuance or preclusion of farming on the alluvial valley floors unless the premining land use has been undeveloped rangeland which is not significant to farming and will not materially damage the quantity or quality of water in surface and ground water systems that supply alluvial valley floors;

(vi) Maps showing farms that could be affected by the mining and, if any farm includes an alluvial valley floor, statements of the type and quantity of agricultural activity performed on the alluvial valley floor and its relationship to the farm's total agricultural activity including an economic analysis[;]

(vii) Such other data as the regulatory authority may require.

In the revision, the same numbered section essentially repeats the more general specifications formerly placed in 30 C.F.R. § 785.19(d)(1) (1982), and is the sole instruction provided; the revision, 30 C.F.R. § 785.19(d)(2) (1986) reads:

(2) The complete application shall include detailed surveys and baseline data required by the regulatory authority for a determination of—

(i) The characteristics of the alluvial valley floor which are necessary to preserve the essential hydrologic functions throughout the mining and reclamation process;

(ii) Whether the operation will avoid during mining and reclamation the interruption, discontinuance, or preclusion of farming on the alluvial valley floor;

(iii) Whether the operation will cause material damage to the quantity or quality of surface or ground waters supplied to the alluvial valley floors;

(iv) Whether the reclamation plan is in compliance with requirements of the Act, this chapter, and regulatory program; and

(v) Whether the proposed monitoring system will provide sufficient information to measure compliance with Part 822 of this chapter during and after mining and reclamation operations.

the Interior as Appellant at 60–61. We find this account somewhat incoherent.

As to the asserted "confusion" attributed to the "detailed informational requirements," we note that the Secretary gave no particulars. He did not identify the specific source or effects of the confusion, nor did he say why revisions trimming and clarifying the requirements would not suffice to deal with that problem.

The Secretary's principal justification for the changes, however, was not to dispel confusion, but to "provide regulatory authorities with flexibility." 48 Fed.Reg. 29802 (1983); *see id.* at 29814 ("The principal difference [between the original and the revised regulation] is that the regulatory authority will have the flexibility to adjust the type of data and level of analysis necessary on which to base its determinations."). But if "[m]ost of the eliminated material ... is the type of information likely to be valuable in assisting the regulatory authority in making its determinations," 48 Fed. Reg. 29802–03, why was wholesale elimination ordered? As the district judge observed, the reference to unofficial "guidelines" is not forceful: "The[ ] guidelines [alluded to] are not mandatory and there is no indication that operators or regulatory authorities will heed them. The existence of these guidelines, however, undermines the Secretary's argument that the diversity of [site-specific] conditions ... precludes the use of [standards or criteria set by regulation]." *PSMRL II (Round II),* 21 E.R.C. at 1740 n. 20.

In 1978, in support of the original regulation, the Secretary then in office noted that the required studies "are believed to be representative of *standard ... studies necessary* to establish characteristics which support the essential hydrologic functions of alluvial valley floors, and determine the effect of the proposed opera-

tion on agricultural activities." 43 Fed. Reg. 41720 (1978) (emphasis added); *see also* 44 Fed.Reg. 15079, 15089 (1979) (objective of § 785.19(d) is to ensure regulatory authority has information it needs). In changing the regulation to foster "flexibility," the Secretary in 1983 did not question the above-quoted conclusion. But if the standards originally set are "necessary to establish characteristics ... support[ing] the essential hydrologic functions of alluvial valley floors," then we do not comprehend why or how "flexibility" would measurably increase under the Secretary's revised approach.

In sum, the Secretary's accounting for the 1983 deletions slips from our grasp, as it did from the district court's. We affirm the remand so that the Secretary may provide appropriate, official guidance to the operators and regulatory authorities, or explain coherently why such guidance is not needed.

### 2. *Mine Waste*

■ In 1983, the Secretary revised the regulations governing disposal of coal mine waste by substituting performance standards—rules describing minimum satisfactory end results—for "how to" rules (design standards). *Compare* 30 C.F.R. §§ 816.81 *et seq.* (1982) *with* 30 C.F.R. §§ 816.81 *et seq.* (1986).[52] NWF successfully argued before the district court that the Act, specifically, § 515(f), demands "how to" rules; in addition, NWF maintained that the Secretary's revisions were inadequately explained. *See PSMRL II (Round III),* 620 F.Supp. at 1534–37.[53] On appeal, the Secretary seeks to salvage two of the provisions invalidated by the district court, 30 C.F.R. § 816.81 and § 816.83.

The aim of the regulatory scheme regarding mine waste is to check, contain, or

52. The regulations running from § 816.81, governing waste disposal from surface mines, and those running from § 817.81, governing waste disposal from underground mines, are substantially identical. *See* 47 Fed.Reg. 26599 (1983) (noting substantial identity). Our discussion, for reasons of convenience, cites only the § 816 provisions, but applies equally to the parallel provisions of § 817.

53. The parties dispute whether the district court ruled solely on the statutory ground, or in the alternative. We see no need to resolve this argument, for NWF may rely on any ground argued before the district judge to justify affirmance.

control hazards that such waste presents to the environment and to human safety. Two of the primary threats posed, identified in §§ 515(b)(11) and 516(b)(4) of the Act, are unplanned shifting and spontaneous ignition of the waste. The regulations under review seek to promote waste stability and incombustibility.

Prior to 1983, design standards mandated by the Secretary for the construction of refuse piles, aimed at achieving stability and incombustibility, included this instruction: "The coal processing waste shall be—(1) Spread in layers no more than 24 inches in thickness [*i.e.*, two foot lifts]; and (2) Compacted to attain 90 percent of the maximum dry density." 30 C.F.R. § 816.85(c)(1), (2) ((1982).[54] The pre–1983 rules also included performance standards. Relevant here, the Secretary ordered operators to construct refuse piles in a manner that would avoid combustion and he required operators to attain a "static safety factor," or stability rating, of 1.5. 30 C.F.R. §§ 816.81(a)(2), 816.85(b) (1982). The 1983 revisions entirely eliminated the density standard for compaction and authorized variances from the two foot lift requirement so long as the 1.5 stability rating is achieved. *See* 30 C.F.R. § 816.81(a)(5), (c)(2) and § 816.83 (1986). *See also* 30 C.F.R. § 77.215(h) (1986) (incorporated by 30 C.F.R. § 816.83 (1986)). These two revisions—elimination of the degree of compactness design standard and allowance of variances from the two foot lift rule—were overturned by the district court and are now before us on review.

The district court remanded revised §§ 816.81 and 816.83 insofar as they fail to provide absolute requirements for lift thickness and post-compaction density, or other satisfactory "how to" rules. *PSMRL II (Round III)*, 620 F.Supp. at 1535–36. In thus remanding, the district court misconstrued the Act; as NWF no longer contests, the district judge incorrectly read

§ 515(f) to mandate design standards for the mine waste at issue, *i.e.*, non-impounding coal mine waste refuse piles. We find that the Secretary did not contravene § 515(f), and that he adequately explained his departures from the earlier regulations; we therefore reverse the district court on this matter.

Section 515(f) of the Act applies to "waste piles referred to in section 515(b)(13) and section 516(b)(5)," and only to such piles. SMCRA § 515(f). Both § 515(b)(13) and § 516(b)(5), we note, refer exclusively to waste piles "used either temporarily or permanently as dams or embankments." Because waste piles of the kind at issue here are *not* used as dams or embankments, § 515(f) is inapposite.

The Secretary accounted reasonably for his 1983 deletion of the compaction density standard. *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866–67. He anticipated that, by allowing operators to design waste sites to account for "the requirements and topography of specific sites," the revised scheme would foster the design of "more efficient and cost-effective coal refuse disposal sites." 47 FED.REG. 26599 (1982) (preamble to proposed revisions). Further impetus for the change came from the Secretary's revision regarding the type of waste placed in coal mine waste refuse piles. Prior to 1983, §§ 816.81 *et seq.* of the regulations governed only waste created during the processing of coal. After 1983, §§ 816.81 *et seq.* also controlled disposal of waste excavated from the development of underground mines. *Compare* 30 C.F.R. §§ 816.81 *et seq.* (1982) (governing coal processing waste disposal) *with* 30 C.F.R. §§ 816.81 *et seq.* (1986) (governing coal mine waste disposal, with coal mine waste defined in 30 C.F.R. § 701.5 (1986) to include coal processing waste and underground development waste).[55] The Secretary explained:

---

**54.** These two provisions work in tandem. The Secretary concluded that ninety percent compaction could be achieved only if waste in thicknesses no greater than two feet were compacted. *See* 44 FED.REG. 15211 (1979); 43 FED.REG. 41765 (1978).

**55.** The Secretary adopted this revised definition to maintain consistency with similar Mine Safety and Health Administration regulations. 48 FED.REG. 44009–10 (1983). The revision has not been challenged.

The 90 percent compaction requirement ... was difficult, but possible when coal processing waste was the only material involved. Now, however, with the inclusion of underground development waste ... with its variable characteristics, the test would be even more difficult and probably would not accomplish its goal.

47 FED.REG. 26603 (1982); *see also* 48 FED. REG. 44018 (1983) ("[h]eterogeneity of coal mine waste material resulting from variations in coal mining techniques ... renders meaningless the application of standard compaction measures").

Not only did the Secretary relate how changes in the definition of waste rendered the 1979 rule obsolete; he also addressed the critical concerns motivating adoption of the ninety percent compaction rule in 1979: stability and incombustibility.[56] Stability, the Secretary observed, has always been, and continues to be, assured by the generous 1.5 long-term safety rating. The compaction density standard, he intimated, was a superfluous requirement that unnecessarily burdened mine operators. 48 FED.REG. 44016 (1983); *see also* 47 FED.REG. 26603 (1982) (citing 1979 Mine Safety and Health Administration report, not identified by the Secretary in 1979, noting allowance of "substantial margin of error" in 1.5 rating). Incombustibility is advanced under the revised regulation, the Secretary stated, through the requirement that mine operators "[p]revent combustion." 30 C.F.R. § 816.81(a)(5) (1986). The Secretary recog-

nized that compaction reduces the chance of combustion, but noted that uncompacted waste does not invariably present "burning problems." 48 FED.REG. 44016 (1983) (referring to 1975 United States Mining Enforcement and Safety Administration report). He concluded, we think reasonably, that "[t]he specific numerical requirement for compaction [density] is ... more appropriately determined based upon the particular design, site conditions and waste characteristics." *Id.*

Given the propriety of eliminating the ninety percent compaction standard, we need not tarry over the Secretary's allowance for variances from the two foot lift rule. Mine operators must obtain mine regulator approval before constructing a waste disposal site. 30 C.F.R. § 816.81(a) (1986). Lift thickness has regulatory significance only as a means of assuring adequate compaction. *See supra* note 54. It can be expected, therefore, that mine operators will succeed in obtaining a variance from the two foot lift requirement only when compaction adequate to assure stability and incombustibility remains feasible.[57]

To recapitulate: the Secretary, contrary to the district court's central but erroneous assumption, transgressed no provision of the Act, and acted reasonably in adopting the mine waste regulatory revisions we have just reviewed. Accordingly, we reverse the district court's ruling on this joint of the case.

---

**56.** Three additional reasons given in 1979 for the rule—providing an easily measurable national standard, improving waste pile resistance to erosion, and reducing the size of waste sites—were less central to the 1979 regulatory preamble. *See* 44 FED.REG. 15211 (1979). In 1983, the Secretary adequately addressed or responded to these concerns as well. First, he explained that a national standard precludes or impedes operators from taking local land conditions into account in constructing waste piles. 47 FED.REG. 26599 (1982). Second, he adopted regulations designed expressly to control erosion and protect water quality. 30 C.F.R. §§ 816.81(a)(1), 816.83(a), (b) (1986). And finally, the Secretary countered the threat of extensive waste piles by directing that the piles be suitable for the approved post-mining land use. 30 C.F.R. § 816.83(c) (1986).

**57.** NWF contends that the regulations improperly delegate to the Mine Safety and Health Administration (MSHA) the authority to grant variances from the two foot lift requirement. Brief of NWF *et al.* as Appellees and Appellee–Intervenors at 89–91. We disagree. True, a variance cannot be obtained without MSHA approval under § 816.83 (through incorporation of 30 C.F. R. § 77.215) of the regulations. But MSHA approval, though necessary, is insufficient to gain a variance. In addition to MSHA approval, the mine operator must obtain the regulatory authority's approval for the operator's entire waste disposal scheme. *See* 30 C.F.R. § 816.81(a) (1986); *see also* Reply Brief for the Secretary of the Interior at 31–33.

### 3. *Backfilling and Grading*

In 1983, the Secretary revised his regulations concerning the first stage of reclamation—backfilling and grading the soil and other overburden (spoil) stripped from the land when mining began. NWF challenged the revisions to 30 C.F.R. § 816.100 and § 816.101 (contemporaneous reclamation), § 816.102 (terracing), and § 816.104 and § 816.105 (thin and thick overburden). These provisions restate the Act's requirement that mine operators restore land to its approximate original contour, if the volume of spoil permits, as contemporaneously with mining operations as practicable. SMCRA §§ 515(b)(3), (b)(16).

Unlike the replaced regulations, the revised provisions failed to furnish regulatory authorities with guidance beyond the prescriptions of the Act itself, and on that account the district court remanded the revisions. *PSMRL II (Round II)*, 21 E.R.C. at 1744–46. On appeal, the Secretary and Industry contend that the district court incorrectly read the Act to require, for each statutory prescription, additional regulatory guidance or "fleshing out." We hold, in accord with the Secretary, that the Act does not automatically and inevitably *require* him to "flesh out" the prescriptions of §§ 515(b)(3) and (b)(16). Nonetheless, we affirm the remand of the contemporaneous reclamation and thick and thin overburden regulations, for only with respect to terracing did the Secretary adequately explain why guidance beyond the statutory requirements sensibly could not be given to local regulators.

We note that the Act expressly commands the Secretary to flesh out certain statutory provisions. Section 515(f), for example, directs the Secretary to adopt rules governing "the design, location, construction, operation, maintenance, enlargement, modification, removal, and abandonment" of the mine waste piles permitted under § 515(b)(13) (mine waste piles used as dams or embankments) and § 516(b)(5) (same) of the Act. Similarly, § 517(h)(2) instructs the Secretary "by regulation, [to] establish procedures to insure" that the inspections of mine operations mandated by § 517(a)

are "adequate and complete." Nothing in the Act, however, expressly requires the Secretary to flesh out §§ 515(b)(3) or (b)(16).

NWF, arguing that the regulations must genuinely guide local regulators in applying each of the Act's prescriptions, cites the House Report accompanying the bill that became the Act. This Report states:

Another element of flexibility is the avoidance of excessive detail in the requirements of the Federal performance standards. The committee is aware, however, of the history of the development of State laws on the subject of regulation of coal surface mining. This history presents a pattern of increasingly detailed legislation and such detail is often traceable to regulations which have failed to provide full implementation of the more general performance standards of the legislation itself. The committee believes that it has struck a balance between legislation which merely frames performance standards in terms of general objectives and standards which are cast in terms more detailed than those generally found in regulatory legislation. In choosing a middle path, the committee is mindful of the past failures on the State level and thus bases it [sic] approval of [the bill] on the expectation that Federal regulations promulgated under the act will fully implement the environmental performance standards. Obviously, the mere reproduction of the statutory environmental performance standards in the regulations would be inadequate.

H.R.Rep. No. 218, 95th Cong., 1st Sess. 85 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 593, 622. The Report thus featured by NWF, however, does not say that the Secretary is obliged to flesh out each and every one of the Act's "environmental performance standards." We think the Report is most reasonably read to mean that, in addition to the matters on which the Act explicitly directs "fleshing out," the Secretary is to exercise his informed discretion in deciding what other statutory performance standards bear elucidation or elaboration.

█ In short, we read the Act, in light of its legislative history (including the House Report passage just quoted) to afford the Secretary discretion, absent an express statutory instruction to regulate, to decide whether fleshing out is appropriate in light of other concerns.[58] Chief among those concerns is the need to accommodate widely varying local conditions that will not admit of a single, nationwide rule. *See, e.g.,* SMCRA § 515(b)(23) (mine operators must "tak[e] into consideration the physical, climatological, and other characteristics of the [mine] site" in achieving reclamation); H.R.REP. No. 218 at 85, 1977 U.S.CODE CONG. & ADMIN.NEWS at 622 ("[w]orkable Federal requirements must be appropriate to the mining setting"); S.REP. No. 128, 95th Cong., 1st Sess. 51, 72 (1977) administration of regulatory program should account for "mining conditions, climate, and terrain [that] vary so greatly among the different coalfields").

Our task, now, is to review reductions of particular regulations—the contemporaneous reclamation, terracing, and thin and thick overburden regulations—to determine whether the revisions comport with the Secretary's regulatory responsibility. Under *State Farm* "the agency must examine the relevant data and articulate a satisfactory explanation" for the revised regulations if they are to gain judicial approbation. 463 U.S. at 43, 103 S.Ct. at 2866–67. The Secretary's accounting for his actions regarding the contemporaneous reclamation, and thin and thick overburden regulations fails to meet this standard; we do not find in the rulemaking record any identified factual basis for, or satisfactory explanation of, the Secretary's conclusion that the variety of local conditions warrants regulations on these matters that simply reiterate the relevant prescriptions in §§ 515(b)(3) and (b)(16) of the Act. In contrast, we find that the Secretary adequately explained his revision of the terracing regulation.

### a. *Contemporaneous Reclamation*

█ Section 515(b)(16) of the Act directs mine operators to reclaim land "as contemporaneously as practicable [to the] mining operations." In 1979, the Secretary had issued both a general instruction that reclamation occur "as contemporaneously as practicable with mining operations," 30 C.F.R. § 816.100 (1982),[59] and specific "time and distance" standards for backfilling and grading spoil at contour and area strip mines, 30 C.F.R. § 816.101 (1982).[60]

---

**58.** In an earlier round of this litigation, this court, sitting *en banc,* addressed, and answered in the affirmative, the question whether the Secretary was *permitted* to adopt regulations expanding the scope of information to be included in mine permit applications beyond that described in the Act. The Secretary's reading of the Act in this case is harmonious with our *en banc* disposition. In both cases, the statute appeared to us to allow for a sound exercise of the Secretary's discretion. *PSMRL I,* 653 F.2d 514.

**59.** 30 C.F.R. § 816.100 (1982) read:
Contemporaneous reclamation.
Reclamation efforts, including, but not limited to, backfilling, grading, topsoil replacement and revegetation, of all land that is disturbed by surface mining activities shall occur as contemporaneously as practicable with mining operations.

**60.** 30 C.F.R. § 816.101 (1982) read in relevant part:
Backfilling and grading: General requirements.
(a) *Timing of backfilling and grading—*(1) *Contour mining.* Rough backfilling and grading shall follow coal removal by not more than 60 days or 1,500 linear feet. The regulatory authority may grant additional time for rough backfilling and grading if the permittee can demonstrate, through a detailed written analysis under 30 CFR 780.18(b)(3), that additional time is necessary.
(2) *Open pit mining with thin overburden.* Rough backfilling and grading shall occur in accordance with the time schedule approved by the regulatory authority, on the basis of the materials submitted under 30 CFR 780.18(b)(3), which shall specifically establish in stated increments the period between removal of coal and completion of backfilling and grading.
(3) *Area strip mining.* Rough backfilling and grading shall be completed within 180 days following coal removal and shall not be more than four spoil ridges behind the pit being worked, the spoil from the active pit being considered the first ridge. The regulatory authority may grant additional time for rough backfilling and grading if the permittee can demonstrate, through a detailed written analysis under 30 CFR 780.18(b)(3), that additional time is necessary.

The Secretary at that time addressed the difficulty of issuing nationwide standards in view of varying mine conditions. He declined to adopt a timetable for backfilling and grading at open pit mines, or for additional reclamation steps at any mine. Furthermore, the time and distance standards he adopted were waivable on a case by case basis. Also, he explained in his regulatory preamble that these standards afforded adequate time to backfill and grade under any of the varying local conditions. 44 FED.REG. 15226 (1979).

The 1983 revision retained the general prescription in § 816.100,[61] but eliminated § 816.101 entirely. *See supra* note 60. To support his deletion, the Secretary commented "that 'contemporaneous reclamation' is a relative term which must be interpreted by each State on the basis of the mining conditions in its territory." 48 FED. REG. 23357–58 (1983); *see also id.* at 24649. ("[T]he regulatory authority can establish a time table, one which is more in keeping with conditions within the State, and can

probably reduce the number of waiver requests received from operators."). Because § 816.101 was devised to account for local differences, we do not find entirely satisfying, as an explanation for scrapping the regulation entirely, the observation that " 'contemporaneous reclamation' is a relative term" whose precise meaning depends on local conditions. The core deficiency, however, is that the Secretary has published barely more than a *conclusion* that the variety of mining conditions across the nation made § 816.101 of the regulations infeasible. *State Farm* requires a "satisfactory *explanation*," one that informs us *why* he drew his conclusion. The Secretary, in other words, if he determines there is no need to "flesh out" the statute, must "flesh out" his explanation so that we can review the rationality of his decision.

### b. *Thin and Thick Overburden*

■ Section 515(b)(3) of the Act directs mine operators to return land to its "approximate original contour."[62] The provi-

---

**61.** 30 C.F.R. § 816.100 (1986) reads:

Contemporaneous reclamation.

Reclamation efforts, including but not limited to backfilling, grading, topsoil replacement, and revegetation, on all land that is disturbed by surface mining activities shall occur as contemporaneously as practicable with mining operations, except when such mining operations are conducted in accordance with a variance for concurrent surface and underground mining activities issued under § 785.18 of this chapter. The regulatory authority may establish schedules that define contemporaneous reclamation.

**62.** Under the Act's definition, SMCRA § 701(2), "approximate original contour" means that surface configuration achieved by backfilling and grading of the mined area so that the reclaimed area, including any terracing or access roads, closely resembles the general surface configuration of the land prior to mining and blends into and complements the drainage pattern of the surrounding terrain, with all highwalls and spoil piles eliminated; water impoundments may be permitted where the regulatory authority determines that they are in compliance with section 515(b)(8) of this Act[.]

The Act's command to return land to approximate original contour, SMCRA § 515(b)(3), reads:

(b) General performance standards shall be applicable to all surface coal mining and rec-

lamation operations and shall require the operation as a minimum to—

. . . . .

(3) except as provided in subsection (c) with respect to all surface coal mining operations backfill, compact (where advisable to insure stability or to prevent leaching of toxic materials), and grade in order to restore the approximate original contour of the land . . . *Provided, however,* That in surface coal mining which is carried out at the same location over a substantial period of time where the operation transects the coal deposit, and the thickness of the coal deposits relative to the volume of the overburden is large and where the operator demonstrates that the overburden and other spoil and waste materials at a particular point in the permit area or otherwise available from the entire permit area is insufficient, giving due consideration to volumetric expansion, to restore the approximate original contour, the operator, at a minimum, shall backfill, grade, and compact (where advisable) using all available overburden and other spoil and waste materials to attain the lowest practicable grade but not more than the angle of repose, to provide adequate drainage and to cover all acid-forming and other toxic materials, in order to achieve an ecologically sound land use compatible with the surrounding region: *And provided further,* That in surface coal mining where the volume of overburden is large relative to the thickness of the coal deposit and where the opera-

sion contains an exemption, however, for situations where the spoil is either so thin or thick relative to the coal seam that there is insufficient or too much spoil to permit return to approximate original contour. *See supra* note 62 (SMCRA § 515(b)(3)).[63] In 1979, the Secretary issued regulations that defined numerically when a variance from the approximate original contour requirement for too little or too much spoil could be granted. 30 C.F.R. § 816.104 and § 816.105 (1982).[64]

In 1983, the Secretary eliminated the numerical definition, permitting a variance whenever the mine operator demonstrates that spoil is either "insufficient" or "more than sufficient" to restore land to its approximate original contour. 30 C.F.R. § 816.104 and § 816.105 (1986).[65] The sole support we have found for this revision is the Secretary's cryptic observation that "[t]he mathematical limit ... has proved to be impractical because of its preciseness."

47 FED.REG. 26764 (1982). We do not know from this unadorned statement why no adjusted (less precise) or alternate nationwide rule was ordered in place of the one found impractical. Absent fuller statement of the reason for the revision, we cannot intelligently determine whether the Secretary has a "satisfactory explanation" for his action.[66]

#### c. Terraces

■ The direction in § 515(b)(3) of the Act to return land to its approximate original contour countenances the substitution of a terraced post-mining landscape for a non-terraced pre-mining landscape. *See supra* note 62 (SMCRA § 701(2) permits terracing to achieve approximate original contour). The 1979 regulations required terraces to be constructed with bench widths less than twenty feet and slopes between benches (out-slopes) less than fifty

tor demonstrates that due to volumetric expansion the amount of overburden and other spoil and waste materials removed in the course of the mining operation is more than sufficient to restore the approximate original contour, the operator shall after restoring the approximate contour, backfill, grade, and compact (where advisable) the excess overburden and other spoil and waste materials to attain the lowest grade but not more than the angle of repose, and to cover all acid-forming and other toxic materials, in order to achieve an ecologically sound land use compatible with the surrounding region and that such overburden or spoil shall be shaped and graded in such a way as to prevent slides, erosion, and water pollution and is revegetated in accordance with the requirements of this Act[.]

63. Mining causes spoil to expand. This expansion may result in the presence of too much spoil to attain approximate original contour.

64. The relevant portion of 30 C.F.R. § 816.104 (1982) read:

(a) The provisions of this section apply only where the final thickness is less than 0.8 of the initial thickness. Initial thickness is the sum of the overburden thickness and coal thickness prior to removal of coal. Final thickness is the product of the overburden thickness prior to removal of coal, times the bulking factor to be determined for each mine plan area.

Section 816.105 substituted "is greater than 1.2 of the initial thickness" for "is less than 0.8 of the initial thickness," and was otherwise identically worded.

65. The relevant portion of 30 C.F.R. § 816.104 (1986) provides:

In surface coal mining which is carried out at the same location over a substantial period of time where the operation transects the coal deposit and where the thickness of the coal deposit relative to the thickness of the overburden is large and where the operator demonstrates that the spoil and other waste materials available from the entire permit area are insufficient, giving due consideration to volumetric expansion, to restore the disturbed area to its approximate original contour, the operator shall, at a minimum—

The relevant portion of 30 C.F.R. § 816.105 (1986) reads:

In surface coal mining where the thickness of the overburden is large relative to the thickness of the coal deposit and where the operator demonstrates that the volume of the spoil and other waste materials is more than sufficient to restore the disturbed area to approximate original countour [sic], the operator shall, at a minimum, after restoring to approximate original contour—

66. The Secretary may have concluded, consistent with Industry's argument before us, that § 515(b)(3) provides all the guidance local regulators can be given, and that guidelines "can add no useful particularity to the statutory words." *See* Brief for Appellants NCA at 26–27. The Secretary, however, has never offered that explanation as his own.

percent, unless the regulatory authority approved a wider bench or steeper outslope. 30 C.F.R. §§ 816.102(b)(1), (3) (1981).[67] As revised,[68] the regulations do not describe a maximum bench width or outslope angle, leaving approval of these and other terrace characteristics [69] to the regulatory authority's judgment. 30 C.F.R. § 816.102(g) (1986).[70] The current regulations do instruct regulators to ensure a reasonable reproduction of the land's original contour. *See* 30 C.F.R. § 816.102(a) (1986).[71] As in the 1979 regulations, the current regulations allow terracing only upon approval of the regulatory authority. 48 FED.REG. 23362 (1983); 30 C.F.R. § 816.102(g) (1986), *supra* note 70; 30 C.F.R. § 816.102(b)(1) (1981), *supra* note 67.

The Secretary has explained on various occasions, both before and after the revisions, that the purpose of the terrace dimension regulations is to ensure the creation of land forms that will support postmining land uses and provide erosion and water runoff control. *See* 48 FED.REG. 23363 (1983); 46 FED.REG. 39854 (1981); 44 FED.REG. 15228–29 (1979); *see also* Memorandum in Support of Federal Defendant's Cross Motion for Summary Judgment (March 5, 1984) at 68, *National Wildlife Federation v. Hodel* (D.D.C.) (No. 83–698), *reprinted in* Supplemental Brief for the Secretary of the Interior (Dec. 24, 1986) at Tab 3 (memorandum filed in district court in this case). The terrace bench and outslope requirements were never intended to fulfill the statutory environmental performance standard of ensuring return to approximate original contour. SMCRA § 515(b)(3). Instead, these requirements existed to ensure restoration of mined land to a condition capable of supporting its post-mining uses, by affording erosion control and moisture conservation, so that revegetation could be accomplished in accordance with SMCRA §§ 515(b)(2), (4), (19).

Supporting his elimination of the bench width and outslope angle rules, the Secretary explained that terrace design to control surface erosion and water runoff must be based on local soil characteristics, local soil-management practices, and local climate. 48 FED.REG. 23363 (1983).[72] This

67. 30 C.F.R. §§ 816.102(b)(1), (3) (1981) read:
 (b) On approval by the regulatory authority in order to conserve soil moisture, ensure stability, and control erosion on final graded slopes, cut-and-fill terraces may be allowed, if the terraces are compatible with the approved postmining land use and are appropriate substitutes for construction of lower grades on the reclaimed lands. The terraces shall meet the following requirements:
 (1) The width of the individual terrace bench shall not exceed 20 feet, unless specifically approved by the regulatory authority as necessary for stability, erosion control, or roads included in the approved postmining land use plan.
 ....
 (3) The slope of the terrace outslope shall not exceed 1v:2h (50 percent). Outslopes which exceed 1v:2h (50 percent) may be approved, if they have a minimum static safety factor of more than 1.3, provide adequate control over erosion, and closely resemble the surface configuration of the land prior to mining. In no case may highwalls be left as part of terraces.

68. We are aware that § 816.102(b)(1) of the 1979 regulations, governing bench width, was originally eliminated by the Secretary in 1982, *see* 47 FED.REG. 18552 (1982), and the deletion carried over into the 1983 revision. We discern

no significance for the task at hand in this regulatory history.

69. These other characteristics, such as the vertical distance between terraces, were left to regulatory discretion in the 1979 regulation as well as in the current regulation. *See* 30 C.F.R. § 816.102(b)(2) (1982).

70. 30 C.F.R. § 816.102(g) (1986) provides:
 (g) Cut-and-fill terraces may be allowed by the regulatory authority where—
 (1) Needed to conserve soil moisture, ensure stability, and control erosion on final-graded slopes, if the terraces are compatible with the approved postmining land use; or
 (2) Specialized grading, foundation conditions, or roads are required for the approved postmining land use, in which case the final grading may include a terrace of adequate width to ensure the safety, stability, and erosion control necessary to implement the postmining land-use plan.

71. 30 C.F.R. § 816.102(a) (1986) provides:
 (a) Disturbed areas shall be backfilled and graded to—
 (1) Achieve the approximate original contour[.]

72. The Secretary observed:
 For terraces to be most effective in reducing sheet and rill erosion and retaining runoff

explanation of the inutility of providing national terrace dimension guidelines adequately justifies the Secretary's decision against imposing such guidelines to fill out the statutory approximate original contour standard. We therefore reverse the district court judgment remanding the terrace regulation and uphold the Secretary's action.

## D. *Residual Issues*

We consider under this heading five rulings appealed by Industry. The Secretary has joined in only one of the five challenges. We affirm the district court's affirmance of the Secretary's regulation on four of these issues, and we find the fifth challenge moot.

### 1. *Damage Caused by Subsidence of Land Overlying Underground Mines*

■ Industry appeals the district court's ruling upholding the Secretary's regulation requiring the restoration of subsided land. We now affirm.

Subsidence occurs when a patch of land over an underground mine sinks, shifts, or otherwise changes its configuration. It is a costly and serious problem, particularly in urban areas, where land overlying and adjoining underground mines has been developed. In 1977, Congress noted that the "estimated cost for controlling subsidence under 200 urbanized areas now affected is approximately $1 billion." H.R.REP. No. 218, 95th Cong., 1st Sess. 126 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN. NEWS 593, 658. In response, the Secretary promulgated regulations to deal with the subsidence problem pursuant to §§ 516(b)(1), 516(b)(2), and 515(b)(10) of SMCRA. These 1983 regulations provide that a mine operator shall "[c]orrect any material damage resulting from subsidence caused to surface lands, to the extent technologically and economically feasible, by restoring the land to a condition capable of maintaining the value and reasonably foreseeable uses which it is capable of supporting before subsidence." 30 C.F.R. § 817.121(c)(1) (1984).

Industry contends that by establishing a duty to restore land damaged by subsidence—as opposed to prevention of subsidence—the regulation exceeds the Secretary's authority under any of the three statutory sections relied on. In the course of this case's lengthy and complicated history, the Secretary has alternated between two mutually exclusive explanations to justify his authority. Secretary Andrus first promulgated regulations requiring restoration of subsided land in 1979, *see* 30 C.F.R. § 817.124(b) (1979), basing his authority to impose such a duty on "the Act's requirement for maintenance of the surface's value and reasonably foreseeable future uses." 44 FED.REG. 15,275 (1979); *see* SMCRA § 516(b)(1).[73] Industry attacked

---

in areas of inadequate rainfall, the terrace design must follow accepted engineering practices including considering the specific conditions of the site. Terrace design involves selecting the proper spacing and location of the terraces and the design of the channel with adequate capacity to carry the runoff from the land area above the terrace. In determining the physical features of terraces, the operator and the reviewing officials should consider such soil characteristics as infiltration and water-holding capacity, cropping and soil-management practices, and climate, which includes intensity, duration, and distribution of precipitation (Schwab and others, 1966, pp. 224–248). The necessity for site-specific design of terraces was emphasized for surface mining operations in arid and semiarid regions of the western U.S. where terraces are used for erosion control and moisture conservation. Some of the terraces in those regions are designed to retain all of the onsite precipitation. (Verma and Thames, 1978, pp. 401–402).

48 FED.REG. 23363 (1983).

73. The full text of § 516(b)(1) states:

(b) Each permit issued under any approved State or Federal program pursuant to this Act and relating to underground coal mining shall require the operator to—

(1) adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of such surface lands, except in those instances when the mining technology used requires planned subsidence in a predictable and controlled manner: *Provided,* That nothing in this subsection shall be construed to prohibit the standard method of room and pillar mining[.]

the 1979 regulation in the original round of litigation before the district court. *PSMRL I (Round I)*, 14 E.R.C. at 1088. The district court sustained the regulation, but not on the ground articulated by the Secretary. *Id.* In the court's view, § 516(b)(1) does *not* address the restoration of land damaged by subsidence. Rather, the Secretary has authority under the discretionary language of § 516(b)(10) [74] to apply to underground mining operations the general restoration duties of § 515, which otherwise only apply to surface mining. Critical to the court's reasoning was the statutory language in § 516(b)(10) that "with respect to surface impacts not specified in [subsection 516(b) ]," the Secretary shall require an underground mine to "operate in accordance with the standards established in section 515;" provided, however, that the Secretary shall modify the § 515 requirements as "necessary to accommodate the distinct difference between surface and underground coal mining." The district court found that the restoration of lands damaged by subsidence was not "a surface impact ... specified" in § 516(b)(1), even though that subsection did specifically address the problem of subsidence.

While appeals from the district court's decision were pending, the new Secretary of Interior, James Watt, announced the Department's intent to reconsider all the challenged SMCRA regulations. This court accordingly remanded the entire case; and in 1983, Secretary Watt repromulgated subsidence regulations, which were changed in certain minor respects but retained the basic requirements of the 1979 regulations. In particular, Secretary Watt retained the duty to restore subsided land. The explanation accompanying the 1983 regulations, however, adopted the district court's theory that a duty to restore subsidence damage

derived from the incorporation of § 515 via § 516(b)(10). 48 FED.REG. 24644 (1983). In so doing, the Secretary necessarily renounced the Department's prior position that § 516(b)(1) authorized the regulations since § 516(b)(10) could apply only if restoration of subsidence was not a specified impact for § 516(b)(1) purposes. And not surprisingly, since the Secretary was now relying on the court's previous interpretation of § 515(b), the district court upheld the regulations based on the authority of § 516(b)(10). The Secretary's briefs before us have also relied on § 516(b)(10). But at oral argument, counsel for the Secretary reverted to Secretary Andrus' original view that a duty to restore subsided land arises directly from the language of § 516(b)(1). We now find authority to rest with the latter—§ 516(b)(1).

We agree with Industry that the language of § 516(b)(10) and the structure of the Act do not permit the wholesale incorporation of § 515 requirements whenever the provisions of § 516 are less stringent than those of § 515. Industry argues that subsidence is not subject to the requirements of § 515 because it is a surface impact specifically treated in § 516(b)(1). The district court's theory is that § 516(b)(1) "deals with the prevention of subsidence causing material damage, not remedial measures." 48 FED.REG. 24644 (1983). Therefore, reasoned the district court, § 515 standards are made applicable "to the extent that they pertain to remedial measures." *Id.* It is clear, however, that the language of § 516(b)(10) precludes that interpretation. By its terms, § 516(b)(10) is triggered only by "surface impacts not specified." It does not purport to be operative for remedies not specified. The district court's interpretation would so expand the scope of incorporation of § 515 via

---

**74.** Section 516(b)(10) provides in full:

[W]ith respect to other surface impacts not specified in this subsection including the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities and for haulage, repair areas, storage areas, processing areas, shipping areas, and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or inci-

dent to such activities, operate in accordance with the standards established under section 515 of this title for such effects which result from surface coal mining operations: *Provided,* That the Secretary shall make such modifications in the requirements imposed by this subparagraph as are necessary to accommodate the distinct difference between surface and underground coal mining[.]

§ 516(b)(10) as to be inconsistent with Congress' decision to create a separate and distinct set of performance standards—set forth in § 516—for underground mining.

We hold the Secretary's original justification, § 516(b)(1), the more reasonable interpretation of the two. Section 516(b)(1) requires the mine operator to "maintain the value and reasonably foreseeable use" of land subject to subsidence. For the Secretary to construe that language as authorizing a regulation requiring the restoration of subsided land is certainly not inconsistent with the section's language: "maintaining the value" of land may well require restoring it after it has been damaged. The legislative history of the Act, although not offering any specific guidance on the construction of § 516(b)(1), makes clear that Congress regarded subsidence as a serious problem. *See* H.R.REP. No. 218, 95th Cong., 1st Sess. 126 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 658. This history also suggests that reclamation was anticipated for a broad range of mining impacts. *See* H.R.REP. No. 45, 94th Cong., 1st Sess. 202 (1975) ("After surface operations or other mining impacts are complete at a particular site, the area must be regraded and a diverse and permanent vegetative cover established."). Finally, Industry has not pointed to any clear evidence of an intent to preclude a duty to restore—a necessary prerequisite here to rebut the inference that Congress meant to delegate to the Secretary the authority to interpret the general and ambiguous terms of § 516(b)(1). *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Our review of the Secretary's decision-making is, of course, limited to the reasoning evidenced on the record. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947). This time-honored rule prevents a court from affirming administrative action on a basis not provided by the agency and thereby guards against judicial encroachment into the policymaking domain of the administrative agency. *Id.* at 196, 67 S.Ct. at 1577. The *Chenery* doctrine also facilitates judi-

cial review by ensuring that a court has a clear statement of the rationale it is reviewing. "It will not do for a court to be compelled to guess at the theory underlying the agency's action." *Id.* at 196–97, 67 S.Ct. at 1577. Here the record contains two alternative bases for the Secretary's regulation, one reasonable and one not. We think that suffices when, as here, the Secretary's original rationale was reasonable and the second was adopted in obvious reliance on the district court's opinion. This is not a case where we must construct a theory for the agency's action or where the agency's reasoning is too sparse or confusing to permit review. Rather, the record contains a clear statement of the basis on which we affirm the Secretary, and therefore a remand is not required by *Chenery*.

2. *Reshaping Cut and Fill Slopes (Roads and Underground Mines)*

■ Industry appeals the Secretary's regulations regarding the reshaping of cut and fill slopes. Because those regulations were remanded pursuant to another proceeding, and not repromulgated by the Secretary, we find the present appeal misplaced. Accordingly, we hold Industry's challenge moot.

The Secretary promulgated national program regulations requiring the reclamation of roads at underground mine sites in accordance with the same standards applied to roads at surface mining sites. The regulations, which were identical to those applied to surface mining sites, mandated, *inter alia*, the "reshaping [of] all cut and fill slopes to be compatible with the post-mining land use and to complement the drainage pattern of the surrounding terrain." 30 C.F.R. § 817.150 (1984).

Industry challenged the regulation on the ground that its application to underground mines, where roads might have been in place for forty years and might have become settled and revegetated, would be unnecessary and possibly harmful. It claimed the reclamation standards of § 515(b)(3), applicable to surface mines, could not be applied to underground mines

through the catchall language of § 516(b)(10)[75] because of that section's requirement that the "distinct differences" between surface and underground mining be accommodated. The district court rejected that challenge, concluding that the Secretary had made an appropriate finding that as far as roads were concerned, different regulations for surface and underground mines were unwarranted.

In a separate challenge, however, the district court remanded the Secretary's road classification system because it had been promulgated without proper notice and comment. Because the regulations establish performance standards for a "primary" road, 30 C.F.R. § 817.151 (1984), not applicable to "ancillary" roads, 30 C.F.R. § 817.150(b)–(f), the Secretary suspended the road regulations in their entirety. He announced his intent "to propose new regulations which define the term 'road' *and* which address the design, construction, use and maintenance of roads used in surface coal mining operations." 50 FED.REG. 7276 (1985) (emphasis added). Consequently, the Secretary now argues that in light of the suspension, Industry's challenge is moot. Industry disagrees, asserting that the Secretary clearly intends to repropose the same regulation, as evidenced by his promulgation of regulations for the Tennessee federal program incorporating the requirements of § 817.150, and the issue is one "capable of repetition, yet evading review" as in *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

Industry's claim notwithstanding, the Secretary's withdrawal of the regulation was not a clever manipulation of regulatory and appellate procedure designed to escape review; it was merely a prudent response to the district court's remand order. Although the road reclamation requirement is certainly "capable of repetition," if and when the Secretary repromulgates § 817.150, the regulation will be reviewable at that time. Unlike the ICC order at issue in *Southern Pacific,* SMCRA regulations are in no danger of expiring before judicial review is complete. It would be entirely inappropriate for this court to do as Industry suggests and issue an advisory opinion to guide the Secretary's rulemaking.[76]

### 3. *Jurisdiction over Processing and Support Facilities*

▮ Industry appeals the district court's statutory interpretation of the Secretary's authority under § 701(28)(A) and the court's alternative holding that there is authority under § 701(28)(B) for the Secretary's jurisdiction over processing and support facilities. Without reaching the statutory question at issue in § 701(28)(A), we affirm the court's judgment based on the authority given to the Secretary in § 701(28)(B).

SMCRA gives the Secretary jurisdiction over "surface coal mining operations," which are broadly defined by § 701(28)(A) as including "activities conducted on the surface of lands in connection with a surface coal mine.... Such activities include ... in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce *at or near the mine site." Id.* (emphasis added). For its part, the companion subsection, 701(28)(B), states that "surface coal mining operations" include

the areas upon which [those activities identified in § 701(28)(A)] occur or where [those activities identified in § 701(28)(A)] disturb the natural land

**75.** Section 516(b)(10) provides that with respect to surface impacts not specified in § 516, which regulates certain surface effects of underground mining, an underground mine shall "operate in accordance with the standards established under section 515 [the Statute's general environmental protection standard] ... *Provided,* that the Secretary shall make such modifications in the requirements imposed by this subparagraph

as are necessary to accommodate the distinct difference between surface and underground coal mining[.]"

**76.** It has been over two years since the Secretary suspended the regulation, and to date he has not taken any action to repromulgate the reclamation standards challenged by Industry.

surface. Such areas shall also include ... repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, *resulting from or incident to* [those activities identified in § 701(28)(A).]

SMCRA § 701(28)(B) (emphasis added).[77]

Based on his reading of § 701(28), Secretary Andrus promulgated regulations governing environmental impacts from offsite coal preparation plants. *See* 30 C.F.R. § 785.21 and Part 827 (1979). The regulations were initially upheld by Judge Flannery in 1980, *PSMRL I (Round II)*, 19 E.R.C. at 1501; and following the remand of the entire case in February 1983, Secretary Watt repromulgated essentially the same regulations. *See* 30 C.F.R. §§ 700.5, 785.21 & Part 827 (1984). It is this repromulgation and the Secretary's supporting justification that are now before us.

When repromulgating the regulations, Secretary Watt recognized that

it is unclear from the syntax alone ... whether the phrase "at or near the mine site" at the end of the examples in Paragraph (A), modifies only the phrase immediately preceding it, *i.e.*, "loading of coal for interstate commerce," or whether it also modifies "the cleaning, concentrating or other processing or preparation."

48 FED.REG. 20392 (1983). Secretary Watt opted for the broader view of his jurisdiction in light of his policy of exercising the most complete jurisdiction available under the Act, *see id.*, and also in reliance on Judge Flannery's 1980 holding that the "at or near" language modified only "the loading of coal." *PSMRL I (Round II)*, 19 E.R.C. at 1501. In addition, Watt found support for his interpretation in Judge Flannery's alternative holding that § 701(28)(B) provides an independent basis for jurisdiction in that it extends the Secretary's authority to "processing areas" and other areas that contain sited structures and facilities "resulting from or incident to [activities identified in § 701(28)(A)]." 48 FED.REG. 20393 (1983).

Industry challenges the Secretary's construction of the statutory language, contending that the Secretary's jurisdiction extends only to coal processing facilities located "at or near the mine site." Under this reading of § 701(28)(A), the phrase "at or near the mine site" modifies the entire family of post-extractive activities set off from the earlier extractive activities by the "and" that precedes their enumeration. Therefore, the argument goes, the Secretary may regulate only the cleaning, concentrating, or other processing or preparation of coal that takes place at or near the mine site. Section 701(28)(B) does not, in

---

77. The complete text of § 701(28) reads:

(28) "surface coal mining operations" means—

(A) activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 516 surface operations and surface impacts incident to an underground coal mine, the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce. Such activities include excavation for the purpose of obtaining coal including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining, the uses of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce at or near the mine site: *Provided, however,* That such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16⅔ per centum of the tonnage of minerals removed for purposes of commercial use or sale or coal explorations subject to section 512 of this Act; and

(B) the areas upon which such activities occur or where such activities disturb the natural land surface. Such areas shall also include any adjacent land the use of which is incidental to any such activities, all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities and for haulage, and excavations, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to such activities[.]

Industry's view, provide any additional authority to the Secretary to regulate offsite processing facilities because that subsection concerns only the extent to which the *area* within which activities defined in subsection (A) occur may be regulated along with the activity itself. If offsite coal processing facilities are not an activity covered by subsection (A), then (B) is inapposite.

The district court, faced with an issue it had already decided once, not surprisingly reaffirmed its earlier decision sustaining the Secretary's regulations. *PSMRL II (Round I)*, 21 E.R.C. at 1199–1203. The court observed that each activity in subsection (A) is separated by a comma, and therefore concluded the phrase "at or near the mine site" refers only to the activity following the preceding comma—the loading of coal. Once again, the district court held that the Secretary had jurisdiction to regulate off-site processing plants based on the reference to "processing areas" in § 701(28)(B). *PSMRL II (Round I)* at 1200. Industry appeals.

All parties, including Industry, seem to agree that the language of § 701(28)(A) lends itself to two possible readings. Industry believes its parsing of the statute is "clearly better," [78] but does not base its challenge on the plain meaning of the statute. It relies principally on a passage in the Senate Report—the only discussion in the legislative history specifically on point—that used slightly different phraseology to explain the intent of the statutory language: "Activities included are ... the cleaning, or other processing or preparation and loading for interstate commerce of coal at or near the mine site." S.Rep. No. 128 at 98. The syntax of the Senate Report clearly makes "processing" an object of "coal at or near the mine site." It is somewhat less clear, however, whether the Senate Report manifests a clear congressional intent as to the meaning of § 701(28)(A). Differences between the Senate Report syntax and that in the statute might well reflect a deliberate congres-

sional decision. Surely, the exclusion of "concentrating" in the quoted passage from the Report does not mean that Congress' inclusion of "concentrating" in the statutory language should be ignored. Moreover, other portions of the legislative history suggest that Congress was specifically concerned about coal processing facilities and stored coal materials, and not necessarily only those within the immediate proximity of an operating surface coal mine. *See* H.R.Rep. No. 218, 95th Cong., 1st Sess. 57, 125–26 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 593, 657–58.

We tend to agree with Industry that reading the "at or near" language as modifying "processing" is the "clearly better" interpretation of subsection (A), but that is not to say that it is the only permissible construction. *See Young v. Community Nutrition Inst.*, 476 U.S. 974, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986) ([respondents'] reading of the statute may seem to some to be the more natural interpretation, but the phrasing of [the statute] admits of either respondents' or petitioner's reading); *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. The Secretary's reading is not implausible: it finds at least some support in both the language and the legislative history of the Act. Nonetheless, whether his reading exceeds the bounds of reasonableness appears to us a close question. In any event, it is not a question we need decide since we find the Secretary may clearly base his jurisdiction over coal processing facilities on the broad language of § 701(28)(B).

At issue in the interpretation of § 701(28)(B) is the scope of "processing areas ... and other areas upon which are sited structures, facilities or other property or materials on the surface resulting from or incident to such activities." The phrase "such activities," as all parties agree, refers to the activities listed in subsection (A). The Industry contends, as we have

---

**78.** The Secretary's reading leaves the words "cleaning, concentrating, or other processing or preparation" floating without an object. "Cleaning," for example, must refer to something, and

it seems most natural that it is "cleaning ... of coal for interstate commerce at or near the mine site." SMCRA § 701(28)(A).

noted, that subsection (B) is therefore limited only to activities listed in subsection (A). We agree, however, with the district court that the Secretary may reasonably construe the meaning of "processing areas ... resulting from or incident to such activities" to include processing facilities that are not at or near the mine site. We are further persuaded because Congress expressed a general concern about the environmental impacts of processing plants. The language of subsection (B) is without geographic limitation; coal processing facilities can certainly be "incident to" surface coal mining operations without being onsite. Moreover, the Secretary only purports to regulate facilities that are "in connection with" a surface coal mine or surface operations of an underground coal mine. SMCRA § 701(28)(A); 30 C.F.R. § 700.5 (1984). The structure of subsections (A) and (B) may well allow for Industry's restrictive interpretation of subsection (B), but it certainly does not, as Industry asserts, preclude the reasonable interpretation adopted by the Secretary and sustained by the district court. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

Although he rejected the notion that § 701(28)(A) limits his jurisdiction to processing facilities located "at or near the mine site," the Secretary has concluded in a separate regulation that the "resulting from or incident to" language in subsection (B), which modifies "areas upon which are sited structures, facilities, or other property or material on the surface," connotes an element of proximity. 30 C.F.R. § 701.5 (1984). The district court struck down this regulation, concluding that Congress had mandated a functional or causal test. The court pointed out that in other parts of § 701(28), Congress used phrases such as "in situ," "at or near the mine site," or "adjacent" when it wanted to express a proximity limitation. The court therefore

found an intent to preclude a proximity test in Congress' choice of "resulting from or incident to," language that is not explicitly "geographic."

▮ Industry argues that the meaning of the phrase at issue is ambiguous and that under *Chevron* the agency must be allowed a reasonable interpretation, especially when the issue involves "industrial practices of great complexity."[79] We agree. The phrase "resulting from or incident to" clearly suggests a causal connection, which, while not indicating an element of geographic proximity, certainly does require some type of limiting principle of proximate causation that is familiar to the courts in tort law. Otherwise, every support facility that could be considered a "but for" result of a surface coal mining operation would be subject to SMCRA regulation. Since causation analysis is necessarily so heavily informed by explicit policy considerations, a statutory phrase such as the one at issue here is an obvious example of the sort of congressional delegation of policy choices to an agency that courts are bound to respect. *See Chevron,* 467 U.S. 837, 104 S.Ct. 2778. Moreover, we note that the Secretary's regulations do not preclude the consideration of factors other than proximity: " 'Resulting from or incident to' an activity *connotes an element of proximity* to that activity." 30 C.F.R. § 701.5 (1984) (emphasis added). Proximity is used as a guiding principle in a flexible implementation of the statute that allows regulatory authorities to "consider the myriad site specific situations that cannot be fully anticipated in writing a Federal regulation." 48 FED.REG. 20397 (1983). We cannot say that the Secretary's regulations reflect an unreasonable interpretation of vague statutory language. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.[80]

---

79. The Secretary chose not to appeal the district court's opinion, but he has stated in his supplemental brief that the government abides by its original defense of the regulations before the district court.

80. The Secretary has also interpreted § 701(28)(B) to authorize extending SMCRA re-

quirements to a number of "support facilities" "resulting from or incident to" mining activities that are not specifically mentioned in the statute. 30 C.F.R. § 701.5 (1984). Industry objects to the Secretary's inclusion of railroads as a support facility. The district court upheld the Secretary. Industry's argument is basically that (1) there is nothing specific in the statute about

#### 4. *Alluvial Valley Floors Performance Standards*

■ Both the Secretary and Industry appeal the district court's finding that the Secretary must establish minimum standards to preserve or reestablish the essential hydrological functions of alluvial valley floors ("AVFs"). We affirm, albeit on a different rationale, the district court's conclusion.

The Secretary has promulgated regulations pursuant to SMCRA to control coal mining on certain AVFs. An AVF is a deposit on the floor of a stream laid by running water. It is often an integral part of irrigation-based agricultural activity. The importance of AVFs is especially marked in the West, where they are the "productive lands that form the backbone of the agricultural and cattle ranching economy in [arid and semiarid] areas." H.R.REP. No. 218, 95th Cong., 1st Sess. 116 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 649.

The Surface Mining Act, in § 515(b)(10), requires of all mine operators the following performance standard:

(b) General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as a minimum to—

. . . .

(10) minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation by—

. . . .

(F) preserving throughout the mining and reclamation process the essential hydrological functions of alluvial valley floors in the arid and semiarid areas of the country[.]

The Secretary has interpreted this language literally and implemented regulations that apply the performance standard to all alluvial valley floors. 30 C.F.R. §§ 822.11, 822.13(a)(1) (1984). Industry challenges the regulations as inconsistent with the permit application requirement set forth in § 510(b)(5), which requires a permit applicant to show that his proposed operations will not disrupt alluvial valley floors in the western United States that are significant to farming.[81] Industry contends that the Secretary's decision to apply the § 515(b)(10) performance standard to those alluvial valley floors not significant to farming renders the § 510(b)(5) permit requirement a nullity. And, Industry claims, the only way to harmonize the two sections is to read § 515(b)(10) as implicitly incorporating the "significant to farming" limitation of § 510(b)(5). The district court rejected these arguments.

We agree with the district court's conclusion—though not necessarily its rationale—and hold that the Secretary's interpretation of § 515(b)(10), as manifested in his regulations, is reasonable and entitled to deference. *See Chevron*, 467 U.S. at 842–43,

railroads, and (2) it is difficult for mine operators to control environmental impacts from railroads since they typically do not operate railroads. As for the first point, the broad language of § 701(28)(B) clearly permits the Secretary to regulate railroads, provided, of course, that they are "resulting from or incident to" mining activities. The second point is an argument for Congress; the statute does not make "control" the operative test for regulation. We affirm the district court's rejection of Industry's challenge to the regulation of railroads.

**81.** Section 510(b) provides in pertinent part that:

(b) No permit or revision application shall be approved unless the application affirmatively demonstrates and the regulatory authority finds in writing on the basis of the information set forth in the application or from information otherwise available ... to the applicant, that—

. . . .

(5) the proposed surface coal mining operation, if located west of the one hundreth meridan west longitude, would—

(A) not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands as to which the regulatory authority finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production[.]

104 S.Ct. at 2781–82. The language of the statute provides ample support for the Secretary's position because, on its face, it extends to all alluvial valley floors. Industry thus bears a heavy threshold burden. For this court to disregard *Chevron* deference, Industry must demonstrate that Congress had a specific intent that is contrary to the plain meaning of the statute, or in the alternative, that the legislative history and/or the structure of the statute demonstrate that Congress' intent was ambiguous and that the Secretary acted unreasonably in construing the statute according to its plain meaning. *Id.* Under either approach, Industry's arguments fall well short of persuading us to upset the Secretary's regulations.

Industry's position is grounded on an erroneous view of the relationship between the permit requirements set forth in § 510 and the performance standards of § 515. By contending that the Secretary has ignored the "statutory exemption" of § 510(b)(5), Industry suggests that it is somehow anomalous for the Secretary to presume that Congress provided a different level of protection at the permit stage than it did after mining operations commence. But it seems entirely plausible to us that Congress could have intended just that, *i.e.,* to protect all alluvial valley floors in arid and semiarid areas with a performance standard while also providing special protection at the permit stage for those alluvial valley floors significant to farming. Under the Secretary's interpretation, then, § 510(b)(5) is not an exception to the performance standards in § 515, but rather a supplement. It is an additional guarantee that, at least with respect to particularly important alluvial valley floors (those significant to farming), mine operators will fully anticipate at the outset what is required for compliance with the Act's performance standards. Although the legislative history cited by Industry clearly supports the notion that Congress intended

special protection for farms dependent on alluvial valley floors, it does nothing to refute the notion that other alluvial valley floors are also subject to protection, albeit not at the permitting stage. In light of the foregoing, we reject Industry's challenge and uphold the Secretary's reasonable construction of the statute.

### 5. *Substantial Legal and Financial Commitment*

■ Under § 522 of the Act, state regulatory authorities may designate an area of land as unsuitable for surface coal mining either because reclamation is not feasible or because mining operations might have one of the serious consequences listed in § 522(a)(3). But § 522 contains a grandfather clause that exempts, *inter alia,* lands where "substantial legal and financial commitments" in mining operations were in existence prior to January 4, 1977.[82] At issue here is the Secretary's definition of "substantial legal and financial commitments" ("SLFC"):

> *Substantial legal and financial commitments in a surface coal mining operation* means significant investments that have been made on the basis of a long-term coal contract in power plants, railroads, coal-handling, preparation, extraction or storage facilities and other capital-intensive activities. An example would be an existing mine, not actually producing coal, but in a substantial stage of development prior to production. Costs of acquiring the coal in place or the right to mine it without an existing mine, as described in the above example, alone are not sufficient to constitute substantial legal and financial commitments.

30 C.F.R. § 762.5 (1984).

We are asked by Industry to overrule the district court, but we do not. We affirm the district court's upholding of the Secretary's power to promulgate § 762.5. Relying heavily on the legislative history of

---

**82.** The entire grandfather provision reads:

The requirements of this section shall not apply to lands on which surface coal mining operations are being conducted on the date of enactment of this Act or under a permit issued pursuant to this Act, or where substantial legal and financial commitments in such operation were in existence prior to January 4, 1977.

SMCRA § 522(a)(6).

similar sections of the Act, Industry contends that the above definition is too narrow and rigid to be consistent with congressional intent. The district court rejected Industry's challenge, finding that the Secretary's interpretation is amply supported by the one expression of legislative intent specifically on point.[83] A portion of the House Report explains:

> The phrase "substantial legal and financial commitments" in the designation section and other provisions of the act is intended to apply to situations where, on the basis of a long-term coal contract, investments have been made in power plants, railroads, coal handling and storage facilities and other capital-intensive activities. The committee does not intend that mere ownership or acquisition costs of the coal itself or the right to mine it should constitute "substantial legal and financial commitments."

H.R.REP. No. 218, 95th Cong., 1st Sess. 95 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 631. The Secretary's definition closely tracks this language; however, Industry objects to the Secretary's decision to limit SLFC to situations involving long-term contracts, claiming that the House Report used long-term contracts merely as an example of the sort of commitment required.

It may well be possible to read the House Report as Industry suggests, but it is also certainly possible, and indeed more natural, to interpret it as the Secretary has. Nevertheless, Industry would have us believe that the legislative history of the "valid existing rights" clauses in § 522(e) and § 601, as well as selected discussions of a similar phrase in § 510(b)(5), mandates its reading of the House Report and accordingly its broad interpretation of SLFC. We disagree and conclude with the district court that, at best, the legislative history of the other provisions of the bill creates some ambiguity—perhaps enough to support Industry's position had it been adopted by the Secretary. But it is far from sufficient to constitute a specific legislative intent contradicting the Secretary's interpretation. Congress has evidently delegated to the Secretary the authority to flesh out the meaning of "substantial legal and financial commitments," *see Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82, and the Secretary has done so in an entirely reasonable fashion, balancing the financial interests of the mine operators against the public's interests in prohibiting mining where it is environmentally unsuitable. Accordingly, we affirm the judgment below on this issue.

### E. *Residual Issues II*

We consider under this heading 11 district court rulings. We affirm the district court's decision to uphold the Secretary's regulations with regard to six: those dealing with continually-created valid existing rights; with the replacement of damaged water supplies; with the exemption from water replacement for holders of senior water rights; with anticipated mining; with the temporary storage of top soil; and with jurisdiction over air quality issues. We affirm the district court's decision to remand the Secretary's regulations to the agency with regard to two other rulings: those dealing with values incompatible with surface mining and authority to grant variances from approximate original contour requirements. Finally, we reverse the district court and reinstate the Secretary's regulations with regard to three regulations: those dealing with the elimination of underwater highwalls; with jurisdiction over support facilities issues; and with the delegation of federal lands.

#### 1. *Continually–Created Valid Existing Rights.*

■ Section 522 defines standards and procedures for designating certain lands as unsuitable for surface coal mining. For the most part, Congress delegated the mak-

---

**83.** *PSMRL II (Round III),* 620 F.Supp. at 1546–47. The district court did not uphold the regulation in its entirety. Counsel for the government informed the district court that despite language suggesting the contrary, the Secretary's definition of SLFC is not limited to existing coal mines. The court accordingly remanded the regulation for "the narrow purpose of clarifying his position that an existing mine is not necessary for SLFC."

ing of such determinations to state regulatory agencies. Section 522(e), however, lists lands directly declared by Congress to be unsuitable for mining. Included among those lands on which surface coal mining is prohibited are: lands within the National Park or National Wildlife Refuge systems, § 522(e)(1); federal lands within a national forest, § 522(e)(2); areas in which mining might adversely affect a designated historic site, § 522(e)(4); or within 300 feet of occupied dwellings, public schools, or churches, § 522(e)(5). Lands that fall within the specified categories are not subject to the discretionary designation process described elsewhere in § 522, but are statutorily declared to be unsuitable for mining.[84]

Congress, however, limited the application of the surface mining proscriptions to avoid infringement of existing property rights. "After the enactment of this Act and subject to valid existing rights no surface coal mining operations except those which exist on the date of enactment of this Act shall be permitted ..." SMCRA § 522(e). Neither the statutory language nor the legislative history elaborate on the meaning of the phrase "valid existing rights" ("VER"). The Secretary, however, promulgated a regulation implementing § 522(e) that created what he described as "continually created valid existing rights," 47 FED.REG. 25281 (1982):

> Where an area comes under the protection of Section 522(e) of the Act after August 3, 1977, valid existing rights shall be found if—
>
> (1) On the date the protection comes into existence, a validly authorized surface coal mining operation exists on that area.... [85]

30 C.F.R. § 761.5(d). In other words, even after the enactment of the Act, once a mining operation is properly initiated on a

---

**84.** In its entirety, § 522(e) of the Act states:

After the enactment of this act and subject to valid existing rights no surface coal mining operations except those which exist on the date of enactment of this Act shall be permitted—

(1) on any lands within the boundaries of units of the National Park System, the National Wildlife Refuge Systems, the National System of Trails, the National Wilderness Preservation System, the Wild and Scenic Rivers System, including study rivers designated under section 5(a) of the Wild and Scenic Rivers Act and National Recreation Areas designated by Act of Congress;

(2) on any Federal lands within the boundaries of any national forest: *Provided, however,* That surface coal mining operations may be permitted on such lands if the Secretary finds that there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operation and—

(A) surface operations and impacts are incident to an underground coal mine; or

(b) where the Secretary of Agriculture determines, with respect to lands which do not have significant forest cover within those national forests west of the 100th meridian, that surface mining is in compliance with the Multiple–Use Sustained–Yield Act of 1960, the Federal Coal Leasing Amendments Act of 1975, the National Forest Management Act of 1976, and the provisions of this Act; *And provided further,* That no surface coal mining operation may be permitted within the boundaries of the Custer National Forest;

(3) which will adversely affect any publicly owned park or places included in the National Register of Historic Sites unless approved jointly by the regulatory authority and the Federal, State, or local agency with jurisdiction over the park or the historic site;

(4) within one hundred feet of the outside right-of-way line of any public road, except where mine access roads or haulage roads join such right-of-way line and except that the regulatory authority may permit such roads to be relocated or the area affected to lie within one hundred feet of such road, if after public notice and opportunity for public hearing in the locality a written finding is made that the interests of the public and the landowners affected thereby will be protected; or

(5) within three hundred feet from any occupied dwelling, unless waived by the owner thereof, nor within three hundred feet of any public building, school, church, community or institutional building, public park, or within one hundred feet of a cemetery.

**85.** Section 761.5(d)(2) stated

The prohibition caused by Section 522(e) of the Act, if applied to the property interest that exists on the date the protection comes into existence, would effect a taking of the person's property which would entitle the person to just compensation under the Fifth and Fourteenth Amendments to the United States Constitution.

This part of the VER regulation was remanded by the district court because it incorporated the broad definition of takings in § 761.5(a), which the court had already remanded for additional notice and comment. *PSMRL II (Round III–VER),* 22 E.R.C. at 1564–65. No appeal has been taken from this action by the district court.

particular parcel of land, if that land were later to be designated as unsuitable for mining pursuant to § 522(e)—*e.g.*, if the land were declared by Congress to be a National Wildlife Refuge—the mine would be permitted to continue operating pursuant to a valid existing right. NWF's challenge of that regulation, and the district court's rejection of that challenge are the subject of this appeal.

NWF's argument is, essentially, that a "continually-created valid existing right" is an oxymoron, and that to assign any meaning to VER other than "existing as of the date of enactment" is arbitrary and contrary to the intent of Congress. Under NWF's reading of the Act, any mining operation initiated after August 3, 1977, the date of SMCRA's enactment, would be subject to shut-down if the land on which it stood or abutted were subsequently found to be unsuitable under the provisions of § 522(e). The district court rejected this challenge and concluded that the concept of continually-created VER was "in accord with law." *PSMRL II (Round III–VER),* 22 E.R.C. at 1564–65.

Industry, supporting the district court, argues that once an operator has obtained mining rights and a permit for a particular parcel of land that has not yet been declared unsuitable, any subsequent infringement of that mining right, *i.e.,* because of a declaration of unsuitability under § 522(e), would constitute a taking. Since Congress explicitly tried to avoid takings in § 522(e), once a permit has been validly issued the permit area is insulated from subsequent unsuitability designations. This, however, is a somewhat circular argument; one could just as easily argue, as NWF does, that after the passage of the SMCRA mine operators are put on notice that certain kinds of lands are subject to the protections of § 522(e), and that they make their investments subject to that risk. For example, a mine operator could purchase a

300–foot buffer zone around the mine to protect that mine site from the § 522(e) protections triggered by proximity to dwellings, roads, cemeteries, etc. Both "notice" arguments *presuppose* particular, opposing interpretations of the statutory language; neither aids us in choosing between them.

The statutory language appears to be susceptible to either interpretation of "valid existing rights." The legislative history, however, is of some help. Although it does not answer the specific question before us,[86] it does suggest that Congress did not intend to infringe on valid property rights or effect takings through § 522(e). In discussing the state regulatory process for declaring non-federal lands unsuitable for mining, *see* § 522(a), the House committee made clear that operating mines should not be shut down: "The designation process is not intended to be used as a process to close existing mine operations, although the area in which such operations are located may be designated with respect to future mines." H.R.REP. No. 218, 95th Cong., 1st Sess. 94 (1977), *reprinted in* U.S.CODE CONG. & ADMIN.NEWS 593, 631.

That same principle should reasonably apply to the unsuitability designations of § 522(e), and is indeed the basis for the Secretary's VER regulation. As the House report noted, when land on which mines are already in existence is declared unsuitable, those mines should be allowed to continue, but no new mines should be permitted within the protected area. That rule should apply equally to mines in existence as of August 3, 1977, or to mines subsequently started on lands which have permits approved for mining. Thus, if a site not previously designated unsuitable were to be declared to be subject to § 522(e) protection—*e.g.,* if the site which was not covered by § 522(e) in 1977 were subsequently included within the National Historic Register, but not before a mining operation had been lawfully established—the prohibition

---

**86.** Although not directly answering NWF's challenge, the Supreme Court has previously rejected a too-restrictive interpretation of VER in an early challenge to the SCMRA brought by industry. In *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Court found that the contention that VER applies only to mining operations for which all permits were issued by the enactment date was compelled neither by the statute nor its legislative history. *Id.* at 296 n. 37, 101 S.Ct. at 2370–71 n. 37.

would apply only prospectively. We find such a rule to be a reasonable interpretation of the Act, and thus affirm the decision of the district court upholding the Secretary's VER regulation.

### 2. *Values Incompatible with Surface Mining.*

■ Section 522(e)(2) prohibits coal mining operations on any federal lands within the boundaries of any national forest.[87] It provides for an exception to that proscription, however, when the Secretary finds "that there are no significant recreational, timber, economic, or other values which may be incompatible with such surface mining operations." Secretary Watt promulgated regulations implementing § 522(e)(2) and defining its operative terms:

> Significant recreational, timber, economic, or other values incompatible with surface coal mining operations means those values to be evaluated for their significance which could be damaged beyond an operator's ability to repair or restore by, and are not capable of existing together with, surface coal mining operations because of the undesirable effects mining would have on those values, either on the area included in the permit application or on other affected areas.[88]

30 C.F.R. § 761.5. NWF challenged this regulation, claiming that to allow mining anytime the land could be properly reclaimed would upset the balance among uses of public lands established by Congress in the Act, and would render § 522(e)(2) redundant: § 522(a)(2) indepen-

dently requires that all lands for which reclamation is not technologically or economically feasible be declared unsuitable for mining.[89] The district court agreed and remanded the regulation. *PSMRL II (Round III)*, 620 F.Supp. at 1557.

The Secretary defended his regulation before the district court, arguing that it was responsive to Congress' recognition that national forests have multiple land uses, which include mining, and that the reclamation requirement of the regulation guaranteed that the mining use would be a temporary one.[90] The preamble accompanying the regulations explained:

> To the extent an operator completely repairs the damage caused by mining, then the values will ultimately be compatible with the mining operation. During mining itself there could be a temporary interruption of important activities. However, the mere interruption does not make the mining incompatible with the long-term resumption of the activity.... [The Office of Surface Mining] continues to believe that mining is an acceptable temporary use of the land in most situations.

48 FED.REG. 41317 (1977).

The district court correctly rejected the Secretary's argument that "temporary interruption[s] of important activities" were permissible within national forests, and concluded that by focusing on whether the land may eventually be reclaimed, the Secretary's regulation ignores explicit congressional direction to preserve lands in nation-

---

**87.** *See* § 522(e), *supra,* note 84.

**88.** The regulation also provides a non-exhaustive list of those specific values to be evaluated. Values to be "evaluated for their importance" include:

> (a) Recreation, including hiking, boating, camping, skiing or other related outdoor activities;
> (b) Timber manager and silviculture;
> (c) Agriculture, aquaculture or production of other natural, processed or manufactured products which enter commerce;
> (d) Scenic, historic, archeologic, esthetic, fish, wildlife, plants or cultural interests.

30 C.F.R. § 761.5.

**89.** Section 522(a)(2) states:

> Upon petition pursuant to subsection (c) of this section, the State regulatory authority shall designate an area as unsuitable for all or certain types of surface coal mining operations if the State regulatory authority determines that reclamation pursuant to the requirements of this Act is not technologically and economically feasible.

**90.** The Secretary also argued that the regulation does not render § 522(e)(2) superfluous, because the regulation's requirement that scenic, historic and cultural values be considered in determining compatibility, *see supra* note 89, gives that section real effect, independent of the reclamation requirements of § 522(a)(2).

al forests for other uses. The Senate Committee Report made clear that

> the Committee has made a judgment that *certain lands simply should not be subject to surface coal mining operations.* These include primarily and emphatically *those lands which cannot be reclaimed* under the standards of this Act *and* the following areas dedicated by the Congress in trust for the recreation and enjoyment of the American people: lands within the ... *National Forests* with certain exceptions.

S.REP. No. 128 at 55 (emphasis added). We could not hope for a more clear statement from Congress that the ability to reclaim the land may not be the only test for compatibility. Moreover, elementary principles of statutory construction dictate that we not construe one section of the statute so as to make another superfluous.[91] Section 522(a)(2) requires that any land that may not be reclaimed be declared unsuitable for mining, *see supra* note 89. This requirement is mandatory on state regulatory agencies, and applies to all lands, not just those in national forests. If the only factor in the Secretary's consideration of incompatibility under § 522(e)(2) were to be whether the land may be reclaimed and damage to other values repaired, then that section would merely restate the requirements of § 522(a)(2).

On appeal, the Secretary seems to have shifted his position, and now argues not that reclaiming alone will make a mining operation "compatible" with other values, but that the plain language of the regulation requires that the regulatory authority consider as well whether other values may coexist with stripmining for any period of time.[92] The Secretary appears at this point not to differ with the district court's interpretation of the Act or its legislative history, but rather to claim that his regulation, as promulgated, is actually consistent with those interpretations. We must reject that

argument. Counsel's post-hoc assertions notwithstanding, the preamble to the regulation, quoted above, explicitly states that the relevant inquiry under the regulation is whether the land may be reclaimed, 48 FED.REG. 41317, and it is that interpretation that we must look to. *See Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). The further recognition in the preamble that "[m]ining, even when fully reclaimed, may result in permanent changes which may be undesirable," 48 FED.REG. 41317 (1983), only goes to how good a job of reclamation and restoration the operator may carry out. The Secretary's willingness to consider whether even after reclamation other important values would still be damaged, is a far cry from the congressional intent to give *priority* to non-mining uses of national forests:

> Since mining has traditionally been accorded primary consideration as a land use there have been instances in which the potential for other equally or more desirable land uses has been destroyed. The provisions discussed in this section [522] were specifically designed and incorporated in the bill in order to restore more balance to Federal land use decisions regarding mining.

S.REP. No. 128 at 55.

Congress did not write a statute that required the Secretary to make sure that in the *long-term* the national forests be available for some use other than mining. Section 522(e)(2) of the SMCRA specifically declared national forests to be off limits to stripminers, except insofar as the Secretary could determine that the *preferred* uses of those lands were not interfered with by the mining operations. By saying that lands in national forests may be taken over for mining and occupied for the forty to fifty years that a coal mining and reclamation operation may take, without any consideration

---

**91.** *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); *SMRL,* 627 F.2d at 1362.

**92.** The Secretary has stressed language in its definition of values incompatible with surface coal mining that refers to contemporaneous use

of the land: "values to be evaluated for their significance which could be damaged beyond an operator's ability to repair or restore by, *and are not capable of existing together with,* surface coal mining operations." 30 C.F.R. § 761.5 (emphasis added).

whatsoever of damage to "significant recreational, timber, economic, or other values" during that time, the Secretary violates the clear mandate of the SMCRA. Accordingly, the district court's remand order is affirmed.

### 3. Replacement of Damaged Water Supplies by Operators of Underground Mines.

■■■ The Act requires that, under certain circumstances, mine operators replace any water supplies that they damage.

> The operator of a surface coal mine shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where such supply has been affected by contamination, diminution, or interruption proximately resulting from such surface coal mine operation.

SMCRA § 717(b). In 1979 Secretary Andrus promulgated regulations requiring operators of all mines, surface and underground, to replace damaged water supplies. 44 FED.REG. 15430 (1979). On review of a challenge by Industry, the district court struck down those regulations as exceeding statutory authority, because § 717(b) only mentions operators of *surface* coal mines, and no other provisions of the Act authorized the Secretary to compel replacement of water damaged by *underground* operators. *PSMRL I (Round II)*, 19 E.R.C. at 1495. In 1983 Secretary Watt promulgated new regulations that did not require underground mine operators to replace damaged water supplies. NWF challenged these regulations, arguing both that the terms of § 717(b) require underground operators to replace damaged water supplies, and that a similar replacement requirement can be inferred from the permitting requirements of § 508(a)(13) of the Act.[93] The district court upheld the 1983 regulation, reaffirming its earlier pronouncement that sec. 717(b) does not apply to underground mines and consistent with that interpretation, refusing to

read any water replacement requirement for underground mines into the permitting requirements of § 508(a)(13). *PSMRL II (Round III)*, 620 F.Supp. at 1533.

#### a. The Unplain Meaning of Section 717(b)

The issue of whether underground mine operators are covered by the water damage provision arises because of the confusing terminology used by the drafters of the SMCRA. In some places in the statute, the phrase "surface coal mining operation" is used, *e.g.*, §§ 502(a)–(c), (e), (f), which the Act defines as:

> (A) activities conducted on the surface of lands in connection with a *surface coal mine* or subject to the requirements of section 516 surface operations and surface impacts incident to an *underground coal mine....*

SMCRA § 701(28) (emphasis added). In other portions of the Act, reference is made to "operators of surface coal mines," § 502(d); § 717(b), or to a "surface coal mine operation," § 717(b). These terms are not specifically defined. NWF suggests that the various terms are used more or less interchangeably. Industry and the Secretary, on the other hand, assert that the different phrases consciously distinguish between provisions applicable to both surface mines and underground mines with surface effects ("surface coal mining operations"), and those applicable only to surface mines ("surface coal mine operation" or "operators of surface coal mines").

The Act clearly contemplates, at least for some purposes, that surface coal mines will be treated differently from underground coal mines, even though the latter have some surface effects. *See e.g.*, SMCRA § 516(d) (accommodating "distinct differences between surface and underground coal mining"). The most natural reading of the statute as a whole, and the definition in § 701(28) in particular, then suggests that "surface coal mining operations" encompasses both surface coal mines and the surface effects of underground coal mines; but that the term "surface coal mines," by

---

**93.** *See infra* pp. 755–56.

contrast, does not include underground operations or their surface effects.[94]

The history of the SMCRA confirms that Congress consciously distinguished between requirements applicable to surface mines and underground mines, and that water replacement was not specifically required by statute for operators of underground mines. Senate bill S.7 included a water replacement requirement in § 415(b)(10)(E), a provision detailing the performance standards applicable to surface mines. The parallel provision for underground mines, § 416(b)(9), omitted the water replacement requirement. *See* S.REP. No. 128 at 25, 29. The Senate report demonstrates that § 416 represented the Senate committee's judgment of which § 415 surface mining requirements should also apply to underground mines.

> *Certain* of the environmental protection standards for surface mining operations also apply to underground mines. In this section [416], the Secretary is required to incorporate in his regulations the *following key provisions* concerning the control of surface effects from underground mining.

S.REP. No. 128 and 84 (emphasis added).[95] House bill H.R. 2 served as the main basis for the Conference Committee's final draft of the SMCRA. That bill contained the water replacement requirement in § 717(b) in the form it exists today. The Conference Committee adopted the House language asserting there were "no significant differences" between the House and Sen-

ate versions with respect to § 717. H.R. CONF.REP. No. 493, 95th Cong., 1st Sess. 115 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 746.

We conclude from the text as well as the legislative history of the water replacement provision, and from other provisions distinguishing between surface and underground mining, that Congress explicitly recognized the difference between surface and underground mines; that it deliberately chose to apply some environmental safeguards to one and not the other; and that water replacement is a provision it explicitly required only of surface mine operators. The Secretary's implementing regulations were reasonable and consistent with that legislative intent.

### b. The "Puzzling Contradiction" of Section 508(a)(13)'s Permitting Requirements

NWF raised another challenge to the Secretary's new regulation, arguing that § 508(a)(13) independently requires underground mine operators to replace damaged water supplies. That section, describing the information that must be included in the reclamation plan accompanying a permit application, requires, "in the degree of detail necessary to demonstrate that reclamation required by the State or Federal program can be accomplished":

> a detailed description of the measures to be taken during the mining and reclamation process to assure the protection of:

---

**94.** There is one glitch in the textual interpretation described above: in one provision generally acknowledged to apply to both surface and underground mines, the SMCRA refers only to "operators of surface coal mines." Section 502 describes general permitting requirements. Sections 502(a)–(c), (e) impose requirements on "surface coal mining operations"; section 502(d) speaks only of "operators of surface coal mines." Industry terms this an "inadvertent mistake" and a "drafting error." This "inconsistency," albeit in a different part of the statute, suggests we need to look to the legislative history for clarification.

**95.** NWF argues that § 416(b)(11) of S. 7 *did* make the water replacement requirement applicable to underground mines. We disagree. That section required operators, "with respect to other surface impacts not specified in this sub-

section ... [to] operate in accordance with the standards established in section 415." But water damage was a surface impact already specified in § 416(b) and thus not subject to the catchall provisions of § 416(b)(11). *See* § 416(b)(9) (addressing "disturbances of the prevailing hydrologic balance at the mine site and in associated offsits areas and to the quantity of water in surface ground water systems"). Section 416(b)(9) deals with essentially the same concerns as § 415(b)(10), the surface mining performance standard that contains the water replacement provision, but omits that specific requirement. NWF's reading of the catchall provision of § 416(b)(11) ignores the choices made throughout § 416 of which surface mine provisions to make applicable to underground mines.

(A) the quality of surface and ground water systems, both on- and off-site, from adverse effects of the mining and reclamation process;

(B) the rights of present users to such water; and

(C) the quantity of surface and ground water systems, both on- and off-site, from adverse effects of the mining and reclamation process or to provide alternative sources of water where such protection of quantity cannot be assured.

SMCRA § 508(a)(13). NWF argued, and the district court agreed, that the permit information requirements of § 508 apply to underground mines. The court rejected NWF's further argument, however, that § 508(a)(13)(C) should be read to require underground mine operators to replace damaged water supplies. Admitting that the language of that section could pose a "puzzling contradiction" to § 717(b)'s provisions requiring only surface mine operators to replace damaged water, the court read § 508 merely "to require a description of steps to be taken to implement actual performance standards in the Act." *PSMRL II (Round III)*, 620 F.Supp. at 1533. We affirm.

Section 508 is essentially an information-gathering provision. It seeks to ensure that regulatory authorities have sufficient information on hand when they evaluate permit applications. Although the House report described the reclamation plan required by § 508 as a "blueprint for action," H.R.REP. No. 218, 95th Cong., 1st Sess. 91 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 628, it never suggested that § 508 independently imposed substantive performance standards. Rather, the House report identified the lack of sufficient data during the review process as the evil that § 508 was designed to address:

Experience has shown that without a thorough and comprehensive data base presented with the permit application, and absent analysis and review both by

the agency and other interested parties based upon adequate data.... environmental factors tend to receive short shrift. *To meet this problem the bill delineates in detail the type of information required in permit applications in section 507 and 508* and the criteria·for assessing the merits of the application in section 510.

*Id.* (emphasis added). The Conference Committee report similarly referred to the final version of § 508 as "specif[ying] that a wide range of information and analysis be included" in the reclamation plan. H.R. CONF.REP. No. 493, 95th Cong., 1st Sess. 103 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 734–35. We can find no support for the claim that an independent performance requirement was implied by § 508.

A more credible claim could be made that § 508(a)(13)(C), by requiring both surface and underground mine operators to provide a description of their plans to provide alternate sources of water where protection of the water supply cannot be assured, *authorizes* the Secretary to do something with that information, *i.e.*, to require underground mine operators to replace damaged water supplies, or to allow state regulatory authorities to require from underground mine operators, as a permit condition, commitments to replace damaged water supplies. But even under that interpretation, the Secretary would not be *compelled* to impose a water replacement requirement on underground mine operators, since SMCRA clearly affords the Secretary wide discretion in the application of permit requirements to underground mines. Section 516(d) directs the Secretary to accommodate the distinct difference between "surface and underground coal mining," through modifications to permit and bond requirements otherwise applicable to both types of mines. In fact, Secretary Watt relied on that discretion to exempt underground mine operators from the information requirements of § 508(a)(13)(C).[96]

---

**96.** Secretary Watt, in issuing the 1983 regulations, declared that 30 C.F.R. § 780.21(e), which implements the information requirement

§ 508(a)(13)(C), does not apply to underground mine operators. He interpreted § 508(a)(13)(C) as a permitting standard that implements

#### 4. Exemption from Water Replacement Requirements for Holders of Senior Water Rights

 This issue involves the meaning of § 717(a) of the SMCRA, which provides that:

Nothing in this Act shall be construed as affecting in any way the right of any person to enforce or protect, under applicable law, his interest in water resources affected by a surface coal mining operation.

The interpretation of this provision is required by a challenge to a regulation promulgated to implement § 717(b), quoted *supra*. The Secretary's regulation essentially mirrored the statutory language. *See* 30 C.F.R. § 816.41(h). Industry challenged that regulation, arguing that § 717(a) exempted mine operators who had senior water rights from the § 717(b) water replacement requirements and that the regulation failed to reflect this limitation. During the course of litigation before the district court, the Secretary rejected this argument, but reinterpreted his regulation to exempt the *legitimately exercised* senior water rights of miners.

The Secretary agrees that sec. 717(a) requires deference to state water law on questions of water use, and thus interprets sec. 717(b) and the rule at issue as *not* requiring the replacement of water supplies *to the extent a surface coal mine operator consumes or legitimately uses* the water supply under a senior

§ 717(b), and since that section had been held not to apply to underground mines, the information-gathering provision provides no independent basis for the water replacement requirement. 48 Fed.Reg. 43970 (1983). The Secretary's interpretation of the relationship between these performance and permitting provisions is reasonable.

97. Congress' explicit statement of non-interference with state water law is consistent with its prior pattern of legislation in related matters.
 The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress.

water right determined under applicable State law.

*PSMRL II (Round III)*, 620 F.Supp. at 1525 (quoting Secretary's Response, at 6) (emphasis added). Industry accepted that interpretation and withdrew its challenge to the regulation. NWF, as intervenor, then challenged the new interpretation, arguing that § 717(a) did not apply to mine operators at all and thus that there ought to be no exemption for miner's senior water rights, whether or not legitimately exercised. NWF asserted that § 717(a) is a savings provision that allows afflicted water users to retain whatever remedies state law affords them against anyone who damages their water supplies—including mine operators—in addition to the water replacement remedy created by § 717(b) of the SMCRA. The district court rejected this challenge and upheld the regulation as interpreted by the Secretary. *PSMRL II (Round III)*, 620 F.Supp. at 1525.

NWF's characterization of § 717(a) as a "savings provision" is accurate; but it errs in identifying what and whose rights are being saved. It is clear from the legislative history that the "applicable" laws referred to are state laws. H.R.Rep. No. 218, 95th Cong., 1st Sess. 181 (1977), *reprinted in* U.S.Code Cong. & Admin.News 593, 712.[97] And state water laws confer rights and responsibilities on both senior and junior water users.[98] Nothing in the Act nor in the legislative history supports the proposition that only the rights of *junior* water users are saved by § 717(a).[99]

*California v. United States*, 438 U.S. 645, 653, 98 S.Ct. 2985, 2990, 57 L.Ed.2d 1018 (1978). *See also Sporhase v. Nebraska*, 458 U.S. 941, 959, 102 S.Ct. 3456, 3465–66, 73 L.Ed.2d 1254 (1982) (noting that "37 statutes ... demonstrate Congress' deference to state water law.").

98. State water law, whether following a prior appropriate water rights sytem, or a riparian system, defines the rights of water users with conflicting claims to the same water supply. It is not relevant to this analysis which system a particular state follows; § 717(a) merely preserves for each party whatever rights state law allows.

99. When law addresses competing claims to a limited depletable resource, rights conferred on one party operate to limit those of other parties. For example, if the water law of a state were to

We can find no indication in the legislative history that mine operators were meant to be excluded from the operation of § 717(a), or that Congress, when it said "any person" meant "any person except the operator of a surface coal mine." The most reasonable interpretation of the statutory language is that whatever water rights state law afford mine operators are preserved along with those of other users. Under such a reading, § 717(b) creates an additional remedy against illegitimate water uses, but does not deprive anyone, including mine operators, of whatever rights to the use of water they had previously. The savings provision by its terms applies to "any persons." Congress could have easily excluded mine operators had it so intended. Moreover, throughout the SMCRA, Congress expressed a concern for preserving existing property rights, and for not interfering with state determination of those rights. The district court's decision upholding the regulation is affirmed.

### 5. Cumulative Hydrologic Assessment —What is "Anticipated Mining"?

██ In order to promote better planning, Congress required regulatory agencies to consider all "anticipated mining" within a given area each time a permit was to be issued. SMCRA § 510(b)(3); H.R. REP. No. 218, 95th Cong., 1st Sess. 113 (1977), reprinted in U.S.CODE CONG. & ADMIN.NEWS 593, 646. That way regulators could require the operators to implement hydrologic safeguards now, to make allowances for mining expected in the future. The planning requirement was implemented by requiring permit applications to include

a determination of the probable hydrologic consequences of the mining and reclamation operations, both on and off the mine site, with respect to the hydrologic regime, quantity and quality of water in surface and ground water systems including the dissolved and suspended solids under seasonal flow conditions and the collection of sufficient data for the mine site and surrounding areas so that an assessment can be made by the regulatory authority of the probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area and particularly upon water availability.

SMCRA § 507(b)(11). No permit can be approved unless "the assessment of the probable cumulative impact of all anticipated mining in the area on the hydrologic balance specified in § 507(b) has been made by the regulatory authority and the proposed operation thereof has been designed to prevent material damage to hydrologic balance outside the permit area." SMCRA § 510(b)(3).

Secretary Watt promulgated regulations defining "anticipated mining" to mean:

at a minimum, the entire projected lives through bond releases of: (a) the proposed operation, (b) all existing operations, (c) any operation for which a permit application has been submitted to the regulatory authority, and (d) all operations required to meet diligent development requirements for leased Federal coal for which there is actual mine development information available.

30 C.F.R. § 701.5. NWF challenged parts (c) and (d) of the definition, arguing that they impermissibly limited the scope of the cumulative hydrologic assessment by restricting the inquiry to those mines for which data was available.[100] Specifically,

---

grant junior water users the right to some level of water consumption for some purpose, it would concurrently limit the rights of the senior user to that water source. Similarly, the rights of senior water users often limit those of others who wish to partake from the same water supply. NWF's reading of the Act, by implying a water replacement not subject to the allocation of water rights under state law, would necessarily change state water law: if a junior water user may insist that a senior water user replace a water supply, regardless of whether state law allowed the senior use to consume that water,

the senior user has lost some state law water rights.

**100.** NWF's challenge to parts (c) and (d) of the Secretary's definition identifies two categories of arguably anticipated mines that are excluded from consideration. First, it alleges that the part (c) requirement that a permit have been submitted excludes mines for which substantial financial commitments have been made and extensive environmental monitoring has been carried out; these mines, NWF argues, are anticipated in the ordinary sense of the word.

NWF alleged·that such a limitation contradicted the provisos of § 507(b)(11) that no permits issue until hydrologic information is available and incorporated into the application:

> [The cumulative hydrologic impact] determination shall not be required until such time as hydrologic information on the general area prior to mining is made available from an appropriate Federal or State agency: *Provided further,* That the permit shall not be approved until such information is available and is incorporated into the application.

SMCRA § 507(b)(11). The district court deferred to the Secretary's expertise on technical matters, finding that the narrow definition of "anticipated mining" represented a thoughtful response to concerns raised in the administrative record. *PSMRL II (Round III),* 620 F.Supp. at 1532.

As part of the permitting process, Congress required that the cumulative hydrologic effect of current and anticipated mining be taken into account. SMCRA § 510(b)(3). The goal of such a requirement is more rational planning at earlier stages.

> Current experience ... clearly shows that where operators have carried out adequate planning and engineering, they have been able to identify ways of limiting environmental impacts to the mine site.

S.REP. No. 128 at 113. If regulatory authorities, in deciding whether to grant a permit and what kind of hydrologic safeguards to require, were only to consider existing mines and the specific operation being applied for, a less than optimal allocation of permits would result. Those who applied for permits later might have to be turned down, because earlier mines were not required to incorporate hydrologic safeguards that would have made it possible to allow more coal to be mined from that area. Alternatively, hydrologic protection standards would have to be lowered to allow more mines to operate in a given area, damaging the environment. Both options would be predictable, yet undesirable, consequences of regulatory shortsightedness.

The Secretary's decision to exclude from the definition of anticipated mining lands for which some steps may have been taken toward eventual mining, but in which no permit had yet been applied for, constitutes quintessential line-drawing. At some point between the time that a potential mine site is merely a gleam in an operator's eyes and the time when commercial coal is finally extracted from the mine, that site must be considered "anticipated mining." But precisely where that line should be drawn requires expert administrative judgment about the way in which hydrologic assessments may be carried out. The Secretary, after review of comments submitted in response to a broader proposed definition, issued the final rule quoted above, and explained that he wanted to avoid the difficulty of requiring data about hypothetical mines which might render the regulator's assessments speculative and meaningless. 48 FED.REG. 43958–59 (1983).

Similarly, the Secretary determined that it is highly speculative whether lands under federal coal leases, even those subject to diligent development requirements, will ever actually be mined. There is no legal requirement that lessees mine the land; the only consequence of not mining within the ten-year due diligence period is termination of the lease, 43 C.F.R. § 3483.2(a). Thus, the decision whether to mine in each case will be made by the leaseholder primarily in response to market conditions. The Secretary's regulation attempts to impose some limit on free-ranging speculation about which federal lands may or may not be mined, by defining as "anticipated mining" only those federal coal lands for which there is actual mine development information available.

---

Second, NWF asserts that part (d)'s requirement that mine development data be available before lands under federal coal leases constitute "anticipated mining" excludes lands subject to a due diligence requirement to develop within ten years or forfeit the lease. Given that the leases have been signed, and will be lost if not developed, NWF argues that such mining should be held to be anticipated, without regard for whether particular data is available.

Essentially, the Secretary's decision represents a basic policy trade-off between holding up or denying *current* mining permit applications until additional data about possible future mining in the area is generated, and risking the possibility that *future* mining in that same area may be delayed or precluded because the full extent of mining activity was not fully anticipated and proper hydrologic safeguards were not required.[101] Absent the expression of clear Congressional intent to the contrary, there is no basis for judicial second-guessing. *See State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867 (1983).

### 6. *Elimination of Underwater Highwalls.*

 Highwalls are vertical walls of exposed overburden and coal that remain after an excavation. Congress expressed great concern about these dangerous and unsightly by-products of stripmining [102] and flatly declared that "all surface coal mining operations" must "backfill, compact ..., and grade in order to restore the approximate original contour [AOC] of the land with all highwalls, spoils piles, and depressions eliminated." SMCRA § 515(b)(3). Even where Congress allowed exceptions to the general AOC restoration requirement, it still explicitly required the elimina-

tion of highwalls. *See* SMCRA §§ 515(c), (e).[103]

The Secretary nonetheless promulgated regulations that permitted vertical highwalls to remain in permanent water impoundments (where such impoundments were provided for in the mining permit), so long as "[t]he vertical portion of any remaining highwall shall be located far enough below the low-water line along the full extent of the highwall to provide adequate safety and access for the proposed water users." 30 C.F.R. § 816.49(a)(9).[104] NWF challenged these regulations on the basis of the prohibition of "all highwalls" under sec. 515(b)(3). The district court struck down the regulation as unlawful, concluding that explicit language requiring the elimination of highwalls elsewhere in the Act, and its legislative history, strongly counseled against inferring an exception to that requirement in the case of water impoundments. *PSMRL II (Round III),* 620 F.Supp. at 1571-72.

The Secretary argued that the SMCRA explicitly makes water impoundment subject to the grading requirements of § 515(b)(3). Although the Act assuredly requires that operators restore mined land to its AOC, including the elimination of highwalls, AOC itself is defined as follows:

101. The Secretary has stated that future mining that would be inconsistent with proper environmental protection because it had not been adequately anticipated would be prohibited; environmental protection standards would not be lowered.

If any material damage would result to the hydrologic balance from the cumulative impacts of a newly proposed operation and any previously permitted operation, the new operation *could not be permitted.*
48 Fed.Reg. 43957 (1983) (emphasis added).

102. For example, the Senate Report accompanying S. 7 took note of the highwall problem in the Eastern United States:

Unstable highwalls are a hazard to life and property. Highwalls that crumble and erode from weathering ruin drainage patterns and significantly add to water pollution. Material falling off the highwall can retard surface water flow.
S.Rep. No. 128 at 51.

103. Section 515(c)(2) provides that under limited circumstances permits may be granted "with-

out regard to the requirement to restore to approximate original contour," but only "where the mining operation will remove an entire coal seam or seams running through the upper fraction of a mountain, ridge, or hill ... by removing all of the overburden and creating a level plateau or a gently rolling contour *with no highwalls remaining,* and capable of supporting postmining uses in accord with the requirements of this subsection." (emphasis added).

Section 515(e)(1) extends to regulatory authorities power to grant variances in certain cases, but only "provided that the watershed control of the area is improved; and further provided complete backfilling with spoil material shall be required *to cover completely the highwall* which material will maintain stability following mining and reclamation." (emphasis added).

104. An identical regulation, 30 C.F.R. § 817.49(a)(9), applies to water impoundments incidental to underground mining activities.

"approximate original contour" means that surface configuration achieved by backfilling and grading of the mined area so that the reclaimed area, including any terracing or access roads, closely resembles the general surface configuration of the land prior to mining and blends into and complements the drainage pattern of the surrounding terrain, with all highwalls and spoil piles eliminated; *water impoundments may be permitted where the regulatory authority determines that they are in accordance with section 515(b)(8) of this Act.*

SMCRA § 701(2) (emphasis added). Thus permanent water impoundments could reasonably be seen as subject not to the general grading requirements of § 515(b)(3), but to the particular ones of § 515(b)(8).

The district court did not dispute the Secretary's contention that water impoundments constitute a third specific variance from AOC requirements (in addition to those found in § 515(c), (e)). However, because the other two AOC waivers in the Act explicitly mandate the elimination of highwalls, and because the section of the Conference Report dealing with the AOC variance applicable to steep slope mining emphasized Congress' concerns about highwalls, the district court concluded that Congress meant the highwall elimination requirement to apply to water impoundments as well.

The Act, however, on its face, does not support the district court's interpretation. Unlike the other two AOC variances, the water impoundment grading requirements do not include a highwall elimination requirement. Instead, an operator wishing to create a permanent water impoundment must show, among other things, that "final grading will provide safety and access for proposed water users." SMCRA § 515(b)(8)(E).

NWF argues, and the district court held, that the ubiquitous requirement that highwalls be eliminated should be read into a provision where it was left out. Industry and the Secretary argue the contrary, that Congress included the requirement precisely in those provisions where it meant to do so.[105] Congress in this case has not stated that highwalls completely submerged in an authorized impoundment must be removed. The Secretary in turn has considered the policies in favor of the general highwall elimination requirement and concluded that they do not necessitate removing those highwalls in every water impoundment case. This is the type of judgment we would expect Congress to leave to the agency given the task of implementing and enforcing their complex regulatory scheme. The district court should have given greater deference to the Secretary's interpretation of the statute. *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781 (1984). We reverse the district court judgment and reinstate the regulations.

### 7. *Temporary (but Long–Term) Storage of Top Soil.*

Coal mining involves removing large volumes of top soil from the mine site; if the site is to be effectively reclaimed later, that topsoil must be stored in some fashion that will not destroy its productive properties. Congress took care to require that operators

> remove the topsoil from the land in a separate layer, replace it on the backfill area, or if not utilized immediately, segregate it in a separate pile from other spoil and when the topsoil is not replaced on a backfill area within a time short enough to avoid deterioration of the topsoil, maintain a successful cover by quick growing plant or other means thereafter so that the topsoil is preserved from wind and water erosion, remains free of any contamination by other acid or toxic material, and is in a usable condition for sustaining vegetation when restored during reclamation.

SMCRA § 515(b)(5). In 1983, the Secretary promulgated regulations permitting the

---

**105.** " 'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (citations omitted).

use of host soils—undisturbed lands within a permit area—for the long-term storage of topsoil. The regulations, challenged by NWF as inadequately supported by technical data or analysis in the record or generally in agricultural science, provide an alternative to stockpiling topsoil under certain conditions:

> Where long-term surface disturbances will result from facilities such as support facilities and preparation plants and where stockpiling of materials removed under paragraph (a)(1) of this section would be detrimental to the quality or quantity of those materials, the regulatory authority may approve the temporary distribution of the soil materials so removed to an approved site within the permit area to enhance the current use of the site until needed for later reclamation, provided that—
>
> (i) Such action will not permanently diminish the capability of the topsoil of the host site; and
>
> (ii) The material will be retained in a condition more suitable for redistribution than if stockpiled.

30 C.F.R. §§ 816.22(c)(3), 817.22(c)(3).

NWF's challenge in the district court and again on appeal revolves around its claim that there is no evidence that such topsoil distribution will not damage either the topsoil, the host soil, or both. Therefore, it argues, a nationwide program of host soil storage should not have been undertaken; instead, an experimental pilot program should have implemented under § 711.[106]

The district court rejected NWF's challenge, finding that the Secretary had indeed relied on some technical studies establishing certain related, if not directly controlling, premises. *PSMRL (Round II)* 21 E.R.C. at 1747.

No one disputes that this is a highly technical issue. The Secretary, on the basis of studies of the relationship between soil depth and productivity, made a determination that under certain conditions, distribution of topsoil over a broad area was preferable to stockpiling, which is known to adversely affect soil productivity. The Secretary promulgated these regulations on the basis of technical reports, and comments on a proposed version which he ultimately modified. 48 Fed.Reg. 22096 (1983). There is no requirement in the SMCRA, or elsewhere, that the Secretary institute pilot programs prior to implementing regulatory schemes. Moreover, the challenged regulations do not mandate host soil storage, but merely make it available under limited circumstances. NWF's arguments that there are no studies actually proving that such a form of storage will not do any harm are unavailing. This is precisely the sort of issue on which a court should defer to agency expertise.[107] The judgment of the district court is affirmed.

### 8. *Authority to Grant Variance from AOC Requirements.*

The Act's general AOC requirements are set out in § 515(b)(3), which requires "all surface coal mining operations"

---

**106.** Section 711 of the Act provides:

In order to encourage advances in mining and reclamation practices or to allow post-mining land use for industrial, commercial, residential, or public use (including recreational facilities), the regulatory authority with approval by the Secretary may authorize departures in individual cases on an experimental basis from the environmental protection performance standards promulgated under sections 515 and 516 of this Act. Such departures may be authorized if (i) the experimental practices are potentially more or at least as environmentally protective, during and after mining operations, as those required by promulgated standards; (ii) the mining operations approved for particular land-use or other purposes are not larger or more numerous than

necessary to determine the effectiveness and economic feasibility of the experimental practices; and (iii) the experimental practices do not reduce the protection afforded public health and safety below that provided by promulgated standards.

**107.** The Supreme Court has noted that

a reviewing court must remember that the Commission is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.

*Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983).

to "backfill, compact ..., and grade in order to restore the approximate original contour of the land with all highwalls, spoil piles, and depressions eliminated." [108] Section 515(d)(2) adds specific AOC requirements applicable to "steep slope mining," (*i.e.*, slopes above twenty degrees): "Complete backfilling with spoil material shall be required to cover completely the highwall and return the site to the appropriate original contour, which material will maintain stability following mining and reclamation."

The Act also allows for variances from AOC requirements under certain circumstances. *See* section 6, *supra.* Section 515(c) describes conditions under which surface mining operations may be permitted "without regard to the requirement to restore to approximate original contour set forth in subsection 515(b)(3) or 515(d)(2) and (3)." SMCRA § 515(c)(2). Section 515(e) also provides for variances from some AOC requirements. The question before the court is whether the variance power er described in § 515(e) extends to all surface mining, or only to steep slope mining. That section provides:

(1) Each State program may and each Federal program shall include *procedures pursuant to which the regulatory authority may permit variances* for the purposes set forth in paragraph (3) of this subsection, provided that the watershed control of the area is improved; and further provided complete backfilling with spoil material shall be required to

cover completely the highwall which material will maintain stability following mining and reclamation.

(2) Where an applicant meets the requirements of paragraphs (3) and (4) of this subsection *a variance from the requirement* to restore to approximate original contour *set forth in subsection 515(d)(2)* of this section *may be granted* for the surface mining of coal where the owner of the surface knowingly requests in writing, as a part of the permit application that such a variance be granted so as to render the land, after reclamation, suitable for an industrial, commercial, residential, or public use (including recreational facilities) in accord with the further provisions of (3) and (4) of this subsection.

SMCRA § 515(e) (emphasis added).[109] Three competing views have been advanced about the meaning of this section: the Secretary's view is that § 515(e) establishes one variance that applies to mining on steep and non-steep slopes; Industry would be content with that reading, or alternatively suggests that § 515(e) establishes two variances, one general and one for steep slopes; NWF argued, and the district court agreed, that § 515(e) only establishes one variance, applicable solely to mining on steep slopes.

The district court concluded, as it had in 1980, that § 515(e)(1) did not actually grant a variance, *PSMRL II (Round II)* 620 F.Supp. at 1511–15 [110] and that the variance

---

**108.** "Approximate original contour" is defined in § 701(2), quoted at p. 759, *supra.*

**109.** The additional conditions on § 515(e) variances are:

(3)(A) After consultation with the appropriate land use planning agencies, if any, the potential use of the affected land is deemed to constitute an equal or better economic or public use;

(B) is designed and certified by a qualified registered professional engineer in conformance with professional standards established to assure the stability, drainage, and configuration necessary for the intended use of the site; and

(C) after approval of the appropriate state environmental agencies, the watershed of the affected land is deemed to be improved.

(4) In granting a variance pursuant to this subsection the regulatory authority shall require that only such amount of spoil will be placed off the mine bench as is necessary to achieve the planned post-mining land use, insure stability of the soil retained on the bench, meet all other requirements of this Act, and all spoil placement off the mine bench must comply with subsection 515(b)(22)

SMCRA § 515(e).

**110.** We find the district court's reasoning convincing, that the language and structure of §§ 515(e)(1), (2) are so different from each other, that if § 515(e)(2) creates a variance, it is not reasonable to read § 515(e)(1) as also doing so. Section 515(e)(1) speaks of "procedures pursuant to which" a regulatory authority could permit variances, while § 515(e)(2) specifies that a

granted in § 515(e)(2), *as enacted*, included only a reference to the steep slope AOC requirements of § 515(d)(2).[111] In trying to resolve the conflict among the three interpretations of § 515(e), the district court reviewed the legislative history of the variance provision, and found it to be ambiguous at best. *Id.* at 1574–77. It concluded that "the muddled legislative history does not provide sufficient clarity to permit the court to re-insert the provision deleted in conference," *Id.* at 1577, and remanded the regulation providing for more general variances. Industry appealed; the Secretary did not.

We too find it necessary to turn to the legislative history for illumination of what this curiously worded statutory provision was intended to accomplish. The variance provision was introduced as an amendment to S.7 by Senator Wendell Ford. He specifically noted that his amendment was meant to cover steep slope mining. 123 CONG.REC. 15233–34 (1977). Senator Jennings Randolph, who had independently planned to introduce a similar amendment, co-sponsored the Ford amendment and introduced into the record prepared remarks indicating that *his* amendment was meant to apply to non-steep mining as well. 123 CONG.REC. 15710 (1977). In Conference, a compromise resolving a controversy about whether to require complete elimination of highwalls even from those operators who had obtained AOC variances, led the Committee to turn to the Randolph amendment as a base from which to work; that amendment had been intended to apply to steep and non-steep mining, and explicitly referenced sec. 515(b)(3).

> "variance ... from the requirement ... set forth in sec. 515(d)(2) ... may be granted."

**111.** An earlier version of § 515(e)(2), had also included a reference to § 515(b)(3). *See* discussion of legislative history *infra.*

**112.** Before the district court, the Secretary noted that his revised view of the statute, promulgated in 1983, was prompted in particular by remarks of Representative Seiberling concerning the interpretation of § 515(e), made during oversight hearings on March 5, 1979. Secretary's Mem. in Support of Cross Motion for Summary Judgment, at 143 (Dec. 17, 1984),

The bill that emerged from Conference, however, *deleted the* reference to the general AOC requirements of § 515(b)(3). H.R.CONF.REP. NO. 493 at 55–56. No explanation for the deletion was offered, and the Conference Committee report discussed the AOC variance found in § 515(e) in the section of the report dealing with steep slope mining, rather than in the general standards section. *Id.* at 108–09. Senator Lee Metcalf, in reporting the text of the Conference Committee bill back to the Senate noted the concerns of landowners in "mountainous areas" that "steep slope performance standards" in the bill would preclude some beneficial land uses: "In recognition of this need, the conference report modifies the standards so as to allow retention of strip mine benches." 123 CONG.REC. 23609–10 (1977).

Since the passage of SMCRA, one Secretary of Interior has interpreted the statutory language to create only one variance, for steep slope mining, 44 FED.REG. 15312 (1979); another has promulgated regulations allowing both steep and non-steep slope mining operators to apply for and receive variances from AOC requirements,[112] and has, for reasons of his own, declined to join Industry's appeal from the district court's 1985 ruling remanding those regulations. *See* Supplemental Brief for the Secretary of the Interior as Appellant at 2.

Ultimately we rely on the text of § 515(e)(2) which specifically states that variances may be granted from the AOC requirements of § 515(d)(2), the steep slope mining provision; it does not, as enacted, state that non-steep slope mining AOC requirements may be waived or excused, and

reproduced as appendix to Supplemental Brief for the Secretary of the Interior as Appellant, at Tab 5. Rep. Seiberling, reportedly instrumental in shaping the Conference Committee compromise, stated that it was his "personal opinion" that the variance provision of § 515(e) applied to both steep and non-steep mining. H.R.Rep. No. 4, 96th Cong., 1st Sess. 47 (1979). Post-enactment interpretations of statutes by individual Congressmen, however, are entitled to little weight. *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960).

neither does it reference § 515(b)(3), the general AOC provision. A variance provision similar in structure, § 515(c), expressly allows for disregarding the AOC requirements of *both* § 515(b)(3) *and* 515(d)(2) under certain circumstances. *See* § 515(c)(2).[113] Although we might speculate about the reasons why the reference to § 515(b)(3) (which was once a part of the variance amendment), was deleted by the Conference Committee, that unexplained deletion alone does not persuade us to read into a statute a provision that is not there. As the Supreme Court has recently reminded us, if the statutory language appears to plainly settle the question before us, "we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses." *INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987) (citations omitted). There is just not enough there to change our minds about what the text of § 515(e) appears to say. The judgment of the district court is affirmed.

### 9. *Jurisdiction over Nonerosional Aspects of Air Quality.*

 One of the Act's performance standards aimed at environmental protection requires that all surface coal mining and reclamation operations "stabilize and protect all surface areas including spoil piles affected by the surface coal mining and reclamation operation to effectively control erosion and attendant air and water pollution." SMCRA § 515(b)(4). In 1979, Secretary Andrus interpreted this section to require operators to engage in pervasive control of air pollution from all their mining operations. He found that fugitive dust associated with surface mining activities constituted a public health and safety problem, and promulgated regulations requiring

mine operators to control air quality. 44 FED.REG. 15050 (1979). The district court struck down this regulation as unauthorized by the Act, and on remand, Secretary Watt repromulgated a regulation requiring operators to control only the impacts of mining on air quality due to erosion. 48 FED.REG. 1160 (1983).

NWF has challenged the new regulation, arguing that the Act requires the Secretary to regulate all air pollution attendant to surface mining operations. NWF stakes its claim on an alternate reading of § 515(b)(4), and on the legislative history of a similar provision in an earlier draft of the Act. The district court reaffirmed its prior reading of the Act, and upheld the regulations. *PSMRL II (Round I),* 21 E.R.C. at 1206–07. For the reasons stated below, we affirm the district court's decision.

NWF argues that the words "to effectively control" refer both to "erosion" and "pollution"; "attendant" then, would modify "air and water pollution" and not "erosion." Under their suggested reading, an operator is under two separate duties: to control erosion and to control the air and water pollution attendant to mining operations. But the very articulation of such an interpretation suggests how strained it is: if Congress had intended to regulate "the air and water pollution attendant to the surface mining operation," Brief for Appellants NWF at 38, it could easily have constructed the sentence that way. Instead, the statute was written to regulate "erosion and attendant air and water pollution." The Secretary's interpretation of the statutory language, that only pollution occasioned by erosion is regulated by this statute, is more reasonable than that propounded by NWF.

NWF also cites to the House Report accompanying a 1974 version of the Act, in which a provision quite similar to § 515(b)(4) was described as requiring operators to "stabilize and protect all surface areas including spoil piles to control air and water pollution." H.R.REP. No. 1072, 93d

---

**113.** As we noted earlier, *see supra* note 104, when Congress includes particular language in one section of a statute, but not in another, we assume that a distinction was intended. *Russello v. United States,* 104 S.Ct. at 300. Here, Congress has included the general AOC requirements within the § 515(c) variance, but not within the § 515(e) variance. We must respect that choice.

Cong., 2d Sess. 134 (1974). While that language may allow for NWF's interpretation, the 1974 bill was never enacted. The House Committee Report accompanying H.R. 2, the bill actually adopted, explained § 515(b)(4) by stating that "[s]tandards to assure the stability of spoil mass as well as to control surface erosion are prescribed for surplus soil from all types of mining operations." H.R.REP. No. 218, 95th Cong., 1st Sess. 174 (1977), *reprinted in,* 1977 U.S.CODE CONG. & ADMIN.NEWS 593, 705. General air pollution control was simply not discussed. Neither the plain meaning of the statute nor the legislative history of the Act indicate that Congress intended the Secretary to regulate all air pollution attendant to mining operations.

Congress did, however, clearly state that nothing in the SMCRA should be contrued as "superseding, amending, modifying, or repealing" various statutes, including the Clean Air Act, 42 U.S.C. § 1857, or regulations promulgated thereunder. SMCRA § 702(a)(4). We have previously interpreted this provision as limiting the Secretary, when otherwise exercising his lawful authority under the Act, to promulgate regulations that fill a "regulatory gap" in the coverage of another statute. *SMRL,* 627 F.2d at 1367. The Environmental Protection Agency has the authority under the Clean Air Act to regulate fugitive dust from coal mines, 42 U.S.C. § 7602(j); *Sierra Club v. Gorsuch,* 715 F.2d 653 (D.C.Cir. 1983), and is in the process of reconsidering whether to do so, 51 FED.REG. 7090 (1986). Under these circumstances we do not find the requisite gap or "absence of regulation," 627 F.2d at 1367, necessary to avoid the limitations imposed by § 702(a)(4).

Thus, we conclude that the Secretary's interpretation of § 515(b)(4) is reasonable and affirm the judgment of the district court.

10. *Use of Proximity as a Factor in Determining Jurisdiction over Support Facilities.*

 Section 701(28) defines "surface coal mining operations" for purposes of the Act as encompassing certain "activities," § 701(28)(A), and certain "areas" and "facilities," § 701(28)(B). It is the Secretary's interpretation of OSM's jurisdiction over support facilities that is at issue here. The Act refers to "areas upon which are sited structures, facilities, or other property or materials on the surface *resulting from or incident to such activities."* SMCRA § 701(28)(B) (emphasis added). The Secretary promulgated regulations interpreting § 701(28) that made geographic proximity to the mine site a factor in determining whether a particular facility is covered by the Act, concluding that "[r]esulting from or incident to an activity connotes an element of proximity to that activity." 30 C.F.R. § 701.5; 48 FED.REG. 20401 (1983).

NWF challenged the restriction arguing that the Act contemplates a functional rather than geographic limitation. The district court agreed and remanded the regulation, concluding that in other instances Congress has used "words of geography" such as "in situ," "at or near the mine site" or "adjacent," and its failure to do so here precluded the Secretary's interpretation. *PSMRL II (Round I),* 21 E.R.C. at 1202. Because the Secretary's reading led to a reduction in coverage of what was essentially a remedial statute, the district court declined to defer to the agency's construction. *See Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 278–79, 97 S.Ct. 2348, 2365, 53 L.Ed.2d 320 (1977).

The statutory language neither plainly precludes the consideration of distance from the mine site nor dictates a functional test. The legislative history of the Act appears to provide no guidance on the specific question before us. The Secretary's definition of support facilities does not impose a strict proximity test, but rather considers both function and distance to be relevant. "Function should be weighed against distance. Depending on the kind of facility, distances may vary." [114] While it would have been contrary to the lan-

---

114. Secretary's Memorandum in Support of Cross Motion for Summary Judgment, at 41

(Sept. 30, 1983), reproduced as applies to Sup-

guage and spirit of the Act to promulgate a per se distance rule cutting off coverage of coal mining support facilities otherwise subject to the Act *solely* because they were not adjacent to or nearby the mine site, (*e.g.,* no facilities more than one-half mile from a mine site shall be covered) it is not an irrational reading of the statute to conclude that distance may be "an element of proximity," 30 C.F.R. § 701.5, to be weighed along with other factors.

How to put into practice a "resulting from or incident to" test, without producing absurd results (*i.e.,* subjecting to SMCRA coverage the offices of mine executives or design engineers in another state and nowhere near the actual mine site) is something we should leave in the first instance to the officials entrusted to implement and enforce the Act's mandate. Thus, we reverse the judgment of the district court and reinstate the Secretary's regulation.

11. *Delegability of Secretary's Authority over Federal Land Mining Permits.*

■ SMCRA envisions substantial cooperation between state and federal regulators in order to protect the environment, while accommodating the diverse terrain, climate and other conditions throughout the various states. "Congress preferred to leave primary governmental responsibility with the states ... but skepticism about the states' willingness to implement the federal program justified the Secretary's continuing oversight role." *PSMRL I,* 653 F.2d at 520. Under this cooperative approach, state agencies are expected to regulate all non-federal lands within the state, unless they surrender their regulatory functions to the Secretary, who will then implement a federal program thereon. SMCRA § 504(a). Those states that do set up regulatory programs covering non-federal lands may enter into cooperative agreements with the Secretary to regulate coal mining on federal lands located within the state as well, provided they are found qualified to do so, and that certain specified

regulatory functions are retained by the Secretary. SMCRA § 523(c). At issue here is Secretary Watt's interpretation of one regulatory function deemed by Congress to be non-delegable.

Section 523(c) of the Act provides that [a]ny State with an approved State program may elect to enter into a cooperative agreement with the Secretary to provide for state regulation of surface coal mining and reclamation operation on Federal lands within the State.... Nothing in this section shall be construed as authorizing the Secretary to delegate to the States his duty to *approve mining plans on Federal lands,* to designate certain Federal lands as unsuitable for surface coal mining pursuant to section 522 of this Act, or to regulate other activities taking place on Federal lands.

SMCRA § 523(c) (emphasis added). Although the "mining plans" referred to above are not defined anywhere in the Act, all parties are in agreement that they refer to those required by the Mineral Lands Leasing Act (MLLA), as amended by the Federal Coal Leasing Amendments Act of 1976, Pub.L. No. 94–377, 30 U.S.C. § 202a(2). The MLLA requires that a mining plan include an operation and reclamation plan, 30 U.S.C. § 207(c), but does not explicitly define its contents.

In 1979, Secretary Andrus promulgated regulations that defined "mining plans" to include the SMCRA reclamation plan requirements; consequently, review of SMCRA permit applications for federal lands became non-delegable under § 523(c). 44 FED.REG. 14975–77 (1979). In 1983, however, Secretary Watt redefined mining plans to include only those requirements set out by MLLA regulations, taking the approval of SMCRA permits out from under the non-delegable prescription. NWF challenged the 1983 regulation and the district court sustained that challenge, thereby requiring a return to a "dual system of review" whereby the Secretary must review the SMCRA operation and reclamation plan as part of its non-delegable duty to review "mining plans," even if a state,

under a cooperative agreement, will then also review the operation and reclamation plan under its permitting process. *PSMRL II (Round I)*, 21 E.R.C. at 1141.

The district court reasoned that the SMCRA, coming on the heels of the MLLA amendments, must have meant to clarify the meaning of "reclamation plan" in the MLA's definition of mining plan: "once SMCRA became law, the gap in definition that previously existed was filled in emphatic terms." *Id.* at 1196. But this approach ignored the explicit requirements of the SMCRA, that "[n]othing in this Act shall be construed as superseding, amending, modifying, or repealing" the MLLA, as amended, or any rule or regulation promulgated under it. SMCRA § 702(a)(8). If the SMCRA cannot amend or modify the MLLA, it cannot define or redefine one of the operative terms of the earlier statute.

Nonetheless an issue of interpretation still remains. NWF argues, in defense of the district court judgment, that when Congress enacted the SMCRA it intended to make non-delegable the approval of MLLA plans *as defined by the applicable regulations then in place.*[115] Its argument is straightforward: in using the term "mining plan" in the SMCRA, Congress was utilizing familiar language with a very specific meaning, having only recently passed amendments to the MLLA. Congress meant a "mining plan" in SMCRA to include a substantive reclamation plan, as that term was understood in 1977 in the context of the MLLA. By decreeing that approval of such "mining plans" for federal lands be non-delegable by the Secretary, Congress intended to require the Secretary to review operators' reclamation plans.

Despite the intuitive appeal of drawing on contemporaneous interpretations of vague or ambiguous statutory terms, NWF's argument does not finally persuade. Any alleged similarity between the MLLA mining plan regulations in force in 1977 and the permitting requirements of §§ 507–508 of the SMCRA notwithstanding, nothing in the logic of NWF's reclamation plan compels the literal incorporation of SMCRA reclamation plan requirements into the term "mining plan" in § 523(c). Indeed the effect would be to reinstate the 1977 MLLA regulations, since rewritten, when it is clear that SMCRA may not revise MLLA regulations anymore than it could modify MLLA statutory terms. SMCRA § 702(a)(8). NWF's argument basically goes to the Secretary's action in taking the teeth out of MLLA requirements; unfortunately its challenge is directed at the wrong set of regulations.[116]

The legislative history of the Act also supports the view that Congress intended a cooperative system of regulation with a substantial role for the states, rather than a dual review process. The 1977 version of the Act, unlike earlier, vetoed bills, contemplated state regulation of federal coal lands under cooperative agreements. The Senate Committee Report clarified the intent of the Act's federal lands provision:

> The purpose of this provision is to alleviate a significant problem in Western mining. Where Federal and non-Federal lands are checkerboarded, mining operators could find themselves working under two separate permits—Federal and State. The cooperative agreement should allow the operator to conduct his operation *under a single regulatory system.*

S.REP. No. 128 at 95 (emphasis added). The Secretary's interpretation of the statute remains faithful to this expression of congressional intent: states may enter into cooperative agreements and take over the permit approval process for federal lands;

---

**115.** As of 1977, when the SMCRA was enacted, regulations promulgated under the MLLA describing the elements of a mining plan included many of the provisions now required by the permitting provisions of SMCRA §§ 507–508. *See* 30 C.F.R. § 211.10(c) (1977).

**116.** No one disputes that if MLLA regulations were to spell out detailed reclamation plan re-

quirements akin to those in SMCRA, the Secretary would have to review those submissions pursuant to § 523(c). But to argue that the less demanding MLLA regulations in place currently stand in contradiction to the Secretary's duties under SMCRA is to challenge the lawfulness or reasonableness of the MLLA regulations, not under review here.

under NWF's proposed reading, even if a state were approved by the Secretary to take over the permitting process for federal lands within the state, operators would still have to submit their applications to the Secretary as well as the state, for review of their operation and reclamation plans. The dual regulation that § 523(c) was designed to eliminate in the case of checkerboard lands would instead extend to all federal lands within any state that had a cooperative agreement.[117] Such a result seems clearly incorrect and unintended by Congress, and is by no means compelled by the language of the statute or the legislative history. The judgment of the district court is reversed, and the Secretary's regulations are reinstated.

### IV. CONCLUSION

The judgment of the district court is hereby affirmed with respect to NWF's standing and the following merits issues: prime farmland and pastureland issues (III–A), bonding for damage caused by subsidence (III–B–2), alluvial valley floors (III–C–1), contemporaneous reclamation (III–C–3–a), thick and thin overburden (III–C–3–b), damage caused by subsidence (III–D–1), jurisdiction over processing and support facilities (III–D–3), alluvial valley floors performance standards (III–D–4), substantial legal and financial commitment (III–D–5), continually-created valid existing rights (III–E–1), values incompatible with surface mining (III–E–2), replacement of damaged water supplies (III–E–3), replacement requirements for holders of senior water rights (III–E–4), anticipated mining (III–E–5), temporary storage of top soil (III–E–7), authority to grant variances from AOC requirements (III–E–8), and jurisdiction over air quality (III–E–9).

The judgment of the district court is hereby reversed with respect to incremen-

tal and phased bonding (III–B–1), mine waste disposal (III–C–2), terracing (III–C–3–c), elimination of underwater highwalls (III–E–6), jurisdiction over support facilities (III–E–10), and authority over federal land mining permits (III–E–11). Finally, we find the challenge to reshaping cut and fill slopes (III–D–2) moot.

*It is so ordered.*

---

**117.** The "checkerboard problem" arises when adjacent blocks of mining land are under alternating federal and state jurisdiction, requiring a miner whose operations extend across such boundaries to obtain permits from both authorities. Cooperative agreements were intended to eliminate this problem by allowing a state regulatory authority to issue permits covering the blocks of federal land, thus eliminating the need

for two different permits for one mine site. NWF's reading of the non-delegability provision of § 523(c), on the other hand, would mean that operators mining *any* federal land within a state, *even if their operation did not extend outside the federal boundaries,* would have to seek two different permits from two regulatory authorities, if that state had entered into a cooperative agreement.